**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SHEILA BEDI and LYNN COHN, | ) | |
| | ) | **Case No. 1:25-cv-3837** |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES HOUSE OF | ) | |
| REPRESENTATIVES COMMITTEE | ) | |
| ON EDUCATION AND | ) | |
| WORKFORCE, | ) | |
| | ) | |
| TIM WALBERG, Committee Chair, in his | ) | |
| official capacity, and | ) | |
| | ) | |
| BURGESS OWENS, Subcommittee Chair, | ) | |
| in his official capacity, | ) | |
| | ) | |
| *Defendants*, | ) | |
| | ) | |
| NORTHWESTERN UNIVERSITY, | ) | |
| | ) | |
| MICHAEL SCHILL, Northwestern | ) | |
| University President, in his official | ) | |
| capacity, and | ) | |
| | ) | |
| PETER BARRIS, Chair of Northwestern | ) | |
| University Board of Trustees, in his | ) | |
| official capacity, | ) | **DEMAND FOR INJUNCTIVE AND** |
| | ) | **DECLARATORY RELIEF** |
| *Nominal Defendants.* | ) | |

<u>**COMPLAINT**</u>

Plaintiffs SHEILA BEDI and LYNN COHN bring this Complaint and seek both an

Injunction and a Declaratory Judgment against Defendants the U.S. House of Representatives

Committee on Education and Workforce, U.S. House Member Tim Walberg, in his official

capacity as Committee Chair, U.S. House Member Burgess Owens, in his official capacity as

Subcommittee Chair (collectively the "Committee"), and against Nominal Defendants

1

Northwestern University, Michael Schill, in his official capacity as President of Northwestern University, and Peter Barris, in his official capacity as Chair of the Board of Trustees of Northwestern University. Plaintiffs allege as follows:

## INTRODUCTION

1.      Leveling threats to Northwestern's federal funding, and based on an investigative pretext, the Committee has demanded that Northwestern University's Pritzker School of Law and its Bluhm Legal Clinic produce information about how they teach their students, represent their clients, and fund their work. The effort is part of the federal government's ongoing attack on academic freedom, legal professionals, and the rule of law. The Committee's demands exceed its authority and have no valid legislative purpose; they are an attempt to investigate, intimidate, and punish institutions and individuals that the Committee has deemed "left-wing;" and they violate the federal Constitution. Immediate relief is necessary to prevent irreparable harm.

2.      Plaintiffs Sheila Bedi and Lynn Cohn are nationally recognized and award-winning lawyers, law professors and experts on prisons and policing, civil rights law, social and racial justice movements, policy advocacy, negotiation, and mediation and dispute resolution. Plaintiffs teach students and represent clients as faculty members at Northwestern University's Pritzker School of Law.

3.      The Committee has demanded that Northwestern turn over an extensive and invasive production of certain sensitive documents pertaining to Plaintiffs' academic and legal work, including documents about governance of their legal clinics, their donors and associates, their job performance, and their representation of their clients; and including attorney work product concerning their selection of legal matters and their strategy regarding the representation of their clients.

4.      The Committee's goal is to shut down speech and advocacy with which it disagrees. That much is obvious on the face of the Committee's demands, which accuse Plaintiffs and Northwestern Law School of engaging in "left-wing advocacy" and "left-wing political activism," and which target Plaintiffs based on the content of what they teach and the cases on which they work and the arguments they make in courts of law.

5.      The Committee purports to justify its broad, intrusive demands using the pretext that a small portion of Plaintiff Bedi's numerous clients engaged in "antisemitic conduct." But this is a pretext, and it is plain on the face of the Committee's demands that it is not trying to investigate antisemitism. Instead, it is illegally singling out viewpoints and causes that it disagrees with for punishment. Our Constitution forbids the government's attempt to punish Plaintiffs based on the clients or organizations they represent, the positions they advocate, the opinions they voice, and the people with whom they associate.

6.      The Committee's demands reflect broader efforts across the federal government to target institutions and individuals the government views with disfavor for reprisal. Intimidation tactics across the federal government constitute a profound threat to academic freedom and education, to scientific research and medicine, to the practice of law and the rule of law, as well as to businesses and our economy. Plaintiffs file this case seeking judicial relief from this dangerous conduct and to stand up for these core principles of American democracy.

7.      In this case, the Committee's demands violate Plaintiffs' rights protected by the First, Fifth, and Sixth Amendments to the U.S. Constitution. The Committee is acting beyond its lawful authority, and Northwestern University's compliance with the Committee's demands threaten irreparable harm to Plaintiffs.

8.     For the reasons discussed below, before 11:00 a.m. Central Time on April 10, 2025, this Court should enter temporary relief staying the Committee's demands and preventing Northwestern University from complying with those demands, so that the Court and parties can adjudicate the legality of Congress's action.

## JURISDICTION AND VENUE

9.     This Court has federal subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331.

10.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1391(e)(1)(B) and (C) both because "a substantial part of property that is the subject of the action is situated" in this judicial district and "a substantial part of the events giving rise to Plaintiffs' claims occurred" within this judicial district.

## PARTIES

11.     Sheila Bedi is an attorney and a Clinical Professor of Law at Northwestern University's Pritzker School of Law. She is the Director of the Community Justice and Civil Rights Clinic ("CJCR Clinic") which operates within the Bluhm Legal Clinic at Northwestern.

12.     Plaintiff Lynn Cohn is a Clinical Professor of Law at the Center on Negotiation Mediation, and Restorative Justice which operates within the Bluhm Legal Clinic at Northwestern Pritzker School of Law.

13.     The Committee on Education and Workforce (the "Committee") is a standing committee of the U.S. House of Representatives and consists of forty-five Congressional members. The Committee is located in Washington, DC.

14.     Tim Walberg is a House Member and Chair of the Committee. He is sued in his official capacity.

15.     Burgess Owens is a House Member and the Chair of the Committee's Subcommittee on Higher Education and Workforce Development. He is also sued in his official capacity.

16.     Northwestern University is an institution of higher education located in both Evanston and Chicago, Illinois.

17.     Michael Schill is the President of Northwestern University and is named in his official capacity.

18.     Peter Barris is the Chair of the Board of Trustees of Northwestern University and is named in his official capacity.

19.     Defendants Northwestern University, Schill, and Barris are named as nominal defendants in this lawsuit only because they received the Committee's demand letter, they are the object of the Committee's coercive threats to deprive Northwestern of federal funding,[1] they are in possession of records responsive to the Committee's demand, they have been demanded to provide a response to the Committee's demands by 11 a.m. Central Time on April 10, 2025, and they therefore must necessarily be named in order for the Court to grant meaningful injunctive or declaratory relief in this case.

## **FACTS**

### **Northwestern University Pritzker School of Law and the Bluhm Legal Clinic**

20.     Northwestern University is one of the world's foremost universities, home to ten graduate and professional schools, including the Pritzker School of Law.

---

[1]     On April 8, 2025, the Trump Administration froze $790 million in funding to Northwestern. *See* Michael C. Bender and Sheryl Gay Stolberg, *Trump Officials Freez $1 Billion for Cornell and $790 Million for Northwestern,* N.Y. TIMES (Apr. 8, 2025), available online at https://www.nytimes.com/2025/04/08/us/politics/cornell-northwestern-university-funds-trump.html (last visited April 9, 2025).

21.     Northwestern University's Pritzker School of Law ("the Law School") is in turn one of the United States's preeminent law schools and produces graduates that go on to serve honorably on the bench, lead their communities through involvement in local, state, and federal government, work in premier law firms, teach at respected law schools and universities, guide American businesses, and otherwise serve the public.

22.     Consistent with its broader public service mission, the Law School is also an important community institution, providing services and programming for the wider public, particularly for those who do not have resources to access private lawyers.

23.     One way that the Law School serves the public is by providing a variety of legal services through its in-house Bluhm Legal Clinic, a legal services organization that provides law students with opportunities to assist attorneys in representing, at no or low cost, a wide range of clients in a variety of different contexts. The Bluhm Legal Clinic is an integral part of the Law School educational mission, so much so that 90% of law students elect to participate in clinical education courses.[2]

24.     The Bluhm Legal Clinic is comprised of twenty different clinical programs and twelve different centers, led by twenty-eight current attorneys who, along with students, provide legal services to clients through Bluhm's programs, including representing *pro bono* clients in contexts including: 1) appellate advocacy; 2) juvenile justice; 3) tenants facing eviction, discrimination, and substandard living conditions; 4) clients facing unlawful detention in countries in violation of international human rights standards; 5) negotiation, mediation and restorative justice in a variety of contexts; 6) remedying wrongful convictions; 7) aiding small businesses, start-ups, nonprofit organizations, and entrepreneurs; 8) environmental advocacy; 9)

---

[2]     Bluhm Legal Clinic, *About the Clinic*, Northwestern Pritzker School of Law, https://www.law.northwestern.edu/legalclinic/about/ (last visited Apr. 9, 2025).

elder abuse; 10) complex civil litigation including securities litigation and whistleblower lawsuits; 11) securities mediation and arbitration; 12) challenging the criminalization of the poor, police misconduct, and discrimination; and 13) promoting the rights of LGBTQIA+ people.

25.     Bluhm's clinical programs provide legal services on a wide variety of issues to many people who would otherwise be unable to retain counsel. These services are made possible through the attorneys who practice in these clinics and their students.

**Plaintiff Sheila Bedi and the Community Justice and Civil Rights Clinic**

26.     Plaintiff Sheila Bedi is a Clinical Professor of Law at the Law School and the Director of the Community Justice and Civil Rights Clinic.

27.     Plaintiff Bedi earned a Bachelor of Arts from Michigan State University, a J.D. from American University Washington College of Law, and an L.L.M. from Georgetown University Law Center. She has spent her legal career working on civil rights issues and has been recognized by organizations like the American Constitutional Society (2024 Abner J. Mikva Award for extraordinary contributions to progressive legal cause), Clinical Legal Education Association (the 2022 Outstanding Advocate for Clinicians Award), the American Bar Association (the 2008 Journal Newsmaker of the Year and 2014 Fellow), and the NAACP (the 2007 Fannie Lou Hamer Award and the 2005 Vernon Dahmer Award), and was awarded an Excellence in Public Interest Award in 2017 by the United States District Court for the Northern District of Illinois for her clinical and public interest work.

28.     Plaintiff Bedi, as a leader in her field, has presented on her litigation and scholarly work at numerous law schools across the country and at conferences sponsored by the American Association of Law Schools and the American Bar Association. She has been invited to speak on panels organized by an array of student associations representing a broad spectrum of political

viewpoints, including the Federalist Society and the National Lawyers Guild. She has also published legal scholarship in various legal journals and other publications.

29.     She was appointed by Governor Pritzker in 2023 to serve as a commissioner on the Torture Inquiry and Relief Commission, authorized by statute to gather and assess evidence about claims of torture by the Chicago Police Department occurring in Cook County, and to determine whether "there is sufficient evidence of torture to merit judicial review." 775 ILCS 40/1, *et seq.*

30.     In 2012, Plaintiff Bedi joined the Bluhm Legal Clinic as an Associate Clinical Professor and attorney for the Roderick and Solange MacArthur Justice Center, working on civil rights issues related to individuals involved with the criminal and juvenile justice systems. She became the Director of the CJCR Clinic in 2020.

31.     The CJCR Clinic works to address mass imprisonment, police abuse, and to protect First Amendment rights through a combination of policy and litigation strategies.

32.     The CJCR Clinic works to achieve these goals in a variety of ways including representing litigants in civil rights lawsuits to redress constitutional harms such as: 1) representing a client who was wrongfully detained sixty times because of an administrative error that law enforcement was unwilling to correct; 2) representing the families of individuals killed in police custody; and 3) representing individuals who have been sexually and physically abused in the custody of the Illinois Department of Corrections. Plaintiff Bedi's clinic also works on the enforcement of a federal consent decree directing the Chicago Police Department to change its unconstitutional practices and routinely challenges other unconstitutional practices across the United States.

8

33.     Some of CJCR's practice includes defense representation of people arrested, accused of crimes, or convicted when that representation is connected to the CJCR Clinic's mission and goals of addressing systemic injustice or a particular harm suffered by those in the criminal legal system.

34.     In addition to this work, the CJCR Clinic also provides support to the broader community in various ways, such as by hosting the Prison Law and Advocacy Conference and helping to advise and support community organizers. Plaintiff Bedi has also participated in efforts to provide educational opportunities to incarcerated individuals.

35.     Plaintiff Bedi and her clinic have represented a number of vulnerable people and organizations related to groups that have been targeted by the Trump Administration.

36.     For example, Plaintiff Bedi has represented or currently represents: 1) transgender individuals who have been subject to discrimination and sexual abuse in the Illinois Department of Corrections, *see, e.g.*, *Higgins v. Kennedy*, No. 23-CV-50038, Dkt. 1 (Complaint); 2) incarcerated people who contracted COVID-19 because of Illinois Department of Corrections practices that failed to prevent the spread of COVID-19 among populations of vulnerable people, *McKinley v. Gomez*, No. 22-CV-5459, Dkt. 61 (Amended Complaint); and 3) a Chicago youth organization that conducts police oversight activities seeking a temporary restraining order to prevent a City of Chicago Ordinance from hampering its abilities to organize, *Good Kids/Mad City v. City of Chicago*, No. 22-CV-5907, Dkt. 1 (Complaint).

37.     Plaintiff Bedi and the CJCR Clinic also represented a group of Chicago organizations that are part of the Sanctuary City Movement, seeking a temporary restraining order to prevent the Trump Administration from beginning immigration raids in Chicago. *See*

*Organize Communities Against Deportation et al. v. Huffman, et al.*, No. 25-CV-868, Dkt. 1
(Complaint).

38.     Consistent with her work to address mass imprisonment, police abuse, and to
protect First Amendment rights, and consistent with the aims of the CJCR Clinic, Plaintiff Bedi
currently also represents, *pro bono*, protesters who participated in a peaceful pro-Palestinian
human rights protest in 2024 and were then sued in a frivolous lawsuit by a putative class
representative purporting to represent a class of people who were inconvenienced by the
protesters blocking the roadway leading to O'Hare Airport. *Manhart v. National Students for
Justice in Palestine*, No. 24-CV-8209 (Dkt. 33) (Amended Complaint).

39.     The *Manhart* plaintiff sued a variety of organizations and individuals, demanding
$36 million dollars as compensation for the putative class. *Manhart*, No. 24-CV-8209, Dkt. 3
(Civil Cover Sheet). The organizations and individuals targeted in *Manhart* have filed motions to
dismiss and motions for sanctions against the plaintiff, which remain pending. *Id.*, Dkts. 53, 63,
71, 73, 75-78, 80, 82.

40.     There are no legal claims relating to allegations of antisemitism at issue in
*Manhart* (the complaint alleges false imprisonment), and the purported speech that the
Committee quotes in its demand is not alleged to have occurred at the protest at issue in the case.

41.     As a result, the Committee's references to one of Plaintiff Bedi's client's
statements is an outright pretext. Put simply, the Committee here invokes the protection of
Jewish people as a fake justification to target institutions and individuals that the government
disagrees with.

**Plaintiff Lynn Cohn and the Center on Negotiation, Mediation, and Restorative Justice**

42.     Plaintiff Lynn Cohn is a Clinical Professor at the Center on Negotiation, Mediation and Restorative Justice (the "Center") which operates within the Bluhm Legal Clinic at the Law School.

43.     Plaintiff Cohn received a Bachelor of Arts from the University of Illinois and her J.D. from Northwestern.

44.     Plaintiff Cohn began working at the Law School in 1991 as an adjunct professor, and became a full-time faculty member in 1996, when she founded the Center and became its Director. The Center was incorporated into the Bluhm Legal Clinic in 2008. Plaintiff Cohn served as director of the Center for thirty years until earlier this year when Annalise Buth and Alyson Carrel became co-directors of the Center.

45.     Plaintiff Cohn has practiced as a mediator since 1998 and in 2013, Plaintiff began serving as a Special Master, designated by various federal district courts, to implement complex class action civil rights settlements. Her work with the Center includes teaching, serving as a professional mediator, training students to become mediators, and working on various restorative justice and alternative resolution initiatives.

46.     The Center has fourteen different course offerings, including a negotiation course, taught by Plaintiff Cohn and her colleagues. The negotiation course alone has 8-12 different sections. Hundreds of students are enrolled in the Center's courses in any given academic year. In 2024-25, about 300 students enrolled in classes with the Center, and the Center conducted around 60 mediations and 23 restorative justice circles. The Center has been repeatedly designated as a Top 10 Dispute Resolution Program by *U.S. News & World Report*.

47.     The Center provides students with theoretical and practical experiences in negotiation and mediation through a series of courses and workshops. Plaintiff Cohn and her

colleagues educate, train, and supervise students with respect to settlement negotiations, formal mediations, and restorative justice circles in a variety of settings.

48.     The Center works with a variety of parties, including individuals, organizations, businesses, government agencies, and the Illinois state court system, to resolve disputes through alternatives to litigation, focusing on non-adversarial and extra-judicial solutions. Many of the mediations concern community issues—employment, housing, contracts, small claims, and neighborhood disputes. Restorative justice circles provide a confidential space to address conflicts, build relationships, and repair harm. The participants for mediations and restorative justice circles come from a variety of backgrounds and perspectives.

49.     The Center works with individual and organizational partners whose information is private and confidential—the disclosure of which would violate their agreements with these partners and cause substantial harm. The Center maintains confidentiality over all aspects of mediations and circles the Center participates in.

50.     The Center provides countless pro bono hours and dispute resolution services to create access to legal services for those who would otherwise be unable to afford such services.

**The House Committee and Trump Administration's Intimidation of Universities**

51.     On March 10, 2025, the Department of Education Office for Civil Rights sent out letters to 60 universities advising them that they were under investigation under Title VI for purported violations relating to "antisemitic harassment and discrimination" and warning those universities that their federal funding was contingent on complying with President Trump's executive orders.[3]

---

[3]     Helen Coster and Julia Harte, *These Universities are in Trump's Crosshairs. Many Don't Know Why*, USA TODAY (Mar. 27, 2025), available online at https://www.usatoday.com/story/news/politics/2025/03/27/universities-targeted-by-trump-antisemitism-campus/82691187007/ (last visited Apr. 9, 2025).

**The Trump Administration's Targeting of Law Firms**

52.     The Trump Administration has targeted not only universities but also attorneys and law firms whose clients or professional connections it opposes.[4]

53.     In recent weeks, the Trump Administration has issued a set of Executive Orders, directed against law firms, designed to punish those law firms with whom the Trump Administration disagrees. This includes firms currently or previously connected to perceived opponents of President Donald Trump, such as Doug Emhoff, Hillary Clinton, former prosecutors involved in the Special Counsel's prosecution of President Trump, and others.

54.     On February 25, 2025, President Trump signed an executive order directed at Covington & Burling, LLP ("Covington"), on the asserted basis that Covington had provided legal advice to Jack Smith during his time as Special Counsel.[5] This Order revoked security clearances of Covington employees and directed the Attorney General and other government agencies to "take such actions as are necessary to terminate any engagement [of Covington] by any agency."

55.     On March 6, 2025, President Trump signed an executive order directed at Perkins Coie, LLP ("Perkins Coie"). This Order criticized Perkins Coie's choice of clients, including its representation of Hillary Clinton, its involvement in election law litigation, and its filing of "lawsuits against the Trump Administration."[6] The Order suspended security clearances of Perkins Coie's employees, barred Perkins Coie employees from federal buildings, directed

---

[4]     Daniel Barnes, *How Major Law Firms are Responding to Trump's Attacks*, POLITICO (Mar. 19, 2025), available online at https://www.politico.com/news/2025/03/19/trump-major-law-firm-sanctions-questions-00236446 (last visited Apr. 9, 2025).

[5]     "Suspension of Security Clearances and Evaluation of Government Contracts," The White House (Feb. 25, 2025), available online at https://www.whitehouse.gov/presidential-actions/2025/02/suspension-of-security-clearances-and-evaluation-of-government-contracts/ (last visited Apr. 8, 2025).

[6]     *Id.*

federal employees not to communicate with Perkins Coie employees, and directed entities with federal contracts to sever ties with Perkins Coie or lose their federal contracts.

56.     President Trump warned he would target other legal professionals while signing the Perkins Coie Executive Order.[7]

57.     Perkins Coie sued to enjoin the Order and a district court granted their motion for a temporary restraining order finding that the order constituted "viewpoint discrimination" to advance a "wholly personal vendetta." *Perkins Coie LLP v. U.S. Dep't of Justice*, No. 25-CV-716 (D.D.C. Mar. 12, 2025) (Dkt. No. 22 at 76-78, 101).

58.     A few days later, President Trump issued a similar order, this time targeting Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss").[8] Paul Weiss's purported wrongdoing was hiring attorneys that had formerly prosecuted President Trump, participating in *pro bono* litigation suing people who were alleged to have participated in the January 6th riots, and promoting diversity, equity, and inclusion efforts. Under this Order, Paul Weiss was subject to the same sanctions as Perkins Coie.

59.     On March 25, 2025, President Trump targeted Chicago-based law firm Jenner & Block LLP ("Jenner") with another Executive Order. This Order subjected Jenner employees to similar sanctions as the earlier law firms and referenced Jenner's prior association with Andrew Weissman who worked with Special Prosecutor Robert Mueller in seeking to prosecute President Trump. In this Order, however, President Trump also specifically asserted that action against Jenner was warranted because Jenner had engaged in "harmful activity" including "obvious

---

[7]     *See* ANI News, *Trump Revokes Security Clearances for Perkins Coie Over DEI Policies*, YouTube, at 1:20 (Mar. 6, 2025), available online at https://www.youtbue.comwatch?v=1Y6ougLkFsc.
[8]     "Addressing Risks from Paul Weiss," The White House (Mar. 14, 2025), available online at https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-paul-weiss/ (last visited Apr. 8, 2025).

partisan representations to achieve political ends," citing Jenner's representation of individuals seeking gender-affirming care and litigation related to the Trump Administration's unconstitutional immigration proceedings.[9]

60.     Jenner also represents Tides (an organization which fiscally sponsors a project focused on criminal justice), a defendant to the *Manhart* litigation in which Plaintiff Bedi also represents certain named defendants.

61.     On March 28, 2025, the District Court granted Jenner's motion for a temporary restraining order, barring enforcement of the Executive Order. *Jenner & Block, LLP v. U.S. Dept. of Justice*, No. 25-cv-916, Dkt. 9.

62.     President Trump also targeted Wilmer Cutler Pickering Hale & Dorr LLP ("WilmerHale"). WilmerHale filed a lawsuit and sought a temporary restraining order which was also granted in part. *Wilmer Cutler Pickering Hale and Dorr, LLP v. Exec. Office of the President, et al.*, No. 25-CV-917, Dkt. 10 (D.D.C. Mar. 25, 2025).

63.     Even though the Executive Orders represent a patently unconstitutional restriction on the independence of the legal profession, several law firms have reached "deals" with the Trump Administration to avoid additional retaliation by the Administration, while other firms have capitulated even before the issuance of any Order. In these so-called deals, the law firms

---

[9]     "Addressing Risks from Jenner & Block," The White House (Mar. 25, 2025), available online at https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-jenner-block/ (last visited Apr. 8, 2025).

agreed to provide hundreds of millions of dollars of free legal services to "mutually agreed-upon projects with the Trump administration."[10]

64.     President Trump has indicated that more sanctions against law firms may be coming.[11]

**The Trump Administration's Targeting and Punishment of Perceived Ideological Enemies**

65.     The Trump Administration and its Congressional allies have shown that they are not only willing to punish universities and law firms, but also that they will seek to punish, personally and professionally, people who purportedly espouse views with which they disagree.

66.     This has included revoking security clearances of former intelligence officers who commented on Hunter Biden's email scandal,[12] revoking the security details of political opponents,[13] barring certain press agencies from White House press briefings,[14] arresting and deporting students who were involved in pro-Palestinian human rights protests and those who expressed pro-Ukraine viewpoints,[15] and separating transgender service members from the military.[16]

---

[10]     Jack Queen, Trevor Hunnicutt, and David Thomas, *Doug Emhoff's Law Firm Willkie Farr & Gallagher Reaches Deal with Trump*, REUTERS (Apr. 3, 2025), available online at https://www.reuters.com/world/us/trump-says-he-reached-settlement-deal-with-law-firm-willkie-farr-gallagher-2025-04-01/ (last visited Apr. 9, 2025); Jack Queen and Luc Cohen, *Milbank Reaches Deal with Trump as Divide Among Law Firms Deepens*, REUTERS (Apr. 2, 2025), available online at https://www.reuters.com/world/us/trump-reaches-agreement-with-milbank-law-firm-2025-04-02/ (last visited Apr. 9, 2025); Melissa Quinn, *Trump's Crusade Against Big Law Firms Sparks Fears of Long-Lasting Damage*, CBS NEWS (Apr. 2, 2025), available online at https://www.cbsnews.com/news/trumps-big-law-firms-retribution/ (last visited Apr. 9, 2025); Chad de Guzman, *The Law Firms Trump Has Targeted, Why, and How They've Each Responded*, TIME (Apr. 1, 2025) available online at https://time.com/7272466/law-firms-trump-wilmerhale-jenner-block-paul-weiss-covington-burling/ (last visited Apr. 9, 2025) (Paul Weiss order was rescinded after an agreement to provide free legal services to "support causes" of the Trump Administration; Skadden, Arps, Slate, Meagher & Flom LLP reached an agreement with the Trump Administration before any order was filed to provide $100 million in *pro bono* legal services for Trump Administration initiatives).

[11]	Daniel Barnes, *How Major Law Firms are Responding to Trump's Attacks*, POLITICO (Mar. 19, 2025), available online at https://www.politico.com/news/2025/03/19/trump-major-law-firm-sanctions-questions-00236446 (last visited Apr. 9, 2025) (President Trump quoted as saying that he "ha[s] a lot of law firms that we're going to be going after.").

[12]	Dustin Volz, *Trump Order Revokes Security Clearances for 50 Former Officials*, WALL ST. J. (Jan. 20, 2025), available online at https://www.wsj.com/livecoverage/trump-inauguration-president-2025/card/trump-order- revokes-security-clearances-for-50-former-officials-8zTkfQqfuYY15yESmer4) (last visited Apr. 7, 2025).

[13]	Kaitlin Collins, *Trump Terminates John Bolton's Security Detail Within Hours of Taking Office*, CNN (Jan. 21, 2025), available online at https://www.cnn.com/2025/01/21/politics/john-bolton-security-detail-trump/index.html (last visited Apr. 7, 2025) (President Trump revokes Secret Service security detail for former intelligence officer John Bolton, who had been critical of the President's foreign policy, despite documented assassination attempts by Iran); Sheryl Storberg, *Trump Terminates Fauci's Government Security Protection*, N.Y. TIMES (Jan. 24, 2025), available online at https://www.nytimes.com/2025/01/24/us/politics/fauci-security-protection.html) (last visited Apr. 7, 2025) (President Trump revokes Secret Service security detail for Dr. Anthony Fauci, who received numerous death threats following Trump's criticism of his role in handling the COVID-19 pandemic).

[14]	Jenna Amatulli, *Associated Press Barred from Oval Office for Not Using 'Golf of America'*, GUARDIAN (Feb. 11, 2025), available online at https://www.theguardian.com/us-news/2025/feb/11/associated-press-oval-office-gulf-of-america (last visited Apr. 7, 2025) (Trump Administration blocks Associated Press journalists from accessing the Oval Office based on the Associated Press's refusal to adopt the "Gulf of America" naming convention).

[15]	Ginger Adams Otis, *ICE Arrests Columbia Student Who Helped Lead Pro-Palestinian Protests*, WALL ST. J. (Mar. 9, 2025), available online at https://www.wsj.com/us-news/dhs-detains-columbia-student-who-helped-lead-pro-palestinian-protests-fbbd8196?mod=article_inline (last visited Apr. 7, 2025) (GOP-controlled Department of Homeland Security ("DHS") revokes Columbia graduate student Mahmoud Khalil's green card and attempts to deport him based on Khalil's participation in and leadership of pro-Palestinian human rights protests and criticism of United States foreign policy regarding Israel); Chole Atkins and Phil Helsel, *Video Shows Tufts Graduate Student Grabbed Off Street by Federal Immigration Officials*, NBC NEWS (Mar. 26-27, 2025), available online at https://www.nbcnews.com/news/us-news/federal-immigration-authorities-detain-international-tufts-graduate-st-rcna198158 (last visited Apr. 7, 2025) (ICE officers arrest Tufts graduate student Rümeysa Öztürk for her criticism of Tufts University's response to demands that it acknowledge deaths of Palestinians and to divest from Israel as a result); Jaclyn Diaz, *What We Know About the Case of Detained Georgetown Professor Badar Khan Suri*, NPR (Mar. 21, 2025), available online at https://www.npr.org/2025/03/21/nx-s1-5336173/immigration-georgetown-university-professor (last visited Apr. 7, 2025) (Georgetown Professor Badar Khan Suri was taken into custody and faced with deportation because of statements supporting Palestinian human rights); Gloria Pazmino and Amanda Musa, *Cornell Student Activist Chooses to Leave US After Judge Denies Bid to Immediately Block Deportation*, CNN (Apr. 2, 2025), available online at https://www.cnn.com/2025/03/31/us/cornell-student-activist-deportation/index.html (last visited Apr. 9, 2025), Michael Casey, Rodrique Ngowi, and Kathy McCormack, *Homeland Security says Professor Deported to Lebanon with US Visa Supported Hezbollah Leader*, AP NEWS (Mar. 18, 2025) (ICE deports Dr. Rasha Alawieh of Brown University, one of three doctors in Rhode Island authorized to perform kidney transplants who had more than 300 patients awaiting transplants, over support for slain Hezbollah leader); Max Matza, *US Arrests Second Pro-Palestinian Columbia University Protestor*, BBC (Mar. 14, 2025), available online at https://www.bbc.com/news/articles/c3rnzp4ye5zo (last visited Apr. 7, 2025) (DHS arrests Leqaa Kordia, who participated in pro-Palestinian protests at Columbia University); Jonah E. Bromwich and Hamed Aleaziz, *Columbia Student Hunted by ICE Sues to Prevent Deportation*, N.Y. TIMES (Mar. 24-26, 2025)

**The House Committee on Education and Workforce Targets Northwestern**

67.     During the 2024 student protests in support of Palestinian human rights in response to the war in Gaza, Northwestern President Schill's administration met with student protesters and ultimately reached an agreement with protesters to dismantle their encampment in exchange for the continuation of peaceful protests, continuing dialogue around University investments, additional support on campus for Muslim and Middle Eastern students, and a commitment to include students from Gaza in the University's "Scholars at Risk" program.[17]

68.     Northwestern's response to the student protests was noteworthy in that the response involved open dialogue, enforcement of university policies, consideration for protesters' aims, and a peaceful resolution to a tense situation at Northwestern and campuses across the country.

---

available online at https://www.nytimes.com/2025/03/24/nyregion/columbia-student-ice-suit-yunseo-chung.html (last visited Apr. 7, 2025); Luis Ferre-Sadurni and Hamed Aleaziz, *How a Columbia Student Fled to Canada After ICE Came Looking for Her*, N.Y. TIMES (Mar. 15, 2025), available online at https://www.nytimes.com/2025/03/15/nyregion/columbia-student-kristi-noem-video.html (last visited Apr. 7, 2025) (Fulbright recipient and Columbia University urban planning Ph.D. candidate Ranjani Srinivasan escapes to Canada after being repeatedly targeted by ICE agents, despite her only involvement in the Columbia University pro-Palestinian human rights protests occurring when she was arrested while returning to her apartment); Andy J. Semotiuk, *Silencing Dissent: U.S. Moves to Deport Kremlin Critic Kseniia Petrova*, FORBES (Mar. 30, 2025), available online at https://www.forbes.com/sites/andyjsemotiuk/2025/03/30/silencing-dissent-us-moves-to-deport-kremlin-critic-kseniia-petrova/ (last visited Apr. 7, 2025) (Harvard Medial School medical researcher Kseniia Petrova, an ardent critic of Russia's invasion of Ukraine, was detained based on the alleged infraction of failing to declare frog embryos used in her research on a customs form and set to be deported to Russia, where her political views all-but-guarantee her arrest).

16      Jo Yurcaba and Courtney Kube, *Transgender Troops will be Removed from the Military, Pentagon Says*, NBC NEWS (Feb. 27, 2025), available online at https://www.nbcnews.com/nbc-out/out-news/transgender-troops-will-removed-military-pentagon-says-rcna194023 (last visited Apr. 7, 2025) (Transgender service members banned from military service because President Trump believes that being transgender categorically "conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life").

17      Michael Schill, *Here's Why I Reached an Agreement with Northwestern Protesters*, CHI. TRIB. (May 9, 2024), available online at https://www.chicagotribune.com/2024/05/09/opinion-peaceful-resolution-northwestern-protests/ (last visited Apr. 9, 2025).

69.     Northwestern's measured response appears to have caught the eye of the Committee, which apparently wanted the University to showcase retribution against the Palestinian human rights protesters. The Committee sent Northwestern a letter demanding documents, including documents related to particular staff members, information about student discipline, information about Board of Trustees' meetings related to the protests, information about donations and funding, and any video recordings related to the protests.[18] In response, Northwestern produced over 200 pages of documents some of which it aggregated from publicly-available sources.[19]

70.     Northwestern President Schill also testified before the Committee.

71.     The Committee then followed up with a June 7, 2024, letter demanding additional documents from Northwestern, accusing President Schill of a lack of candor during his Congressional testimony, and suggesting, without legal basis, that Northwestern's actions with respect to the Scholars at Risk program could violate federal antidiscrimination laws.[20]

72.     These document demands included documents from a larger set of people (none of whom included Plaintiffs), documents about a number of campus meetings, and additional student disciplinary and donation records.

73.     In total, Northwestern produced hundreds of pages of documents in response to these document demands, including communications that it marked as confidential. Many of these confidential materials were released into the congressional record and others were included

---

[18]     *See* Letter from Committee on Education and the Workforce to President Schill and Peter Barris, 4-5 (June 7, 2024), available online at
https://edworkforce.house.gov/uploadedfiles/6.7.24_letter_to_schill_and_barris.pdf.
[19]     *Id.* at 5.
[20]     *Id.* at 4.

in a report published in late October of 2024, titled *Antisemitism on College Campuses Exposed*.[21]

74.     Northwestern appears on page one of this report; Northwestern and President Schill are mentioned almost 100 times combined. Neither the Law School, Bluhm Legal Clinic, or any Plaintiffs are mentioned in any way in this report or the Congressional Record related to this inquiry prior to the March 27, 2025 letter, and the report's critiques appear to be aimed at Northwestern's senior university leadership. Moreover, the report's critiques are based on the thinnest of grounds and mischaracterize the facts.

### The Committee Continues to Work in Tandem with the Trump Administration to Target Universities

75.     Following his second inauguration, President Trump issued Executive Order 14188 on January 29, 2025, directing executive branch agencies to identify all civil and criminal authorities under their jurisdiction to combat antisemitism, directing the Attorney General to pursue cases through the Department of Justice's civil-rights enforcement authorities, and directing the Secretary of Education and other department heads to take further action to combat antisemitism.[22]

76.     In response, on February 5, 2025, the Department of Justice released a memorandum establishing a joint task force to combat "antisemitic acts of terrorism and civil rights violations in the homeland." The memorandum notes that the task force's priorities include "investigating and prosecuting acts of terrorism, antisemitic civil rights violations, and other

---

[21]     *Antisemitism on College Campuses Exposed*, Committee on Education & Workforce, U.S. House of Representatives (Oct. 31, 2024), available online at https://edworkforce.house.gov/uploadedfiles/10.30.24_committee_on_education_and_the_workforce_rep ublican_staff_report_-_antisemitism_on_college_campuses_exposed.pdf.
[22]     "Additional Measures to Combat Anti-Semitism" (Jan. 29, 2025), available online at https://www.whitehouse.gov/presidential-actions/2025/01/additional-measures-to-combat-anti-semitism/.

federal crimes committed by Hamas supporters in the United States, including on college campuses."[23]

77.     Consistent with the Executive Order and the new joint task force, the Department of Justice opened new investigations into Northwestern and four other universities for purportedly tolerating antisemitism, accompanied by a statement from the Department of Education.[24]

78.     Representative Tim Walberg, Chairman of the United States House of Representatives' Committee on Education and Workforce ("House Committee"), applauded the investigation into Northwestern and the other universities.[25] Indeed, Representative Walberg has indicated that he shares the policy aims of the Trump Administration and will work in collaboration with the administration to achieve their policy agenda.[26]

**The Committee Targets Northwestern in its March 27, 2025 Letter**

79.     Continuing their targeting of Northwestern, on March 27, 2025 the Committee sent a letter to Mr. Schill and Mr. Barris—under the signature of Representative Walberg and Representative Owens—demanding information.

---

[23]     "Memorandum for All Department Employees re: Establishment of Joint Task Force October 7, Office of the Attorney General" (Feb. 5, 2025), available online at https://www.justice.gov/ag/media/1388516/dl?inline.

[24]     *Trump Administration Opens Antisemitism Inquiries at 5 Colleges, Including Northwestern*, ASSOC. PRESS (Feb. 4, 2025), available online at https://news.wttw.com/2025/02/04/trump-administration-opens-antisemitism-inquiries-5-colleges-including-northwestern (last visited Apr. 9, 2025).

[25]     *Id.*

[26]     *Rep. Wahlberg to Newsmax: Removing Funding will 'Wake Up' Colleges* (Mar. 4, 2025), available online at https://walberg.house.gov/media/in-the-news/rep-walberg-newsmax-removing-funding-will-wake-colleges (last visited Apr. 8, 2025) (Rep. Walberg: "If you want to allow [illegal protests on college campuses] to carry on, then you're going to lose your federal funding. . . . I think that should wake them up. And that's what the president is saying. He's been saying common sense, law and order, America First.").

80.     The Letter indicated for the first time that the Committee was concerned that Northwestern was "providing free legal representation in a civil suit to the organizers of an anti-Israel blockade of highway traffic to Chicago's O'Hare International Airport," and dedicating its resources to "support this illegal, antisemitic conduct."[27]

81.     The Letter stated that the Law School reflected the "institutionalization of left-wing political activism," and referenced Plaintiff Bedi, stating that she used "Northwestern's name and resources to engage in progressive-left political advocacy." It specifically targets Plaintiff Bedi's work on the consent decree involving the Chicago Police Department and her work on "over-policing and mass imprisonment" and with "social justice movements." It described her clinic's work as "troubling," and identified it, without explanation, as "one of numerous Northwestern Law clinics and centers promoting left-wing causes."

82.     The Letter demanded the production of five categories of documents by April 10, 2025:

1. All written policies, procedures, and guidance relating to the function of legal clinics at Northwestern Law, including any written guidance on what constitutes appropriate work, and direction on appropriate client representations;
2. A detailed budget for the Bluhm Legal Clinic, including detailed budgets for its more than 20 clinics and 12 centers.
3. A list of the sources of Bluhm Legal Clinic's funding, including the funding for each of its centers and clinics;
4. A list of all the Community Justice and Civil Rights Clinic's payments to people or groups not employed by Northwestern and any of its clinics and centers since 2020; and
5. All hiring materials and performance reviews for Sheila A. Bedi.

83.     The Attorney General and Secretary of Education were carbon copied on the Committee's Demand for Information.

---

[27]     Available online at https://edworkforce.house.gov/uploadedfiles/ltr_to_northwestern_3.27.25.pdf.

**Northwestern's Compliance with the Committee's Demands Would Cause Irreparable Harm to the Practice and Mission of Northwestern's Legal Clinics**

84.    Legal clinics are in a unique position intersecting academia and legal practice and are therefore uniquely vulnerable to the harms faced by both universities and law firms as described above.

85.    Plaintiffs therefore reasonably fear a cascade of harms to their clinics, clients, donors, and students if Northwestern complies with the Committee's demands.

86.    The Committee's letter includes demands directed to each of the 20 clinics and 12 centers within the Bluhm Legal Clinic. All of these clinics will be impacted if Northwestern responds to the Committee's demands. While some of those clinics or centers may work on behalf of causes that the Trump Administration finds objectionable, others do not. For example, the Center for Externships offers a range of practicum courses that provide students an opportunity to gain real-world experience under the supervision of experienced lawyers. Over 200 students are enrolled in courses at the Center for Externships this year. These courses combine work in one practice setting or area of law with a seminar taught by a faculty member focused on issues arising in that kind of work. The practice areas range from criminal law to sports and entertainment law, and students are placed in civil rights and legal aid agencies; federal, state, and local government agencies; federal and state judicial chambers; and major corporations.

87.    If Northwestern is forced to disclose confidential information related to the operation of its clinics, that disclosure may dissuade partner organizations from accepting the Center for Externship's students for placements. Many legal organizations engage in litigation and advocacy work that depends on being able to maintain strict confidentiality of their records. Those organizations may not be willing to take the risk of jeopardizing their work by partnering

23

with a legal clinic that is subject to a congressional investigation and providing documents to the Committee.

88.     Likewise, the Center on Negotiation, Mediation, and Restorative Justice provides students with the opportunity to learn negotiation, mediation and restorative justice skills. Hundreds of students participate in the Center's courses every year. The Center works with a variety of parties, including individuals, organizations, businesses, government agencies, and the Illinois state court judiciary to resolve disputes through alternatives to litigation, focusing on non-adversarial and extra-judicial solutions. The Center's work depends on confidentiality of participants in mediation. The Committee's demands for information threaten this confidentiality and will deter potential participants from accessing the Center's services. Likewise, the Center's integrity and relationship with various courts that partner with the Center to provide mediation services will be undoubtedly disrupted if the Committee's demands for information are compelled.

89.     Northwestern Law and the Bluhm Legal Clinic's reputation as a place that supports academic and viewpoint freedom is crucial to the Center's current and prospective students. In a recent panel at Northwestern Law for admitted students, a prospective student asked a clinician about the issue of the future of academic freedom. The Letter and the federal government's interference and attack on students is already impacting Northwestern's ability to attract students.

90.     As the former director and current clinical professor at the Center, Plaintiff Cohn understands intimately the Bluhm Legal Clinic's importance in current and prospective students' legal education and future career. The value of the clinical experience to skill development,

career readiness and specialized knowledge is greatly diminished if faculty and students cannot speak freely about the political and social justice issues that are inherently involved.

91.     Other clinics and centers reasonably fear an interruption of their work if Northwestern complies with the Committee's demands because their work may be viewed as controversial by the Trump Administration.

92.     The Children and Family Justice Center (CFJC) represents young people in delinquency hearings, expungement proceedings, clemency petitions for young people in prison for serious offenses, and re-sentencing hearings for individuals serving life without parole for crimes committed when they were juveniles. All of the clients of the CFJC clinic are indigent and many of them would not have access to counsel without the clinic. The Committee's inquiry and implicit threat to withhold billions of dollars in federal funding from Northwestern will have a chilling effect on CJFC clinicians' freedom to choose potentially controversial cases and to engage in policy work that may be adverse to the Trump Administration's agenda.

93.     Likewise, the Committee's demand for information could discourage students from enrolling in the clinic for fear that their access to federal loans could be threatened if they enroll in a clinic that the federal government opposes. If Northwestern complies with the Committee's demand to release private donor information, donors may cease supporting the CFJC in the future. The CFJC's funding is particularly endangered given that some of its advocacy work and clients are controversial, and donors may be deterred if their support could be publicly disclosed or become the subject of a congressional investigation.

94.     These are but a few examples of the many harms that could result from Northwestern's compliance with the Committee's Demands. On information and belief, many other clinicians, clients, and donors would be harmed by compliance with the Committee's

demands, but the impacted individuals are afraid to provide information about their concerns in public because of the retaliation and targeting the Trump Administration has committed.

95. The chilling effect for clients and students of Plaintiff Bedi's CJCR Clinic will be even more severe. Clients of Plaintiff Bedi's clinic have already indicated that they may forego her representation rather than risk further exposure or targeting by federal actors, and at least one client has terminated her representation upon learning of the Committee's demands.

96. Plaintiff Bedi has already had to inform clients whose cases have not yet been filed about the Committee's inquiry, which has discouraged these clients from seeking her counsel and accessing the court system.

97. The reputational harms to Professor Bedi would also harm those clients with criminal charges or convictions. For example, even if clients know that Professor Bedi has not said or done anything "antisemitic," they might still forego her counsel out of fear that the inquiry about her would damage her reputation, and their case, before the judiciary.

98. Plaintiff Bedi's clinic funds all litigation expenses through its own budget (not through clients), so disclosure of this budget will allow party opponents to evaluate the funds available to Plaintiff Bedi's clients and make litigation choices accordingly. Adversaries could also coordinate their efforts to increase costs or time their efforts according to budgetary crunches. This type of information about an adversary's litigation budget is not available under normal circumstances and would not be available to the clinic's party opponents absent the demand from the Committee. These harms would extend to other clinics whose budgets could be exploited by litigation adversaries to harm their representation of clients.

99. If Northwestern responds to the demands, donors to the CJCR Clinic will also be chilled in their speech and association. Donors have already indicated to Plaintiff Bedi that they

are fearful of their identities being exposed and some donors may not wish to provide further funding to the clinic. This would be devastating to the Clinic's work and the under-resourced clients the Clinic seeks to represent. The Clinic's one staff attorney is entirely funded by donors and the work of that attorney could not continue without donor support. The CJCR Clinic is not able to adequately serve clients—including completing depositions and staffing trials—without the staff attorney.

100. Disclosure of payments that the CJCR Clinic has made to experts, court reporters, or co-teachers would also chill the participation of those individuals in casework. Given the steep risk associated with being listed publicly in any Congressional communication regarding "antisemitism," these individuals may simply refuse to work with the CJCR Clinic in the future.

101. Plaintiff Bedi also reasonably fears reputational harm from the Committee's demands. If Northwestern complies with the Committee's demands, Professor Bedi reasonably fears having her private information publicly exposed and being doxxed, putting her future employment prospects, privacy, and safety at risk.

102. If Northwestern produces the demanded documents, it will harm Plaintiffs' academic freedom in what they teach and publish; their attorney-client relationships; their ability to raise money for their work; their ability to litigate effectively and with confidentiality against their adversaries; their ability to associate freely on behalf of causes and groups they support; and their reputations.

## CLAIMS FOR RELIEF

### Count I: First Amendment

### Violation of Free Speech, Freedom of Association, Right to Petition for Redress of Grievances, Academic Freedom, and Retaliation

103. Plaintiffs incorporate each paragraph of this Complaint as if restated fully herein.

27

104.    In the manner described more fully above, Defendants violate Plaintiffs' rights under the First Amendment of the United States Constitution in multiple ways.

105.    Plaintiffs' advocacy on behalf of clients is protected by the Free Speech and Petition Clauses in the First Amendment.

106.    Coercion of a third-party can be the means by which the government violates the First Amendment rights of others. The Committee is coercing Northwestern to violate the First Amendment rights of Plaintiffs. The First Amendment prohibits government officials from wielding their power selectively to punish or suppress speech, directly or indirectly through private intermediaries. In the manner more fully described herein, Plaintiffs have alleged conduct that could reasonably be understood to convey a threat of adverse government action (freezing millions in federal funding from Northwestern) in order to punish or suppress Plaintiffs' speech (on "left-wing" causes).

107.    Defendants' actions discriminate based on viewpoint. By its plain terms, the Committee's Letter targets Plaintiff Bedi and her clinic for "engag[ing] in progressive-left political advocacy." The Letter also targets Bluhm Legal Clinic (including Plaintiff Cohn's clinic) generally for allegedly "promoting left-wing causes" and "left-wing advocacy." But Plaintiffs' and the clients' rights to express and advocate for their personal and political interests is protected by the First Amendment, including by seeking to vindicate rights through the legal process.

108.    The Letter's viewpoint discrimination is all the more egregious because it concerns speech that is at the core of First Amendment protection—i.e., political speech.

109.    Viewpoint discrimination that is retaliatory cannot be justified by any government interest. Even if the Letter were not retaliatory (as it clearly is), no compelling interest can

support the Letter's demands. The government's bare desire to harm a politically unpopular group or those with which the government disagrees is not a legitimate state interest, much less a compelling one. The government's interest in targeting and punishing lawyers and professors who advocate and litigate for certain causes – such as addressing over-policing and mass incarceration (CJCR Clinic); seeking to free innocent individuals who have been wrongfully convicted (Center on Wrongful Convictions); promoting and advancing litigation in support of the rights of LGBTQI+ people (LGBTQI+ Rights Clinic); challenging injustices in the criminal legal system (MacArthur Justice Center); advocating for human rights of individuals around the world (Center for International Human Rights); addressing pressing environmental and energy issues (Environmental Advocacy Center); advocating for the rights of low-income tenants and homeowners (Tenant Advocacy Clinic) – is not a legitimate one. That interest—which clearly and explicitly underlies the Letter's Demand—is a pernicious one that strikes at the core of our constitutional form of government.

110.    The Letter does not distinguish between clients' viewpoints and Plaintiff Bedi's zealous advocacy of her clients, but it instead attributes their viewpoints to Plaintiff Bedi and seeks to discourage, suppress, and retaliate against the exercise of Plaintiffs' First Amendment rights.

111.    The Letter also targets and punishes Plaintiffs based on their associations—which clients they choose to represent and which cases they choose to take. It also punishes donors' associations with Plaintiffs and the clinics. The First Amendment protects the right to associate with others in pursuit of a wide variety of political, social, economic, religious, and cultural ends. Defendants violate this right in meting out disfavored treatment based on protected association.

112.    Defendants violate Plaintiffs' and their clients' freedom of association because they single out and threaten Plaintiffs for their association with certain clients or organizations (and with respect to Plaintiff Bedi, her representation of the protester specifically mentioned in the Committee's Letter and other protesters). Plaintiff Bedi has also been chilled from taking on new clients as a result of Defendants' actions.

113.    The demand that Northwestern turn over Plaintiff Bedi's personnel file; the identities of all of the donors to the clinics and centers of the Bluhm Legal Clinic; and information about how the clinics and centers select their cases, violates freedom of association under the First Amendment. Compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as other forms of governmental action.

114.    Forced disclosure of any clinic or center client, any clinic or center donor, Plaintiff Bedi's personnel file, or any other disclosure of how the clinics spend money is not narrowly tailored to any professed interest in (a) combatting antisemitism or (b) purporting to monitor the manner in which specific grants of money to the University are being handled. Because the demands are not narrowly tailored to address even the Committee's purported interests, every forced disclosure that may chill association fails exacting scrutiny.

115.    Defendants impose severe burdens on Plaintiffs' associational rights, but the Letter is not narrowly tailored to serve a compelling state interest. The Committee has no interest, much less a compelling one, in punishing Plaintiffs for their association with, and advocacy for, clients or causes that the Committee does not like.

116.    The Petition Clause of the First Amendment protects the right of individuals to appeal to courts and other forums established by the government. A petition may take the form

of a lawsuit and defending against a lawsuit, as well as advocacy before other governmental entities.

117.    Defendants violate the Petition Clause by targeting Plaintiffs' right to file lawsuits on behalf of clients, defend clients in lawsuits, and advocate for them in other governmental fora. Defendants penalize Plaintiffs based on particular lawsuits filed and defended on behalf of clients and seek to coerce Plaintiffs to align with the Committee's preferred political views. The Letter expressly targets Plaintiff Bedi for representing specific clients and litigating specific cases, such as against the Chicago Police Department and in defense of protesters. And by threatening to withhold millions of dollars in funding from Northwestern, Defendants burden Plaintiffs' rights to do so going forward.

118.    Defendants also retaliate against Plaintiffs for engaging in protected activity, which the Committee describes as "left-wing advocacy." In the manner described more fully above, Plaintiffs engaged in activity protected by the First Amendment; Defendants' actions would chill a person of ordinary firmness from continuing to engage in that activity; and the protected activity was at least a motivating factor in Defendants' actions.

119.    The First Amendment limits the government's ability to compel individuals to disclose their affiliations with groups engaged in advocacy. Compelled disclosures—such as the ones in the Letter regarding donors and payments to venders—must satisfy exacting scrutiny, which requires the government to show that there is a substantial relation between the disclosure requirement and a sufficiently important governmental interest. Defendants' interest—retaliating against Plaintiffs for First Amendment-protected activity of which the Committee disapproves—is not sufficiently important to withstand exacting scrutiny.

120.    The First Amendment forbids the government's creation of a patronage system whereby it conditions government benefits, such as federal funding to Northwestern, on political affiliation or viewpoint.

121.    Although the government generally may impose limits on the use of government funds to ensure they are used in the manner Congress intends, the government cannot leverage funding to regulate speech or other protected conduct outside the contours of the government program itself. In other words, the government may not deny a benefit to a person on a basis that infringes her constitutionally protected rights even if she has no entitlement to that benefit.

122.    Here, Defendants threaten federal funding to Northwestern based on the viewpoints and associations of Plaintiffs and their clients. Defendants are leveraging funding to regulate speech on the basis of viewpoint and content.

123.    Defendants also violate Plaintiffs' right to academic freedom and substantially chill its exercise. In order to prevail over Plaintiffs' First Amendment-protected interest in teaching, research, and publishing without government interference, the interests of the government must be strong and the extent of intrusion limited. Here, the materials demanded by the Committee have little to no probative value to the asserted interest in investigating antisemitism, and any asserted probative value is outweighed by the risk that allowing public access to the information would jeopardize Plaintiffs' ability to research and advocate and thus, adversely impact their careers. In addition, Plaintiffs can reasonably fear that additional demands for disclosure will be made in the future. This chills the exercise of their First Amendment rights.

124.    As discussed more fully above, the Committee's Letter serves no legitimate legislative purpose.

125.    Defendants' violations cause ongoing and irreparable harm to Plaintiffs.

## Count II: Fifth Amendment

## Due Process

126. Plaintiffs incorporate each paragraph of this Complaint as if fully restated herein.

127. The Due Process Clause of the Fifth Amendment to the U.S. Constitution guarantees that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."

128. Lawyers and clients have due process interests in their contractual and professional relationships.

129. The Letter interferes with and chills all of those representations and relationships. The Letter failed to provide adequate process before interfering with Plaintiffs' right to represent the clients of their choosing and their clients' due process rights to counsel. And because these sanctions—which attempt to punish Plaintiffs for lawsuits based on viewpoint and threaten Plaintiffs' clients—are not rationally related to a legitimate government interest, they cannot stand.

130. Defendants' violations cause ongoing and irreparable harm to Plaintiffs.

## Count III: Sixth Amendment

## Right To Counsel

131. Plaintiffs incorporate each paragraph of this Complaint as if fully restated herein.

132. The Sixth Amendment to the U.S. Constitution guarantees criminal defendants the right to counsel of one's choosing. Actions that interfere with the right to select and be represented by one's preferred attorney violate the Sixth Amendment.

133. Lawyers have prudential, third-party standing to challenge violations of their clients' Sixth Amendment or Due Process rights to counsel that interfere with the lawyers' practice. Because an attorney's duty to provide effective counsel may not be fettered by

33

harassment of government officials, a lawyer has standing to challenge any act which interferes with his professional obligation to his client and thereby, through the lawyer, invades the client's constitutional right to counsel. Because Plaintiff Bedi has represented and may represent criminal defendants and others in dealings with the government, she has standing to challenge the Letter's attempted interference with her clients' right to counsel.

134.    Defendants' violations cause ongoing and irreparable harm to Plaintiff Bedi.

### Count IV: Fifth Amendment

### Equal Protection

135.    Plaintiffs incorporate each paragraph of this Complaint as if restated fully herein.

136.    The Equal Protection Clause as incorporated by the Fifth Amendment to the U.S. Constitution prohibits the federal government, its agencies, its officials, and its employees from denying persons the equal protection of the laws.

137.    Governmental action must be rationally related to a legitimate governmental purpose. The government may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational. And a bare desire to harm a politically unpopular group is not a legitimate state interest.

138.    The Letter reflects a bare desire to harm Plaintiffs for their association with "left-wing" causes that the Committee does not like and for the protected speech reflected in their "progressive," "left" advocacy.

139.    The desire to harm is evident in that the relationship of the Letter's demands to the asserted goal (combating antisemitism) is so attenuated as to render the distinction arbitrary or irrational. The Committee has threatened Plaintiffs and the Bluhm Legal Clinic because they have associated with individuals whose message they do not like, and the Letter's demands seek to harm them as a result.

34

140.    Moreover, Defendants lack even a rational justification for the demands in the Letter. Among other things, the demands for documents include Plaintiff Bedi's hiring materials and performance reviews, and information about donors and budgets for all of Bluhm Legal Clinic's centers and clinics which have no bearing whatsoever on the asserted interest in fighting antisemitism.

141.    Defendants' violations cause ongoing and irreparable harm to Plaintiffs.

<div align="center">**PRAYER FOR RELIEF**</div>

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Declare the demands in the Committee's Letter unconstitutional as violative of the First, Fifth, and Sixth Amendments to the Constitution;

B.    Immediately and preliminarily enjoin Northwestern, Michael Schill, and Peter Barris from producing any documents demanded in the Committee's Letter and enjoin the Committee from obtaining any documents demanded in the Committee's Letter;

C.    Permanently enjoin Northwestern, Michael Schill, and Peter Barris from producing any documents demanded in the Committee's Letter and enjoin the Committee from obtaining any documents demanded in the Committee's Letter; and

D.    Grant other such relief as the Court deems just and proper.

Dated:  April 9, 2025                    RESPECTFULLY SUBMITTED,

                                         By: /s/ Jon Loevy
                                         *Counsel for Plaintiffs*

<div style="display:flex">
<div>

*Counsel for Cohn*
Amanda S. Yarusso
1180 N. Milwaukee Ave.
Chicago IL, 60642
(773) 510-6198
amanda.yarusso@gmail.com

*Counsel for Cohn*
Nora Snyder
People's Law Office
1180 N. Milwaukee Ave.
Chicago IL, 60642
773-235-0070
norasnyder@peopleslawoffice.com

</div>
<div>

*Counsel for Bedi*
Baher Azmy
Maria LaHood
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
BAzmy@ccrjustice.org
mlahood@ccrjustice.org

*Counsel for Bedi*
Jon Loevy
Tara Thompson
Elizabeth Wang
Heather Lewis Donnell
Steve Art
Theresa Kleinhaus
Julia Rickert
Jordan Poole
Stuart Chanen
*Cooperating Counsel*
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012

</div>
</div>