# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| SHEILA BEDI and LYNN COHN, | ) | **Case No. 1:25-cv-3837** |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES HOUSE OF REPRESENTATIVES COMMITTEE ON EDUCATION AND WORKFORCE, | ) ) ) ) | |
| | ) | |
| TIM WALBERG, Committee Chair, in his official capacity, and | ) ) | |
| | ) | |
| BURGESS OWENS, Subcommittee Chair, in his official capacity, | ) ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| NORTHWESTERN UNIVERSITY, | ) | |
| | ) | |
| MICHAEL SCHILL, Northwestern University President, in his official capacity, and | ) ) ) | |
| | ) | |
| PETER BARRIS, Chair of Northwestern University Board of Trustees, in his official capacity, | ) ) ) | **DEMAND FOR INJUNCTIVE AND DECLARATORY RELIEF** |
| Nominal Defendants. | | |

## EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER

<u>**TABLE OF CONTENTS**</u>

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION ................................................................................................................... 2

RELEVANT FACTS ................................................................................................................ 4

    I.      Northwestern University's Pritzker School of Law Is an Important American Legal Institution ....................................................................................................................... 4

    II.     The Law School's Bluhm Legal Clinic Represents Clients In a Variety of Matters .... 4

    III.    Plaintiff Sheila Bedi is an Award-Winning, Nationally Recognized Expert on Criminal Legal Reform ................................................................................................ 5

    IV.    The Community Justice and Civil Rights Clinic Advocates Against Over-Policing and Mass Imprisonment ....................................................................................................... 7

    V.     Professor Bedi Has Represented Clients Who Are Disfavored or Vilified by the Trump Administration and His Allies in Congress ........................................................ 9

    VI.    The Trump Administration Takes Notice of Professor Bedi's Representation of Protesters Advocating in Support of Palestinian Human Rights ................................. 10

    VII.   Plaintiff Lynn Cohn is a Nationally Recognized Expert Mediator ............................ 11

    VIII.  The Committee and Later the Trump Administration's Interest in Chilling Speech and Academic Freedom at America's Universities ........................................................... 13

    IX.    The Trump Administration Has Punished Numerous People It Views as Ideological Opponents ................................................................................................................... 15

    X.     The Executive Branch Has Also Targeted Law Firms Representing Clients With Whom the Trump Administration Disagrees ............................................................... 17

    XI.    The House Committee on Education and Workforce Targets Northwestern University ..................................................................................................................................... 22

    XII.   The House Committee Works Hand in Hand with the Trump White House to Further Target Universities for Purportedly Failing to Combat Antisemitism ........................ 26

    XIII.  The House Committee Follows Up with Its March 27, 2025 Demand for Information ..................................................................................................................................... 27

    XIV.  Northwestern's Compliance with the Committee's Demands Would Cause Irreparable Harm to Sheila Bedi, Her Colleagues, and Their Donors .......................................... 28

LEGAL STANDARD ............................................................................................................. 34

ARGUMENT ....................................................................................................................... 35

    XV.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ............................ 35

    XVI.  ABSENT A PRELLIMINARY INJUNCTION, PLAINTIFF WILL SUFFER IRREPARABLE HARM ............................................................................................ 57

    XVII. THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR AN INJUNCTION ............................................................................................................. 60

REQUEST FOR ORAL ARGUMENT .................................................................................... 67

CONCLUSION ..................................................................................................................... 67

**<u>TABLE OF AUTHORITIES</u>**

**Cases**                                                                                               **Pages**

*303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) .......................................................... 37

*Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6 (7th Cir. 1992) ................................. 57

*ACLU v. Alvarez*, 679 F.3d 583 (7th Cir. 2012) ............................................................ 35

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) .............. 64

*Agency for Int'l Development v. Alliance for Open Society Int'l, Inc.*, 570 U.S. 205 (2013) ...... 37

*Americans for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021) ......................... 64, 66

*Ams. For Prosperity Foundation v. Bonta*, *Ams. for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021) ................................................................... 35, 38, 49, 50

*Bantam Books v. Sullivan*, 372 U.S. 58 (1963) .............................................................. 57

*Barenblatt v. United States*, 360 U.S. 109 (1959) ......................................................... 66

*Bart v. Telford*, 677 F.2d 622 (7th Cir. 1982) ............................................................... 36

*Bell v. Keating*, 697 F.3d 445 (7th Cir. 2012) ............................................................... 41

*Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023) ........................................... 35

*Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011) ................................................ 48

*Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) .................................................. 36

*Brown v. Kemp*, 86 F.4th 745 (7th Cir. 2023) .......................................................... 40, 41

*Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972) .......................... 48

*Cantwell v. Connecticut*, 310 U.S. 296 (1940). ............................................................ 43

*Chicago Women in Trades v. Trump*, __ F. Supp. 3d __, 2025 WL 933871 (N.D. Ill. Mar. 27, 2025) ............................................................................................................... 35

*Christian Legal Soc'y v. Walker*, 453 F.3d 853 (7th Cir. 2006) ................................... 58

*City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985) ................................. 44, 55, 56

*Clingman v. Beaver*, 544 U.S. 581 (2005) ................................................................. 44

*Coates v. Cincinnati*, 402 U.S. 611 (1971) ............................................................... 43

*Cox v. Louisiana*, 379 U.S. 536 (1965) ................................................................... 43

*Cusumano v. Microsoft Corp.*, 162 F.3d 708 (1st Cir. 1998) ...................................... 47

*Dow Chemical v. Allen*, 672 F.2d 1262 (7th Cir. 1982) ............................................. 46

*Eastland v. United States Servicemen's Fund*, 421 U.S. 491 (1975) ........................... 67

*Edwards v. South Carolina*, 372 U.S. 229 (1963) .................................................... 43

*Elrod v. Burns*, 427 U.S. 347 (1976) ..................................................................... 58

*Eng. v. Cooley*, 552 F.3d 1062 (9th Cir. 2009) ....................................................... 48

*Exxon Corp. v. Fed. Trade Comm'n*, 589 F.2d 582 (D.C. Cir. 1978) .......................... 62

*FCC v. Beach Communications, Inc.*, 508 U.S. 307 (1993) ....................................... 56

*FEC v. Cruz*, 596 U.S. 289 (2022) ........................................................................ 43

*Fighters, Loc. 365 v. City of E. Chicago*, 56 F.4th 437 (7th Cir. 2022 ........................ 58

*First Defense Legal Aid v. City of Chicago*, 319 F.3d 967 (7th Cir. 2003) .................... 36, 58

*Gibson v. Florida Legislative Investigation Comm.*, 372 U.S. 539 (1963) .................... 63

*Gideon v. Wainwright*, 372 U.S. 335 (1963) ........................................................... 55

*Grutter v. Bollinger*, 539 U.S. 306 (2003) ............................................................. 46

*Guajardo-Palma v. Martinson*, 622 F.3d 801 (7th Cir. 2010) .................................... 60

*Hentoff v. Ichord*, 318 F. Supp. 1175 (D.D.C 1970) ................................................ 65

*Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010) ............................................. 65

*Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988) ............................................. 43, 47

*In re Primus*, 436 U.S. 412 (1978) ........................................................................ 36

*Joelner v. Vill. of Washington Park*, 378 F.3d 613 (7th Cir. 2004) ............................ 60

*Keyishian v. Bd. of Regents of Univ. of State of N. Y.*, 385 U.S. 589 (1967) .................. 46, 64, 65

*League of Women Voters of the U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ............................ 61

*Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001) ................................................ 37, 43, 64

*Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531 (7th Cir. 2021) ............................... 59

*Luis v. United States*, 578 U.S. 5 (2016) ........................................................................ 51

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................... 40, 41

*Mann v. Wash. Metro. Area Transit Auth.*, 185 F. Supp. 3d 189 (D.D.C. 2016) ........................ 60

*Matal v. Tam*, 582 U.S. 218 (2017) .................................................................................. 43

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) .................................................................. 35

*McGrain v. Daugherty*, 273 U.S. 135, 161 (1927) ........................................................ 62

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) ............................................ 49, 63

*NAACP v. Button*, 371 U.S. 4151 (1963) ........................................................................ 36, 43, 49

*Nat'l Inst. of Fam. & Life Advocates v. Becerra*, 585 U.S. 755 (2018) ................................ 37

*Nat'l People's Action v. Vill. of Wilmette*, 914 F.2d 1008 (7th Cir. 1990) ................................ 58

*Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024) ................................................ 35, 57, 63

*National Abortion Fed'n v. Center for Med. Progress*, 2015 WL 5818863 (N.D. Cal. Oct. 6, 2015) ........................................................................................................ 62

*Nationalist Socialist Party of Am. v. Village of Skokie*, 432 U.S. 43 (1977) ............................ 47

*Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449 (1958) ........................................................................................................ 65

*News Am. Publ'g, Inc. v. FCC*, 844 F.2d 800 (D.C. Cir. 1988) ........................................ 56

*Nieves v. Bartlett*, 587 U.S. 391 (2019) .......................................................................... 36

*Nken v. Holder*, 556 U.S. 418 (2009) ............................................................................... 35

*Penny Saver Publications, Inc. v. Vill. of Hazel Crest*, 905 F.3d 150 (7th Cir. 1990) ............... 49

*Perry v. Sindermann*, 408 U.S. 593 (1972).................................................................. 37, 65

*Powell v. Alabama*, 287 U.S. 45 (1932) ......................................................................... 50

*Pro. Towing & Recovery Operators of Ill. v. Box*, 2008 WL 521192 (N.D. Ill. Dec. 11, 2008).. 60

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ................................................................ 44

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ................................................................. 44

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ................................................................. 38

*Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14 (2020).................................... 58

*Romer v. Evans*, 517 U.S. 620 (1996).............................................................................. 56

*Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819 (1995) ........................ 65

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47 (2006) ....................... 40

*Rutan v. Republican Party of Ill.*, 497 U.S. 62 (1990) ....................................................... 38

*Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947 (1984) ............................. 47, 49

*Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725 (D.C. Cir.

    1974) ...................................................................................................................... 61

*Shelton v. Tucker*, 364 U.S. 479 (1960)........................................................................... 65

*Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310 (9th Cir. 1989)..................................... 48

*Speech First, Inc. v. Killeen*, 968 F.3d 628 (7th Cir. 2020)............................................... 41

*Strickland v. Washington*, 466 U.S. 668 (1984) ............................................................... 50

*Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676 (7th Cir. 2012) .......................... 59

*Surita v. Hyde*, 665 F.3d 860 (7th Cir. 2011) ................................................................. 36

*Swanson v. City of Chetek*, 719 F.3d 780 (7th Cir. 2013) ............................................................. 56

*Sweezy v. New Hampshire*, 354 U.S. 234 (1957) ................................................................... 46, 66

*Texas v. Johnson*, 491 U.S. 397 (1989) ............................................................................ 43

*Tinker v. Des Moines Independent Community Sch. Dist.*, 393 U.S. 503 (1969) ...................... 43

*Trump v. Mazars USA, LLP*, 591 U.S. 848 (2020) ................................................................ 62

*Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622 (1994) ................................................ 44

*U.S. Dep't of Lab. v. Triplett*, 494 U.S. 715 (1990) ............................................................. 47

*United States Dept. of Ag. v. Moreno*, 413 U.S. 528 (1973) ................................................ 56

*United States Servicemen's Fund v. Eastland*, 421 U.S. 491 (1975) ........................................ 62

*United States Servicemen's Fund v. Eastland*, 488 F.2d 1252 (D.C. Cir. 1973) ........................ 61

*United States v. Amlani*, 111 F.3d 705 (9th Cir. 1997) ......................................................... 52

*United States v. AT&T Co.*, 419 F. Supp. 454 (D.C. Cir. 1976) ........................................ 61, 67

*United States v. AT&T Co.*, 551 F.2d 384 (D.C. Cir. 1976) ................................................ 61

*United States v. Fulton*, 5 F.3d 605 (2d Cir. 1993) ............................................................. 54

*United States v. Laura*, 607 F.2d 52 (3d Cir. 1979) ............................................................. 51

*United States v. Rumely*, 345 U.S. 41 (1953) ..................................................................... 66

*United States v. Stein*, 541 F.3d 130 (2d. Cir. 2008) ........................................................... 51

*USA-Halal Chamber of Com., Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427 (N.D. Ill. 2019) ................................................................................................................... 34

*Vill. of Willowbrook v. Olech*, 528 U.S. 562 (2000) ............................................................. 55

*Watkins v. United States*, 354 U.S. 178 (1957) ......................................................... 62, 63, 64

*Wheat v. United States*, 486 U.S. 153 (1988) ..................................................................... 50

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) .................................. 60

*Wis. Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985) .................................................. 60

*Wood v. Georgia*, 450 U.S. 261 (1981) ....................................................................... 53

**Other Authorities**                                                                    **Pages**

U.S. Const. art. 1, § 9 ................................................................................................ 65

**Treatises**                                                                              **Pages**

11A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2948.1 (3d ed.

   2002 & Apr. 2021 Supp.) .................................................................................... 59

# INTRODUCTION

Leveling threats to Northwestern's federal funding, and based on an investigative pretext, the Committee has demanded that Northwestern University's Pritzker School of Law and its Bluhm Legal Clinic produce information about how they teach their students, represent their clients, and fund their work. The effort is part of the federal government's ongoing attack on academic freedom, legal professionals, and the rule of law. The Committee's demands exceed its authority and have no valid legislative purpose, they are an attempt to investigate, intimidate, and punish institutions and individuals that the Committee has deemed "left-wing," and they violate the federal Constitution. Immediate relief is necessary to prevent irreparable harm.

Plaintiffs Sheila Bedi and Lynn Cohn are nationally recognized and award-winning lawyers, law professors, and experts on prisons and policing, civil rights law, social and racial justice movements, policy advocacy, negotiation, and mediation and dispute resolution. Plaintiffs teach students and represent clients as faculty members at Northwestern University's Pritzker School of Law.

The Committee has demanded that Northwestern turn over an extensive and invasive production of certain sensitive documents pertaining to Plaintiffs' academic and legal work, including documents about governance of their legal clinics, their donors and associates, their job performance, and their representation of their clients, including attorney work product concerning their selection of legal matters and their strategy regarding the representation of their clients.

The Committee's goal is to shut down speech and advocacy with which it disagrees. That much is obvious on the face of the Committee's demands, which accuse Plaintiffs and Northwestern Law School of engaging in "left-wing advocacy" and "left-wing political activism,"

and which target Plaintiffs based on the content of what they teach and the cases on which they work and the arguments they make in courts of law.

The Committee purports to justify its broad, intrusive demands using the pretext that a small portion of Plaintiff Bedi's numerous clients engaged in "antisemitic conduct." But this is a pretext, and it is plain on the face of the Committee's demands that it is not trying to investigate antisemitism. Instead, it is illegally singling out viewpoints and causes that it disagrees with for punishment. Our Constitution forbids the government's attempt to punish Plaintiffs based on the clients or organizations they represent, the positions they advocate, the opinions they voice, and the people with whom they associate.

The Committee's demands reflect broader efforts across the federal government to target institutions and individuals the government views with disfavor for reprisal. Intimidation tactics across the federal government constitute a profound threat to academic freedom and education, to scientific research and medicine, to the practice of law and the rule of law, as well as to businesses and our economy. Plaintiffs file this case seeking judicial relief from this dangerous executive conduct and to stand up for these core principles of American democracy.

In this case, the Committee's demands violate Plaintiffs' rights protected by the First, Fifth, and Sixth Amendments to the U.S. Constitution. The Committee is acting beyond its lawful authority, and Northwestern University's compliance with the Committee's demands threaten irreparable harm to Plaintiffs. For the reasons discussed below, before 11:00 a.m. Central Time on April 10, 2025, this Court should enter temporary relief staying the Committee's demands and preventing Northwestern University from complying with those demands, so that the Court and parties can adjudicate the legality of Congress's action.

**RELEVANT FACTS**

XVIII. **Northwestern University's Pritzker School of Law Is an Important American Legal Institution**

Northwestern University's Pritzker School of Law (hereinafter "the Law School") is one of the United States' preeminent law schools, with a demonstrated record of attracting and producing law school graduates who are dedicated to public service, *pro bono* work, and participation and leadership in their communities. Graduates of the Law School go on to serve honorably on the bench, aid their communities through involvement in local, state and federal government, work in premier law firms, teach at respected law schools, guide American businesses, and perform numerous other kinds of public service in their capacities as attorneys. *See* Northwestern Pritzker School of Law Alumni Awards.[1] The Law School, part of a private university, is an important community institution in Chicago, in Illinois, and in the United States.

XIX. **The Law School's Bluhm Legal Clinic Represents Clients In a Variety of Matters**

The Law School's commitment to public service is illustrated by the fact that ninety percent of a typical graduating class participates in clinical legal education during their time in school.[2] The Law School provides that clinical education through the Bluhm Legal Clinic ("Bluhm"), an in-house legal services organization that provides law students with opportunities to assist attorneys in representing, at no cost or low cost, a variety of clients in a variety of contexts.

The Bluhm Legal Clinic is comprised of 20 different clinical programs and 12 different centers, with clinicians guiding students in representing *pro bono* clients in areas of practice such as (1) appellate advocacy; (2) juvenile justice; (3) tenants facing eviction, discrimination, and

---

[1]  Available at https://law.alumni.northwestern.edu/s/1479/04law/law/index2.aspx?sid=1479&gid=4&pgid=467  (last visited Apr. 8, 2025).
[2]  Available online at https://www.law.northwestern.edu/legalclinic/about/ (last visited Apr. 8, 2025).

substandard living conditions; (4) clients facing unlawful detention in countries violating standards of international human rights: (5) certification through the Center on Negotiation, Mediation and Restorative Justice to mediate in a variety of contexts; (6) assistance in remedying wrongful convictions through the Center on Wrongful Convictions; (7) aiding small businesses, start-ups, nonprofit organizations, and entrepreneurs in incorporation, trademark registration, copyright protection, and contract review to help build their businesses; (8) environmental advocacy; (9) preventing and remediating elder abuse; (10) securities litigation, whistleblower suits, and other complex civil litigation; (11) protecting investigators through securities mediation and arbitration; (12) opportunities to aid civil litigants in challenging the criminalization of the poor, police misconduct, and discrimination in the criminal legal system; and (13) promoting and advancing litigation to support the rights of LGBTQI+ people. In total, dozens of attorneys provide legal services to clients through Bluhm's programs.[3]

Bluhm's clinical programs fill an important need in the American legal landscape, providing legal services that build businesses, strengthen communities, protect children and the elderly, aid in the building of international legal norms that make peace possible in sometimes volatile places, prevent the need for litigation through negotiated outcomes to disputes, and ensure the functioning of the legal system by providing counsel to parties to litigation who would otherwise be unrepresented. That work is made possible by the efforts of attorneys who run their legal practices through Bluhm.

XX.    **Plaintiff Sheila Bedi is an Award-Winning, Nationally Recognized Expert on Criminal Legal Reform**

Plaintiff Sheila Bedi is a clinical professor of law at the Law School and is the director of the Community Justice and Civil Rights Clinic. Ex. 1 (Bedi Dec.) ¶1. She has a B.A. from

---

[3]     Available online at: https://www.law.northwestern.edu/faculty/clinic/ (last visited Apr. 8, 2025).

Michigan State University and a J.D. from American University. *Id.* at ¶2. After almost a decade working to reform Mississippi's juvenile justice system, and a year spent as the Executive Director of the Justice Policy Institute in Washington, D.C., Professor Bedi came to the Bluhm Legal Clinic, where she first worked for the Roderick and Solange MacArthur Justice Center for more than seven years on issues involving the civil rights of people involved with the criminal and juvenile justice system, and then became the director of the Community Justice and Civil Rights Clinic. *Id.* at ¶¶3-4.

Throughout her career, Professor Bedi has spoken on panels about criminal legal reform across the United States, at law schools, the American Bar Association, the Federalist Society, the Association of American Law Schools, and to various community groups, including the Chicago Community Trust. *Id.* at ¶13. In addition, she has published in various legal journals and other publications. *Id.* at ¶14. Professor Bedi has received awards from organizations like the American Constitutional Society (the 2024 Abner J. Mikva Award for extraordinary contributions to progressive legal causes), Clinical Legal Education Association (the 2022 Outstanding Advocate for Clinicians Award), the American Bar Association (the 2008 Journal Newsmaker of the Year), the NAACP (the 2007 Fannie Lou Hamer Award and the 2005 Vernon Dahmer Award), and was awarded an Excellence in Public Interest Award in 2017 by the United States District Court for the Northern District of Illinois. *Id.* at ¶12. In 2014, Professor Bedi was named a Fellow of the American Bar Association. *Id.* at ¶12. Since 2023, she has served as a commissioner on the Torture Inquiry and Relief Commission as an appointee of Governor Pritzker; this Commission is authorized by statute to gather and assess evidence about claims of torture occurring in Cook County, and to determine whether "there is sufficient evidence of torture to merit judicial review."

775 ILCS 40/1, *et seq. Id.* at ¶15. Professor Bedi is a sought-after speaker, presenter, and leader in her field.

XXI.  **The Community Justice and Civil Rights Clinic Advocates Against Over-Policing and Mass Imprisonment**

The Community Justice and Civil Rights Project works on policy and litigation strategies to reduce mass imprisonment and police abuse, and to protect freedom of speech. Ex. 1 (Bedi Dec.) ¶9. These are important, non-partisan issues that Americans across the political spectrum recognize require focus and reform. *See, e.g.*, Don Thompson and Adam Beam, *Koch exec, Black Lives Matter in group pushing prison reform*, Assoc. Press (July 23, 2019);[4] Steven M. Teles and David Dagan, *Conservatives and Criminal Justice*, Nat'l Affr. (Spring 2016);[5] Evelyn Doueck and Genevieve Lakier, *First Amendment Politics Gets Weird: Public and Private Platform Reform and the Breakdown of the Laissez-Faire Free Speech Consensus*, Uni. of Chi. L. Rev.[6]

Through her work with the Community Justice and Civil Rights Project, Professor Bedi works to address these broader goals in multiple ways. First, Professor Bedi represents litigants in civil rights lawsuits aimed at redressing constitutional harms. This includes victims of police misconduct and abuse (including a client who was wrongfully detained 60 times because someone with the same name had a warrant out for his arrest and police were initially unwilling to correct this error), families of people who have been killed in police custody, people who have been sexually abused and attacked in the custody of the Illinois Department of Corrections, and other civil rights litigants. *See* Ex. 1. Professor Bedi's work includes the enforcement of a federal consent

---

[4]      Available online at https://apnews.com/general-news-b9ec7a456c014ad1ad5da7fbc42035a5) (last visited Apr. 9, 2025).
[5]      Available online at https://www.nationalaffairs.com/publications/detail/conservatives-and-criminal-justice) (last visited Apr. 9, 2025).
[6]      Available online at https://lawreview.uchicago.edu/online-archive/first-amendment-politics-gets-weird-public-and-private-platform-reform-and-breakdown) (last visited Apr. 9, 2025).

decree directing the Chicago Police Department to change unconstitutional practices, and the clinic has challenged other unconstitutional practices through movement litigation across the United States. *Id.*

Part of the scope of Professor Bedi's clinical work has also been to provide *pro bono* criminal defense representation to people who have been arrested, accused, and convicted of crimes when that representation is connected with the Clinic's mission and goal of addressing systemic injustice or harms suffered by those in the criminal legal system. *Id.* at ¶8. Professor Bedi and her clinic take on cases of people who would otherwise go without representation, and they aid the judicial system by resolving disputes with the involvement of expert counsel. *Id.* at ¶11.

The Community Justice and Civil Rights Project is not just a litigation project. It also provides important policy work to support the community, including hosting the Prison Law and Advocacy Conference in 2022 (at which the then-Assistant Attorney General for Civil Rights Kristen Clarke spoke), and helping advise and support community organizers working to implement policies in Chicago that will make its residents safer, including violence interrupters, restorative justice advocates, and community organizers. *Id.* at ¶11.

Professor Bedi is also involved with providing educational opportunities to people who are in prison, which augments educational programming that otherwise would need to be provided at federal and state expense. *Id.* at ¶11. These opportunities do not just support the human rights of incarcerated people, but have also been shown to reduce recidivism, improve prison conditions, and ultimately make prisons and communities safer. *See* Lois M. Davis, Robert Bozick, et al*., Evaluating the Effectiveness of Correctional Education,* RAND Corporation pp. 27-39 (2013) (prison education programs reduce recidivism);[7] James Conway & Edward T. Jones, *Seven Out of*

---

[7]      Available at: https://bja.ojp.gov/sites/g/files/xyckuh186/files/Publications/RAND_Correctional-Education-Meta-Analysis.pdf.

*Ten? Not Even Close: A Review of Research on the Likelihood of Children with Incarcerated Parents Becoming Justice-Involved,* pp. 10-14 (2015) (children with college educated parents are more likely to attend college, disrupting cycles of poverty and incarceration);[8] Correctional Ass'n of N.Y., *Education from the Inside, Out: The Multiple Benefits of College Programs in Prison*, pp. 8-9 (2009) (prison education programs reduce violence in prisons).[9]

XXII. **Professor Bedi Has Represented Clients Who Are Disfavored or Vilified by the Trump Administration and His Allies in Congress**

Professor Bedi's work has included the representation of vulnerable people and organizations who have been targets of the Trump Administration and Congress. Professor Bedi has represented transgender individuals who have been subject to discrimination and sexual abuse in the Illinois Department of Corrections. *Higgins v. Kennedy*, Case No. 23-CV-50038, Dkt. 1 (Complaint). She has represented incarcerated people who contracted COVID-19 because of Illinois Department of Corrections' practices that failed to prevent the spread of COVID-19 among populations of vulnerable people. *McKinley v. Gomez*, Case No. 22-CV-5459, Dkt. 61 (Amended Complaint). She has helped a Chicago youth organization that conducts police oversight activities seek a temporary restraining order to prevent a City of Chicago ordinance from hampering its ability to organize. *Good Kids/Mad City v. City of Chicago*, Case No. 22-CV-5907, Dkt. 1 (Complaint).

Earlier this year, Professor Bedi and the Community Justice and Civil Rights Clinic represented a group of Chicago organizations who are part of the Sanctuary City Movement in Chicago, arguing that the Department of Homeland Security's planned immigration enforcement raids in Chicago were designed to destroy Chicago's Sanctuary City Movement and chill these

---

[8]    Available at: https://www.prisonpolicy.org/scans/CIP_Seven_Out_of_Ten_Not_Even_Close.pdf
[9]    Available at https://perma.cc/678G-979E.

organizations' advocacy for the rights of people regardless of their immigration status. *Organize Communities Against Deportation et al. v. Huffman, et al.*, Case No. 25-CV-868, Dkt. 1 (Complaint). The plaintiffs in *Organize Communities* sought a temporary restraining order to prevent the Trump Administration from beginning immigration raids in Chicago, but after those raids began during the pendency of TRO briefing, altering the factual circumstances of the case and the adequacy of relief, the plaintiffs voluntarily dismissed the case. (Dkt. Nos. 20, 21). Professor Bedi now represents amici in the lawsuit the United States has filed against the State of Illinois as the federal government is now challenging the city, county and state Sanctuary laws in *United States v. Illinois*, No. 23-cv-01285.

XXIII. **The Trump Administration Takes Notice of Professor Bedi's Representation of Protesters Advocating in Support of Palestinian Human Rights**

Professor Bedi has published about, spoken, taught, and advocated for collective liberation, abolition, community self-determination, an end to police violence and all other forms of violence, and preservation of the First Amendment right to protest and petition the government for redress of grievances.

Consistent with those professional commitments, and consistent with the aims of the Community Justice and Civil Rights Clinic, Professor Bedi currently represents, *pro bono*, protesters who participated in a 2024 protest in support of Palestinian human rights who were sued by a putative class representative purporting to represent a class of people who were inconvenienced by peaceful protesters blocking the roadway leading to O'Hare Airport. *Manhart v. National Students for Justice in Palestine*, Case No. 24-CV-08209 (Dkt. No. 33) (Amended Complaint). The *Manhart* plaintiff sued a variety of organizations, including an organization, Tides LLC, that only indirectly supports abolition organizations, and demanded $36 million dollars for the putative class. *Id.*, Dkt. 3 (Civil Cover Sheet). The organizations and individuals unfairly

targeted in *Manhart* have filed motions to dismiss and motions for sanctions, which remain pending. *Id.*, Dkts. 53, 63, 71, 73, 75-78, 80, 82.

XXIV. **Plaintiff Lynn Cohn is a Nationally Recognized Expert Mediator**

Plaintiff Lynn Cohn is a Clinical Professor at the Center on Negotiation, Mediation, and Restorative Justice (the "Center") which operates within Bluhm. Ex**. 2** (Cohn Dec.) ¶1. Professor Cohn began working at the Law School in 1991 as an adjunct professor and became a full-time faculty member in 1996, when she founded the Center and became its Director. *Id.* at 2. The Center was incorporated into Bluhm in 2008. *Id*. Professor Cohn served as Director of the Center for thirty years, until earlier this year. *Id.* Professor Cohn has practiced as a mediator since 1998, and in 2013, Professor Cohn began service as a Special Master, designated by various federal district courts, to implement complex civil class action civil rights settlements. *Id.* Her work with the Center includes teaching, serving as a professional mediator, training students to become mediators, and working on various restorative justice and alternative resolution initiatives. *Id.* at ¶3.

The Center has fourteen different course offerings, including a negotiation course, taught by Professor Cohn and her colleagues. *Id.* at ¶ 4. The negotiation course alone has 8-12 different sections. *Id*. Hundreds of students are enrolled in the Center's courses in any given academic year. *Id.* In 2024-25, about 300 students enrolled in classes with the Center, and the Center conducted around 60 mediations and 23 restorative justice circles. *Id*. The Center has been repeatedly designated as a Top 10 Dispute Resolution Program by *U.S. News & World Report. Id.*

Professor Cohn's classes explore topics such as "privilege, i.e., 'who gets to sit at the table,' power imbalances, and implicit bias in the context of mediations and negotiations. *Id.* at ¶8. It examines historic exclusions in the legal system and promote diversity, equity and

inclusion in alternative resolution methods. *Id.* The Center honors identity as part of its processes and emphasizes the value of different perspectives typically excluded from traditional legal forums and systems." *Id. at* ¶9.

The Center provides students with theoretical and practical experience in negotiation and mediation through a series of courses and workshops. Professor Cohn and her colleagues educate, train, and supervise students with respect to settlement negotiations, formal mediations, and restorative justice circles in a variety of settings. *Id.* at ¶3; s*ee also* Ex. **3** (Buth Dec) ¶5. The Center works with a variety of parties including individuals, organizations, businesses, government agencies, and the Illinois state court system, to resolve disputes through alternatives to litigation. Ex. **2** (Cohn Dec) ¶5. Much of the Center's work concerns community issues— employment, housing, contracts, small claims, and neighborhood disputes. *Id*. Restorative justice circles provide a confidential space to address conflicts, build relationships, and repair harm, without court intervention. *Id.* The participants for mediations and restorative justice circles come from a variety of backgrounds and perspectives. *Id.*

The Center works with individual and organizational partners whose information is private and confidential, the disclosure of which would violate the Center's agreements with these partners and cause substantial harm, as described more fully below. *Id.* at ¶10. The Center maintains confidentiality over all aspects of mediations and circles the Center conducts, a necessary aspect of the Center's work. *Id.*; Ex. **3** (Buth Dec) ¶14. The Center and Professor Cohn provide countless pro bono hours and dispute resolution services for those who would otherwise be unable to afford such services. Ex. **2** (Cohn Dec) ¶15.

XXV. **The Committee and Later the Trump Administration's Interest in Chilling Speech and Academic Freedom at America's Universities**

As has been detailed in other recently filed complaints, the Trump Administration and the Committee have used the pretext of investigating antisemitism to challenge various universities' responses to 2024 student protests in support of Palestinian human rights. These protests, which occurred on many university campuses in the United States, appeared to have prompted the Committee to issue document requests to numerous universities, and to call various university leaders to testify before the Committee. *See generally* Robin D.G. Kelley, *UCLA's Unholy Alliance*, BOS. REV. (May 18, 2024).[10] As has been widely reported, this has led to changes in leadership at some universities. *See, e.g.,* Max Matza, *Claudine Gay resigns as Harvard University president*, BBC NEWS (Jan. 2, 2024).[11]

The Committee held high-profile hearings on these issues in 2024, but has continued to issue increasingly specific and detailed document requests to various universities, seeking not only broader records about purported antisemitism on various campuses, but also specific student disciplinary records, specific records related to faculty, and most recently, specific directions to certain universities that their federal funding is at risk unless they take specific actions to punish and suppress pro-Palestinian speech. *See, e.g.*, Letter from U.S. H.R. Rep. comm. Educ. & Workforce to Dr. Katrina Armstrong, Interim President of Columbia Univ., Mr. David Greenwald & Ms. Claire Shipman, Co-Chairs of the Trs. Columbia Univ. (Feb. 13, 2025).[12]

Following Donald Trump's re-election as President, his executive branch joined the Committee's efforts to pressure universities into suppressing speech with which the Committee

---

[10]     Available online at https://bostonreview.net/articles/uclas-unholy-alliance (last visited Apr. 8, 2025).
[11]     Available online at www.bbc.com/news/world-us-canada-67868280 (last visited Apr. 8, 2025).
[12]     Available online at https://edworkforce.house.gov/uploadedfiles/2.13.25_columbia_letter.pdf (last visited Apr. 8, 2025)

disagrees. *See, e.g.*, Letter from the GSA, U.S. Dept. of Health & Human Servs., and the U.S. Dept. Educ. To Dr. Katrina Armstrong, Interim President of Columbia Univ., David Greenwald & Claire Shipman, Co-Chairs of Trs. Columbia Univ. (Mar. 13, 2025).[13] In recent correspondence to Columbia University, executive agencies demanded that Columbia University alter its student disciplinary procedures, enforce discipline against students involved in protests in support of Palestinian human rights, exercise additional oversight over its Middle East, South Asian and African Studies Department, and ban facial coverings on campus. Most importantly, the letter directed Columbia University to effectively ban speech on campus critical of Israel. *Id.*

On March 10, 2025, the Department of Education Office for Civil Rights sent out letters to sixty universities advising them that they were under investigation under Title VI for purported violations relating to "antisemitic harassment and discrimination" and warning those universities that their federal funding was contingent on complying with President Trump's executive orders. "These universities are in Trump's crosshairs. Many don't know why," USA TODAY (Mar. 27, 2025).[14] This list included universities whose only antisemitism complaints had been resolved, and universities who had no record of complaints. *Id.* It also appeared that the Executive Branch did not have resources to conduct actual investigations of these complaints, given that the day after it sent this letter it closed over half of the regional offices of the Education Department's Office of Civil Rights, which would typically investigate such complaints. *Id.* In response to this letter, at least one large university president advised the press that his university was "not going to take any risk for loss of research funding. We're just not." *Id.*

---

[13]     Available online at https://s3.documentcloud.org/documents/25577971/31325-letter-to-columbia.pdf (last visited Apr. 8, 2025).
[14]     Available online at https://www.usatoday.com/story/news/politics/2025/03/27/universities-targeted-by-trump-antisemitism-campus/82691187007/_ (last visited Apr. 8, 2025).

XXVI. **The Trump Administration Has Punished Numerous People It Views as Ideological Opponents**

The Trump Administration's focus on higher education has been just one facet of its strong signaling to the American public that it will seek to punish, personally and professionally, people who espouse views with which it disagrees. Since President Trump took office, the executive but ranch has taken steps to punish and retaliate against numerous people whose viewpoint the Administration seeks to suppress. The Administration has taken these steps to threaten people who might seek to oppose the Administration—in the political, legal, educational, scientific, or other spheres—making clear they will face consequences for publicly expressing differing views.

This has included revoking security clearances of former intelligence officers who commented on Hunter Biden's email scandal, Dustin Volz, *Trump Order Revokes Security Clearances for 50 Former Officials*, WALL ST. J. (Jan. 20, 2025);[15] revoking security details, Kaitlin Collins, *Trump Terminates John Bolton's Security Detail Within Hours of Taking Office*, CNN (Jan. 21, 2025),[16] Sheryl Storberg, *Trump Terminates Fauci's Government Security Protection*, N.Y. TIMES (Jan. 24, 2025) (President Trump revokes Secret Service security detail for Dr. Anthony Fauci);[17] barring certain press agencies from White House press briefings, Jenna Amatulli, *Associated Press Barred from Oval Office for Not Using 'Gulf of America'*, GUARDIAN (Feb. 11, 2025);[18] arresting and deporting students who were involved in Palestinian human rights protests, Ginger Adams Otis, *ICE Arrests Columbia Student Who Helped Lead Pro-Palestinian*

---

[15]     Available online at https://www.wsj.com/livecoverage/trump-inauguration-president-2025/card/trump-order-revokes-security-clearances-for-50-former-officials-8zTkfQqfuYY15yESmer4 (last visited Apr. 8, 2025).

[16]     Available online at https://www.cnn.com/2025/01/21/politics/john-bolton-security-detail-trump/index.html (last visited Apr. 8, 2025).

[17]     Available online at https://www.nytimes.com/2025/01/24/us/politics/fauci-security-protection.html (last visited Apr. 8, 2025).

[18]     Available online at https://www.theguardian.com/us-news/2025/feb/11/associated-press-oval-office-gulf-of-america (last visited Apr. 8, 2025).

*Protests*, WALL ST. J. (Mar. 9, 2025);[19] Chole Atkins and Phil Helsel, *Video Shows Tufts Graduate Student Grabbed Off Street by Federal Immigration Officials*, NBC NEWS (Mar. 26-27, 2025),[20] Jaclyn Diaz, *What We Know About the Case of Detained Georgetown Professor Badar Khan Suri*, NPR (Mar. 21, 2025),[21] Gloria Pazmino and Amanda Musa, *Cornell Student Activist Chooses to Leave US After Judge Denies Bid to Immediately Block Deportation*, CNN (Apr. 2, 2025),[22] Michael Casey, Rodrique Ngowi, and Kathy McCormack, *Homeland Security says Professor Deported to Lebanon with US Visa Supported Hezbollah Leader*, AP NEWS (Mar. 18, 2025),[23] Max Matza, *US Arrests Second Pro-Palestinian Columbia University Protestor*, BBC (Mar. 14, 2025),[24] Jonah E. Bromwich and Hamed Aleaziz, *Columbia Student Hunted by ICE Sues to Prevent Deportation*, N.Y. TIMES (Mar. 24-26, 2025),[25] Luis Ferre-Sadurni and Hamed Aleaziz, *How a Columbia Student Fled to Canada After ICE Came Looking for Her*, N.Y. TIMES (Mar. 15, 2025),[26] Andy J. Semotiuk, *Silencing Dissent: U.S. Moves to Deport Kremlin Critic Kseniia Petrova*, FORBES (Mar. 30, 2025);[27] and separating transgender service personnel from the

---

[19]     Available online at https://www.wsj.com/us-news/dhs-detains-columbia-student-who-helped-lead-pro-palestinian-protests-fbbd8196?mod=article_inline (last visited Apr. 8, 2025).

[20]     Available online at https://www.nbcnews.com/news/us-news/federal-immigration-authorities-detain-international-tufts-graduate-st-rcna198158 (last visited Apr. 8, 2025).

[21]     Available online at https://www.npr.org/2025/03/21/nx-s1-5336173/immigration-georgetown-university-professor (last visited Apr. 8, 2025).

[22]     Available online at https://www.cnn.com/2025/03/31/us/cornell-student-activist-deportation/index.html (last visited Apr. 8, 2025).

[23]     Available online at https://apnews.com/article/trump-immigration-doctor-deportation-82da65b55159243df4fd27b8be47db87 (last visited Apr. 8, 2025).

[24]     Available online at https://www.bbc.com/news/articles/c3rnzp4ye5zo (last visited Apr. 8, 2025).

[25]     Available online at https://www.nytimes.com/2025/03/24/nyregion/columbia-student-ice-suit-yunseo-chung.html (last visited Apr. 8, 2025).

[26]     Available online at https://www.nytimes.com/2025/03/15/nyregion/columbia-student-kristi-noem-video.html (last visited Apr. 8, 2025).

[27]     Available online at https://www.forbes.com/sites/andyjsemotiuk/2025/03/30/silencing-dissent-us-moves-to-deport-kremlin-critic-kseniia-petrova/ (last visited Apr. 8, 2025).

military, Jo Yurcaba and Courtney Kube, *Transgender Troops will be Removed from the Military, Pentagon Says*, NBC NEWS (Feb. 27, 2025).[28]

Additionally, there are numerous examples of supporters of President Trump and his allies directing "doxxing" attacks and other campaigns of harassment at people who President Trump has publicly disparaged. *See, e.g.*, Nia Prater, *The Pro-Israel Group that Led to Rumeysa Ozturk's Arrest: Canary Mission has a History of Putting Activists on the Trump Administration's Radar,* N.Y. MAG (Mar. 28, 2025) (individuals who publicly associate with Palestinian human rights advocacy are often doxxed by a group called Canary Mission, and doxxed individuals targeted by DHS—including Mahmoud Khalil and Rumeysa Ozturk—have extensive reports on Canary Mission's website, despite vastly differing levels of support for Palestine);[29] Stephanie Saul, *A Mysterious Group Says Its Mission is to Expose Antisemitic Students*, N.Y. TIMES (Apr. 1, 2025);[30] "The Trump Jury Has a Doxing Problem," Wired (Apr. 18, 2024);[31] "Right-Wing Group Publishes 'D.E.I. Watch List' Targeting Federal Workers," N.Y. TIMES (Feb. 5, 2025);[32] "Trump's Biggest Donors Behind Group Doxxing Pro-Palestine Students," The New Republic (May 13, 2024).[33]

## XXVII. The Executive Branch Has Also Targeted Law Firms Representing Clients With Whom the Trump Administration Disagrees

---

[28]     Available online at https://www.nbcnews.com/nbc-out/out-news/transgender-troops-will-removed-military-pentagon-says-rcna194023 (last visited Apr. 8, 2025).

[29]     Available online at https://nymag.com/intelligencer/article/rumeysa-ozturk-tufts-canary-mission.html) (last visited Apr. 8, 2025).

[30]     Available online at https://www.nytimes.com/2025/04/01/us/israel-gaza-student-protests-canary-mission.html) (last visited Apr. 8, 2025).

[31]     Available online at  https://www.wired.com/story/the-trump-jury-has-a-doxing-problem/) (last visited Apr. 8, 2025).

[32]     Available online at https://www.nytimes.com/2025/02/05/us/politics/dei-watchlist-federal-health-workers-cdc-nih.html (last visited Apr. 8, 2025).

[33]     Available online at https://newrepublic.com/post/181534/trump-republican-donors-group-doxxing-pro-palestine-students) (last visited Apr. 8, 2025).

The Administration has not only targeted people whose speech it opposes but has targeted attorneys whose clients or professional connections it opposes. President Trump himself previewed that his administration "ha[s] a lot of law firms that we're going to be going after." Daniel Barnes, *How Major Law Firms are Responding to Trump's Attacks*, POLITICO (Mar. 19, 2025).[34] In recent weeks, the Trump Administration has issued a series of Executive Orders, directed against law firms and designed to punish law firms who the Trump Administration views as associating with people with whom the Administration disagrees. This includes firms currently or previously connected to perceived opponents of Donald Trump, such as Doug Emhoff, Hillary Clinton, and former prosecutors involved in the Special Counsel's prosecution of Donald Trump. And while some of this retaliation began as direct retaliation to settle scores from the Department of Justice's prior investigation of and prosecution of Donald Trump, that retaliation has become explicitly ideological, designed to deter attorneys from representing people with whom the administration disagrees.

For instance, on February 25, 2025, President Trump signed an executive order directed at Covington & Burling, LLP ("Covington"), identifying as the reason for the order that Covington had provided legal advice to Jack Smith during his time as Special Counsel. "Suspension of Security Clearances and Evaluation of Government Contracts", The White House (Feb. 25, 2025).[35] This memorandum revoked the security clearances of Covington employees and directed the Attorney General and other government agencies to "take such actions as are necessary to terminate any engagement [of Covington] by any agency [of the United States]." *Id.* Covington appears not to have formally challenged this order.

---

[34]     Available online at https://www.politico.com/news/2025/03/19/trump-major-law-firm-sanctions-questions-00236446 (last visited Apr. 8, 2025).
[35]     Available online at https://www.whitehouse.gov/presidential-actions/2025/02/suspension-of-security-clearances-and-evaluation-of-government-contracts/) (last visited Apr. 8, 2025).

On March 6, 2025, President Trump signed an executive order directed at Perkins Coie, LLP ("Perkins Coie). That order criticized Perkins Coie's choice of clients, including its representation of Hillary Clinton, its involvement in election law litigation, and its filing of "lawsuits against the Trump Administration." Ex. 4 (Perkins EO). As with other executive orders directed at law firms, this Order suspended security clearances of all Perkins Coie's employees (impeding its ability to represent clients on national security matters), barred Perkins Coie employees from federal buildings, directed federal employees not to communicate with Perkins Coie employees, and directed entities with federal contracts to sever ties with Perkins Coie or lose their federal contracts. At the signing of this Executive Order, President Trump warned again that he would target other legal professionals. See ANI News, *Trump Revokes Security Clearances for Perkins Coie Over DEI Policies*, YouTube (Mar. 6, 2025).[36] The district court granted a motion for a temporary restraining order enjoining this order, finding it constituted "viewpoint discrimination" to advance a "wholly personal vendetta." *Perkins Coie LLP v. U.S. Dep't of Justice*, No. 25-CV-716, at 76-78, 101. (D.D.C. Mar. 12, 2025) (Dkt. No. 22).

A few days later, on March 14, 2025, President Trump issued a similar order targeting Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss"). Ex. 5 (Paul Weiss EO). Paul Weiss's purported malfeasance was hiring former members of the Special Prosecutor's Office and a former member of the team that prosecuted President Trump in Manhattan, participating in *pro bono* litigation suing people who were alleged to have participated in the January 6, 2021 overrunning of the United States Capitol, and promoting diversity, equity, and inclusion initiatives. This order subjected Paul Weiss to the same sanctions as Perkins Coie. *Id.*

---

[36]     Available online at 1:20 at https://www.youtbue.comwatch?v=1Y6ougLkFsc.

On March 25, 2025, President Trump targeted Chicago-based firm Jenner & Block LLP ("Jenner"). Ex. 6 (Jenner EO). This Executive Order not only subjected Jenner employees to similar sanctions as the other law firms but also critiqued more than Jenner's prior association with Andrew Weissman, who worked with Special Prosecutor Robert Mueller in investigating President Trump. President Trump specifically asserted that action against Jenner was warranted because Jenner had engaged in "harmful activity" including "obvious partisan representations to achieve political ends." *Id.* The litigation the White House cited included lawsuits Jenner filed to aid people in receiving gender-affirming care, and litigation related to the Trump Administration's unconstitutional removal proceedings. *Id.* Jenner immediately challenged the Order in federal court. *See also Jenner & Block LLP v. U.S. Dep't of Justice, et. al.*, Case No. 25-CV-916 (D.D.C. Mar. 28, 2025) Dkt. 2-1 at 22-23 (Memorandum of Law in Support of Motion for a Temporary Restraining Order).

These are not the only cases in which Jenner has represented clients at odds with the Trump Administration. Jenner represents Tides LLC, an organization that is a party in the *Manhart* litigation in which Professor Bedi also represents certain named defendants. *Manhart,* Case No. 24-CV-08209 (Dkt. No. 9) (Jenner appearance). And, as Jenner disclosed in its motion for a TRO, it has represented a plaintiff in litigation related to the Trump Administration's blocking of National Institute of Health grants. *Jenner & Block LLP*, Case No. 25-CV-916 (Dkt. No. 2-1 at 23).

On March 28, 2025, the District Court granted Jenner's motion for a temporary restraining order, barring enforcement of the Executive Order. *Jenner*, Case No. 25-CV-916, Dkt. 9. That litigation remains pending.

On March 27, 2025, President Trump issued a similar executive order against Wilmer Cutler Pickering Hale & Dorff LLP ("WilmerHale"). Ex. 7 (WilmerHale Order). WilmerHale filed a lawsuit and sought a temporary restraining order which was also granted in part. *Wilmer Cutler Pickering Hale and Dorr, LLP v. Exec. Office of the President, et al.*, Case No. 25-CV-917, Dkt. 10 (D.D.C. Mar. 25, 2025). That litigation remains pending.

In response to additional Executive Orders, some law firms have reached "deals" with the White House to avoid similar executive orders, and other firms have preemptively negotiated with the White House to avoid such sanctions. In these deals, the law firms agreed to provide hundreds of millions of dollars of free legal services to "mutually agreed-upon projects with the Trump administration." "Doug Emhoff's law firm Willkie Farr & Gallagher reaches deal with Trump," Reuters (Apr. 3, 2025);[37] "Milbank reaches deal with Trump as divide among law firms deepens," Reuters (Apr. 2, 2025);[38] "Trump's crusade against big law firms sparks fears of long-lasting damage," CBS News (Apr. 2, 2025);[39] "The Law Firms Trump Has Targeted, Why, and How They've Each Responded," Time (Apr. 1, 2025) (Paul, Weiss, Rifkind, Wharton & Garrison LLP order was rescinded after an agreement to provide free legal services to "support causes" of the Trump Administration, and Skadden, Arps, Slate, Meagher & Flom LLP reached an agreement with the Trump Administration before any order was filed to provide $100 million in pro bono legal services for Trump Administration initiatives).[40]

---

[37] Available online at https://www.reuters.com/world/us/trump-says-he-reached-settlement-deal-with-law-firm-willkie-farr-gallagher-2025-04-01/ (last visited Apr. 8, 2025).

[38] Available online at https://www.reuters.com/world/us/trump-reaches-agreement-with-milbank-law-firm-2025-04-02/ (last visited Apr. 8, 2025).

[39] Available online at https://www.cbsnews.com/news/trumps-big-law-firms-retribution/ (last visited Apr. 8, 2025).

[40] Available online at https://time.com/7272466/law-firms-trump-wilmerhale-jenner-block-paul-weiss-covington-burling/ (last visited Apr. 8, 2025).

President Trump also indicated that more sanctions against law firms may be coming. On March 22, 2025, President Trump issued another memorandum directing the Attorney General's Office to review "conduct by attorneys or their law firms in litigation against the Federal Government" and to take appropriate steps including termination of contracts, reassessment of security clearances, and "any other appropriate actions." Ex. 8 (Mar. 22, 2025 Executive Order).

Retaliation against attorneys has also taken on more personal, extralegal forms. Just this weekend, a Detroit attorney representing a pro-Palestine protester in criminal proceedings arising from campus protests was detained at the airport following his return to the United States from a vacation with his family, told by Customs and Border Protection Agents that they knew he was a "lawyer" who "take[s] on big cases," and asked to show officers information on his phone protected by attorney-client privilege. "Lawyer for U-M protester detained at airport after spring break trip with family," Detroit Free Press (Apr. 7, 2025).[41]

## XXVIII.   The House Committee on Education and Workforce Targets Northwestern University

This campaign of retribution, punishment, chilling of speech, and signaling about what happens to universities and attorneys who oppose the Administration is helpful context for how Professor Bedi came to be a Plaintiff in this litigation. The Defendant Committee initially took notice of Northwestern University as part of its coordinated campaign to coerce various universities into punishing student protesters advocating on behalf of Palestinian human rights. That is of no moment to Professor Bedi, whose work was never raised as a part of these earlier hearings and who was never identified by the Committee as having any involvement in alleged

---

[41]     Available at https://www.freep.com/story/news/local/michigan/wayne/2025/04/07/lawyer-for-u-m-protester-held-at-airport-refused-to-give-feds-his-phone/82978891007/ (last visited Apr. 8, 2025).

antisemitism on Northwestern's campus at any point until the recent records demands that are the subject of this lawsuit.

The protests at Northwestern University were unique in that Northwestern's administration sought to enforce safety, security, and other campus rules while also seeking to "engage in dialogue and seek to bridge differences peacefully." "Here's why I reached an agreement with Northwestern protesters," Michael Schill, Chicago Tribune (May 10, 2024).[42] As President Schill described in his Opinion piece, as a "proud Jew" with a "love for Israel," he sought to bring Jewish "culture of rationality and tolerance" into his approach to responding to protesters. *Id.* In his words, "claims by some that I have collaborated with antisemitic people feel like personal affronts." *Id.* Following that ethic, his administration met with student protesters, dialogued with them about their aims, and ultimately reached an agreement with protesters for them to dismantle tents in exchange for the continuation of peaceful protests, continuing dialogue around university investments, additional support on campus for Muslim and Middle Eastern students in keeping with resources for other affinity groups, and a commitment to include students from Gaza in the University's "Scholars at Risk" program. *Id.* President Schill determined that this process was intended to center "respectful dialogue" and to honor "young people who were in the process of learning." *Id.*

The protests and the response to those protests at Northwestern were noteworthy for this approach—they involved dialogue, enforcement of university policies, consideration for protesters' aims, and a resolution that did not end with arrests or violence against students as occurred at other universities.

This process apparently caught the eye of the Committee, which in December 2023 began a set of hearings ostensibly about antisemitism on university campuses that came to focus on

---

[42]     Available online at https://www.chicagotribune.com/2024/05/09/opinion-peaceful-resolution-northwestern-protests/ (last visited Apr. 8, 2025).

various university's responses to protests in support of Palestinian human rights. President Schill testified in front of the Committee on May 23, 2024. Prior to his testimony (and the same day his op-ed piece was published in the Chicago Tribune), the Committee sent Northwestern a letter requesting documents, including information related to particular Northwestern staff the Committee had identified as involved in the protests or protest negotiations, information about student discipline in connection with the protests, information about the Board of Trustees' meetings related to these protests, information about donations and funding, and any video recordings related to the protests. Ex. 9 (June 7 Letter). In response, Northwestern produced over 200 pages of documents, some of which it aggregated from publicly available sources. *Id*.

President Schill testified before the House Committee two weeks later. The Committee, dissatisfied with his testimony, followed up with a June 7, 2024 letter that requested additional documents from Northwestern and accused President Schill of a lack of candor in his testimony. *Id*. This letter suggested that Northwestern designating places in the Scholars at Risk program for Palestinian students would potentially violate federal antidiscrimination laws. It followed up with additional document requests including documents from a larger set of identified people (none of whom were Professor Bedi), documents about a number of specifically identified campus meetings, further student disciplinary records, and further donation records. *Id.* at 8-9. The letter warned Northwestern that it "ha[d] failed to voluntarily comply with the Committee's oversight" for past requests, and that "[i]f these requests are not satisfied by the above deadline, the Committee is prepared to issue a subpoena. The Committee is ready to use the full array of oversight powers available to it to obtain the documents and information it requires and to address continued noncompliance." *Id.* at 9.

The Committee's hearings over the summer of 2024 led to a report, published in late October of 2024, titled *Antisemitism on College Campuses Exposed*, Committee on Education & the Workforce, U.S. House of Representatives (October 31, 2024). Ex. 10 (October 31, 2024 Report).[43] Northwestern is mentioned on page 1 of this report; it and President Schill are mentioned almost 100 times combined. *Id.* The Report includes the critique that Northwestern had failed to discipline any students in connection with the protest encampment (although it noted that some students were placed on probation as discipline for fliers circulated on campus). *Id.* at 77-78. Neither the Law School nor the Bluhm Legal Clinic is mentioned in any way in this report, and the Report's critiques appeared aimed at Northwestern's senior university leadership.[44] Moreover, the report's critiques are based on the thinnest of grounds and mischaracterize the facts.

---

[43]     Available online at  https://edworkforce.house.gov/news/documentsingle.aspx?DocumentID=412025 (last visited Apr. 8, 2025).

[44]     The Report, and the Executive Branch's involvement in targeting Northwestern, is consistent with numerous statements made by President Trump, both before and during his presidential terms, reflecting a dislike and denigration of the City of Chicago. *See, e.g.*, *In Chicago, Trump Calls the City an Embarrassment to the US*, PBS WTTW (Oct. 28, 2019), available online at https://news.wttw.com/2019/10/28/chicago-trump-calls-city-embarrassment-us (last visited Apr. 7, 2025) (President Trump criticizes Chicago for perceived issues with crime, and its sanctuary city status); Lincoln Anthony Blades, *Trump's Obsession with Chicago, Explained*, TEEN VOGUE (July 6, 2017), available online at https://www.teenvogue.com/story/trumps-obsession-with-chicago-explained (last visited Apr. 7, 2025) (summary of President Trump's disparaging comments and racist dog-whistles towards Chicago); Edward McClelland, *An Open Letter to Trump: What's Your Beef With Chicago?*, CHI. MAG. (Sept. 13, 2024), available online at https://www.chicagomag.com/news/an-open-letter-to-trump-whats-your-beef-with-chicago/ (last visited Apr. 7, 2025) (same); Kelly Bauer, *Donald Trump and Chicago Have a Rocky History. Here's What to Know*, BLOCK CLUB CHI. (July 31, 2024), available online at https://blockclubchicago.org/2024/07/31/donald-trump-and-chicago-have-a-rocky-history-heres-what-to-know/ (last visited Apr. 7, 2025) (same). President Trump has recently targeted Chicago in various governmental actions. *See, e.g.*, Heather Cherone and Amanda Vinicky, *Donald Trump Administration Sues Chicago, Cook County and Illinois Over Protections for Undocumented Immigrants*, PBS WTTW (Feb. 6, 2025), available online at https://news.wttw.com/2025/02/06/donald-trump-administration-sues-chicago-cook-county-and-illinois-over-protections (last visited Apr. 8, 2025); Jacob Bogage and Jeff Stein, *Trump Team Eyes Funding Showdown with 'Sanctuary Cities' over Immigration*, WASH. POST. (Nov. 26, 2024), available online https://www.washingtonpost.com/business/2024/11/26/trump-mass-deportation-sanctuary-cities-doge-immigration/ (last visited Apr. 8, 2025) (President-elect Trump's advisor reported as saying "Chicago is going to be made an example of" because of its sanctuary city laws);  Becky Vevea, *'We're Gonna Sue': Chicago Mayor Says Trump Threat to Cut Funding Over DEI is 'Unconstitutional'* BLOCK CLUB CHI. (Apr. 4, 2025), available online at

In total, Northwestern produced hundreds of pages of documents in response to these earlier document requests, including communications that it marked as confidential. Many of these confidential materials were released into the congressional record. Ex. 10 (Oct. 31 report) at 10-12, 246-50. Some were also included as images in the October 31, 2024, publicly available report. *Id.,* at 10-12.

XXIX. **The House Committee Works Hand in Hand with the Trump White House to Further Target Universities for Purportedly Failing to Combat Antisemitism**

On January 29, 2025, President Trump issued executive order 14188, "Additional Measures to Combat Anti-Semitism," directing executive branch agencies to identify all civil and criminal authorities under their jurisdiction to combat antisemitism, directing the Attorney General to pursue cases through the Department's civil-rights enforcement authorities, and directing the Secretary of Education and other executive department heads to take further action to combat antisemitism. "Additional Measures to Combat Anti-Semitism".[45]

In turn, on February 5 the Department of Justice released a memorandum establishing a joint task force to combat "antisemitic acts of terrorism and civil rights violations in the homeland." The memorandum notes that the task force's priorities include "investigating and prosecuting acts of terrorism, antisemitic civil rights violations, and other federal crimes committed by Hamas supporters in the United States, *including on college campuses.*" Ex. 11 (DOJ Memo re October 7 Task Force).

---

https://blockclubchicago.org/ 2025/04/04/were-gonna-sue-chicago-mayor-says-trump-threat-to-cut-funding-over-dei-is-unconstitutional/ (last visited Apr. 7, 2025) (Chicago Mayor Brandon Johnson vows lawsuit after the Trump administration threatens to pull funding from public school districts which do not certify they do not engage in politically disfavored diversity, equity, and inclusion initiatives; the Chicago Public School District receives $400 million in federal funds annually).

[45] Available online at https://www.whitehouse.gov/presidential-actions/2025/01/additional-measures-to-combat-anti-semitism/ (last visited Apr. 9, 2025).

At the same time, consistent with the Executive Order and the new joint task force, the Department of Justice opened new investigations into Northwestern and four other universities for purportedly tolerating antisemitism, accompanied by a statement from the Department of Education. "Trump Administration Opens Antisemitism Inquiries at 5 Colleges, Including Northwestern," Associated Press (February 4, 2025).[46] Representative Tim Walberg, Chairman of the United States House of Representatives' Committee on Education and Workforce ("House Committee"), applauded the investigation into Northwestern and the other universities, saying he was "glad that we finally have an administration who is taking action to protect Jewish students." *Id.* Indeed, Representative Walberg has indicated that he shares the policy aims of the Trump Administration and will work in collaboration with the Executive Branch to achieve their policy agenda. "Rep. Wahlberg to Newsmax: Removing funding will 'wake up' colleges," (Mar. 4, 2025) (Rep. Walberg: "If you want to allow [illegal protests on college campuses] to carry on, then you're going to lose your federal funding. . . . I think that should wake them up. And that's what the president is saying. He's been saying common sense, law and order, America First.").[47]

## XXX. The House Committee Follows Up with Its March 27, 2025 Demand for Information

Shortly after, the Committee focus on Northwestern appeared to resurface and redirect toward Professor Bedi and the Bluhm Legal Clinic. On March 27, 2025, on the heels of President Trump's Executive Orders directed at law firms, the Committee—over the signatures of Chairman Walberg and Representative Burgess Owens, Chairman of the Subcommittee on Higher Education and Workforce Development—sent a letter demanding information to Schill and Mr. Peter Barris, Chair of the Board of Trustees of Northwestern University.

---

[46]    Available online at https://news.wttw.com/2025/02/04/trump-administration-opens-antisemitism-inquiries-5-colleges-including-northwestern (last visited April 8, 2025).

[47]    Available online at https://walberg.house.gov/media/in-the-news/rep-walberg-newsmax-removing-funding-will-wake-colleges (last visited April 8, 2025).

This Letter indicated for the first time that the Committee was concerned that Northwestern was "providing free legal representation in a civil suit to the organizers of an anti-Israel blockade of highway traffic to Chicago's O'Hare International Airport." Ex. 12 (March 27, 2025 Letter) at 1. The Letter described this as Northwestern dedicating its resources to "support this illegal, antisemitic conduct." *Id.* It claimed the Law School represented the "institutionalization of left-wing political activism," and mentioned Professor Bedi by name, describing her as "us[ing] Northwestern's name and resources to engage in progressive-left political advocacy." *Id.* at 2. It described her clinic's work as "troubling" and identified it, without any explanation, as "one of numerous Northwestern Law clinics and centers promoting left-wing causes." *Id.* at 3. It accordingly demanded the production of five categories of documents by Apr. 10, 2025, including:

1. All written policies, procedures, and guidance relating to the function of legal clinics at Northwestern Law, including any written guidance on what constitutes appropriate work, and direction on appropriate client representations;

2. A detailed budget for the Bluhm Legal Clinic, including detailed budgets for its more than 20 clinics and 12 centers.

3. A list of the sources of Bluhm Legal Clinic's funding, including the funding for each of its centers and clinics;

4. A list of all the Community Justice and Civil Rights Clinic's payments to people or groups not employed by Northwestern and any of its clinics and centers since 2020; and

5. All hiring materials and performance reviews for Sheila A. Bedi.

*Id.* at 3.

Both Pam Bondi, the Attorney General, and Linda McMahon, Secretary of Education—the heads of departments specifically directed to take action by President Trump in his January 29 Executive Order—were copied on the Committee's letter. *Id.* at 3.

XXXI. **Northwestern's Compliance with the Committee's Demands Would Cause Irreparable Harm to Sheila Bedi, Her Colleagues, and Their Donors**

Legal clinics are vulnerable to both the types of harms that have be inflicted by the Trump Administration and the Committee on institutions of higher education, as well as the harms that have been inflicted on law firms, as described more fully above. Accordingly, Plaintiffs reasonably fear a cascade of harms to their clinics, clients, donors, and students if Northwestern complies with the Committee's demands.

The Committee's letter includes demands directed to each of the 20 clinics and 12 centers within Bluhm Legal Clinic. Ex. 12. All of these clinics will be impacted if Northwestern responds to the Committee's demands. While some of those clinics or centers may work on behalf of causes that the Trump administration, Bluhm's offerings are diverse. For example, the Center for Externships offers a range of practicum courses that provide students an opportunity to gain real-world experience under the supervision of experienced lawyers. Ex. 13 (Wilson Dec) at ¶6. Nearly 200 students enrolled in courses at the Center this past school year. *Id*. at ¶9. Each course combines work in one practice setting or area of law combined with a seminar taught by a faculty member focused on issues arising in that kind of work. *Id.* at ¶6. Practice areas include public interest law, criminal law, civil government, corporate law, media law, high tech law, and sports and entertainment. *Id*. Students are placed in a variety of practice contexts including civil rights and legal aid agencies; federal, state, and local government agencies; federal and state judicial chambers; and major corporations. *Id.* at ¶10. If Northwestern is forced to disclose confidential information related to the operation of its legal clinics, that disclosure may dissuade partner organizations from being willing to accept the Center for Externship's students for externship placements. *Id*. at ¶13. Many legal organizations engage in litigation and advocacy work that depends on being able to maintain strict confidentiality of their records. *Id*. Those organizations

may not be willing to take the risk of jeopardizing their work by partnering with a legal clinic that is subject to a congressional investigation and providing documents to the Committee. *Id.*

Likewise, the Center on Negotiation, Mediation, and Restorative Justice, in which Plaintiff Cohn currently teaches and previously directed, provides students with the opportunity to learn negotiation, mediation, and restorative justice skills. Ex. 2 (Cohn Dec.) at ¶3. As described above, the Center's work depends on confidentiality of participants in mediation. *Id.* at ¶10. The Committee's demands for information threaten this confidentiality and will deter potential participants from accessing and benefiting from the Center's services. *Id.* at ¶11.

Other clinics and centers reasonably fear an interruption of their work if Northwestern complies with the Committee's demands because their work may be viewed as controversial by the Trump Administration. The Children and Family Justice Center (CFJC) represents young people in delinquency hearings, expungement of criminal records, clemency petitions for young people in prison for serious offenses, and re-sentencing hearings for individuals serving life without parole for crimes committed when they were juveniles. Ex. 3 (Biehl Dec.) at ¶¶6, 11. All of the clients of the CFJC clinic are indigent and many of them would not have access to counsel without the clinic. *Id.* at ¶12. The Committee's inquiry and implicit threat to withhold billions of dollars in federal funding from Northwestern will have a chilling effect on CJFC clinicians' freedom to choose potentially controversial cases and to engage in policy work that may be adverse to the Trump administration's agenda. *Id.* at 18. Indeed, just last night the Trump Administration froze $790 million of federal funding for Northwestern. Michael C. Bender and Sheryl Gay Stolberg, *Trump Administration Freezes $1 Billion for Cornell and $790 Million for Northwestern, Officials Say*, N.Y. TIMES (Apr. 8, 2025).[48] Likewise, the Committee's demand for information

---

[48] Available online at https://www.nytimes.com/2025/04/08/us/politics/cornell-northwestern-university-funds-trump.html (last visited Apr. 8, 2025).

could discourage students from enrolling in the clinic for fear that their access to federal loans could be threatened if they enroll in a clinic that the federal government opposes. Ex. 14 (Biehl Dec.) at ¶ 19. If Northwestern is compelled to comply with the Committee's demand to release private donor information, donors may cease supporting CFJC in the future. The CFJC's funding is particularly endangered given that some of its advocacy work and clients are controversial, and donors may be deterred if their support could be publicly disclosed or become the subject of a congressional investigation.

The Center on Wrongful Convictions (CWC) would also suffer harms as a result of the Committee's inquiry. Ex. 15 Hartung Dec. ¶¶12, 16-21. The CWC is dedicated to identifying and rectifying wrongful convictions and other serious miscarriages of justice. *Id*. at ¶6. It primarily represents people with claims of innocence who are seeking to be exonerated. *Id.* Outside of the exoneration context, the Center takes on other cases seeking to assist people who have been disproportionately impacted by the criminal legal system, such as seeking sentence reductions for people who were convicted of murder at a young age and women with convictions related to post-partum illness. *Id*. The CWC's work—which focuses on issues connected to mass incarceration and often involves claims related to police or other official misconduct—would likely be viewed as "left-wing" by the Trump administration and is therefore a direct target of the Committee's inquiry. *Id*. at ¶13. The CWC's model depends in large part on the assistance of pro bono lawyers from major law firms, who at any given time are co-counsel on upwards of 50% of the CWC's cases. *Id.* at ¶18. The prospect of an ongoing congressional inquiry into the Bluhm Clinic's work and forced disclosure of sensitive documents to the federal government may dissuade these essential law firm partners from collaborating with the CWC in the future, severely damaging the

CWC's ability to do its work. *Id.* The CWC's ability to raise funds for its work will also be severely impaired by the Committee's requests. *Id.* at ¶19.

The Tenant Advocacy Clinic's (TAC) work will also be harmed by the Committee's inquiry. Ex. 16, Sirota Dec. The TAC uses a variety of tools to advocate for low-income tenants on both an individual and systemic level. *Id.* at ¶6. The TAC represents tenants in litigation facing evictions, housing discrimination, and poor living conditions. *Id.* The TAC also represents and consults with grassroots organizations, such as tenant associations seeking to improve their building's living conditions. *Id.* at ¶8. The TAC has already had to reconsider whether or not to accept a particular case after learning of the Committee's letter because the TAC's work would likely be considered "left-wing" by the Committee. *Id.* at ¶¶12, f15. A visiting scholar from Switzerland who was planning to collaborate with the TAC abruptly withdrew from the program after the Committee issued its requests. *Id.* at ¶18. Many more students are likely deterred from participating in clinics, including the TAC, that they reasonably believe the Committee will target. *Id.*

These are but a few examples of the many harms that could result from Northwestern's compliance with the Committee's demands. Many other clinicians, clients, and donors would be harmed by compliance with the Committee's demands, but the impacted individuals are likely afraid to provide information about their concerns publicly.

## A. Harms to the Community Justice and Civil Rights Clinic and Its Clients

The chilling effect for clients and students of Professor Bedi's Community Justice and Civil Rights Clinic (CJCRC) will be even more severe. Clients of Professor Bedi's clinic have already indicated that they may forego her advice and support rather than risk further exposure or targeting by federal actors. Ex. 1 (Bedi Dec.) at ¶¶44-45. Professor Bedi has already had to inform

clients whose cases have not yet been filed about the Committee's inquiry, which has discouraged these clients from seeking her counsel and accessing the court system. *Id.* at ¶¶47-49.

Professor Bedi's litigation and advocacy also includes work on behalf of criminal defendants and the reputational harms to Professor Bedi would also harm those clients. *Id.* at 8, 44-49. For example, even if clients know that Professor Bedi has not said or done anything antisemitic, they might still forego her counsel out of fear that the inquiry about her would damage her reputation, and their case, before the judiciary.

Professor Bedi's clinic funds all litigation expenses through its own budget (not through clients) so disclosure of this budget will allow party opponents to evaluate the funds available to Professor Bedi's clients and make litigation choices accordingly. *Id.* at ¶¶19-23. Adversaries could also coordinate their efforts to increase costs or time their efforts according to budgetary "crunches." This type of information about an adversary's litigation budget is not available under normal circumstances and would not be available to the clinic's party opponents absent the demand from the Committee. As explained more fully below, information disclosed to the Committee will not be maintained confidentially so a litigation adversary will only need to FOIA the information from the Committee (if it is not published on a public website) in order to find out the "detailed budget" of a given clinic. These harms would extend to other clinics whose budgets could be exploited by adversaries.

If Northwestern responds to the demands, donors to the CJCR clinic will also be chilled in their speech and association. Donors have already indicated to Professor Bedi that they are fearful of their identities being exposed and some donors may not wish to provide further funding to the clinic as a result. *Id.* at ¶¶ 24-28; Ex. 15 (Hartung Dec.) at ¶19. This would be devastating to the clinic's work. The clinic's staff attorney is entirely funded through the donors and the work of that

attorney could not continue without donor support. The CJCR clinic is not able to adequately serve clients without the staff attorney. Ex. 1 (Bedi Dec.) at ¶¶29-32.

Disclosure of payments that the CJCR clinic has made to experts, court reporters, or co-teachers would also chill the participation of those individuals in casework. Given the steep risk associated with being listed publicly in any Congressional communication regarding "antisemitism," these individuals may simply refuse to work with CJCR in the future. *Id.* at ¶¶35-39.

## B. Harms to Professor Bedi's Reputation

Professor Bedi also reasonably fears reputational harm from the Committee's demands. If Northwestern complies with the Committee's demands, Professor Bedi reasonably fears being publicly exposed and doxxed, putting her future employment prospects, privacy, and safety at risk. Ex. 1. (Bedi. Dec) at ¶¶55-57.

\*\*\*

Northwestern's response to the Committee Defendants' demands will harm Plaintiffs' academic freedom in what they teach and publish; their attorney-client relationships; their ability to raise money for their work; their ability to litigate effectively against their adversaries; their ability to associate freely on behalf of causes and groups they support; and their reputations.

## <u>LEGAL STANDARD</u>

The standards governing temporary restraining orders and injunctions are the same. *USA-Halal Chamber of Com., Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 433 n.5 (N.D. Ill. 2019). To obtain injunctive relief, the movant "must establish that he [or she] is likely to succeed on the merits, that he [or she] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his [or her] favor, and that an injunction is in the public interest." *Chicago Women in Trades v. Trump*, __ F. Supp. 3d __, 2025 WL 933871, at \*4 (N.D.

Ill. Mar. 27, 2025) (quoting *Bevis v. City of Naperville*, 85 F.4th 1175, 1188 (7th Cir. 2023)). When, as here, the government is a party to the suit, "assessing the harm to the opposing party and weighing the public interest … merge." *Id.* (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). The party seeking a TRO "carries the burden of persuasion" on each of these points. *Id.* (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

## ARGUMENT

## I.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

"'In First Amendment cases, the likelihood of success … will often be the determinative factor' in granting an injunction." *Chicago Women in Trades*, __ F. Supp. 3d __, 2025 WL 933871, at *5 (N.D. Ill. March 27, 2025) (quoting *ACLU v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012)).

### A.  The Committee Demands Violate the First, Fifth, and Sixth Amendment Rights of Plaintiffs, Their Donors, and Clients

"[T]he First Amendment prohibits government officials from relying on the threat of legal sanctions and other means of coercion … to achieve the suppression of disfavored speech[.]" *NRA v. Vullo*, 602 U.S. 175, 189 (2024), and bans "punish[ment] based on the choice to associate with others for "political, social, economic, educational, religious, and cultural ends[,]" *Ams. For Prosperity Foundation v. Bonta*, *Ams. for Prosperity Foundation v. Bonta*, 594 U.S. 595, 606 (2021). Yet, that is exactly what the Committee's demands do, attempting to pressure Northwestern into disassociating with Plaintiffs and forcing it to cease support of the work that Plaintiffs' clinics do because the Committee deems such work to be "left-wing" advocacy. The demand violates the First Amendment in a litany of ways.

#### 1.  Retaliation Against Plaintiffs in Violation of the First Amendment

"[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions" for engaging in protected speech." *Nieves v.*

*Bartlett*, 587 U.S. 391, 398 (2019) (internal quotation marks and citation omitted). "If an official takes adverse action against someone based on that forbidden motive, and 'non-retaliatory grounds are in fact insufficient to provoke the adverse consequences,' the injured person may generally seek relief by bringing a First Amendment claim." *Id.* Plaintiffs are likely to succeed on the merits of their First Amendment retaliation claim against the Committee Defendants, because: (1) they engaged in activity (e.g., speech and association) protected under the First Amendment; (2) the Committee's actions would deter a person of ordinary firmness from engaging in that protected activity in the future; and (3) Plaintiffs' protected activity was at least a motivating factor behind the Committee's adverse actions. *Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011); *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009)). In determining whether the adverse actions would likely deter First Amendment activity, the courts apply an objective test: whether the alleged conduct by the defendants would likely deter a person of ordinary firmness from continuing to engage in protected activity. *Surita*, 665 F.3d at 878. This is not a high burden, and it is a question of fact. *See Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982).

*First*, Plaintiffs clearly engaged in activity protected under the First Amendment. Professor Bedi's speech was advanced as a lawyer in the course of representing clients, which is protected by the First Amendment. In the context of the goals of her clinic, "litigation . . . is . . . a form of political expression" and "political association," and it "may well be the sole practicable avenue open to a minority to petition for redress of grievances." *NAACP v. Button*, 371 U.S. 415, 429-31 (1963); *In re Primus*, 436 U.S. 412 (1978) (solicitation of prospective litigants by nonprofit organizations that engage in litigation as a form of political expression and association constitutes expressive and associational conduct entitled to First Amendment protection); *First Defense Legal Aid v. City of Chicago*, 319 F.3d 967, 971 (7th Cir. 2003) ("Attorneys often engage in political

speech—either directly or through solicitation or representation of clients—and enjoy in that endeavor the highest degree of protection."). Thus, the fact that political speech is expressed through the provision of professional services does not diminish the First Amendment protection. *See id.*; *see also Nat'l Inst. of Fam. & Life Advocates v. Becerra*, 585 U.S. 755, 767 (2018) ("Speech is not unprotected merely because it is uttered by 'professionals.'"); *see also, e.g.*, *303 Creative LLC v. Elenis*, 600 U.S. 570, 587-88 (2023).

As to lawyers—whose profession often entails helping those with disfavored viewpoints express and vindicate their rights through constitutionally guaranteed due process—First Amendment protection is particularly important. A lawyer is no less protected when expressing her viewpoint through representation of a client than she would be if she expressed that viewpoint through a sign on her front lawn. As the Supreme Court explained in *Legal Services Corp.*, the First Amendment cannot tolerate attempts to "draw lines around" those arguments that the government "finds unacceptable but which by their nature are within the province of the courts to consider." 531 U.S. 533, 546 (2001); *see also id.* at 548-49 ("Where private speech is involved, even Congress' antecedent funding decision cannot be aimed at the suppression of ideas thought inimical to the Government's own interest."); *Agency for Int'l Development v. Alliance for Open Society Int'l, Inc.*, 570 U.S. 205, 220-21 (2013) (congressional requirement that recipients of certain federal funds explicitly agree with government's police to oppose prostitution and sex trafficking violated the First Amendment). When the government retaliates against a disfavored viewpoint, it has necessarily violated the First Amendment. *See Perry v. Sindermann*, 408 U.S. 593, 597-98 (1972).

Likewise, Professor Cohn engaged in activity protected by the First Amendment through her work in the Center on Negotiation, Mediation and Restorative Justice. The Center works with

a variety of parties to resolve disputes through alternatives to litigation. Ex. 2 (Cohn Decl.) ¶6. Many of the mediations concern community issues, such as employment, housing, contracts, small claims, and neighborhood disputes. *Id.* In her classes, Professor Cohn and her students discuss privilege, power imbalances, and implicit bias, and how these things affect mediations and negotiations. *Id.* ¶9. Exploration of such topics is protected expression.

Professor Bedi also engaged in activity protected by the First Amendment in associating with her clients, whose views she may not share. The First Amendment's core guarantees "could not be vigorously protected from interference by the State unless a correlative freedom to" associate "were not also guaranteed." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). Here, it would be problematic enough were Professor Bedi targeted for her association with a particular individual, but it is doubly problematic that Professor Bedi has been targeted because of that individual's protected political expression.[49] Nowhere is the First Amendment danger greater than when "individuals are punished for their political affiliation[s]." *Ams. for Prosperity Foundation*, 594 U.S. at 606. As the Supreme Court observed decades ago, if citizens may be punished in their employment and business based on their affiliations, they "will feel a significant obligation to support political positions held by" those in power and "may well feel compelled to engage in whatever political activity is necessary to regain regular paychecks and positions corresponding to their skill and experience." *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 73 (1990). The Committee's demands explicitly target Professor Bedi for the perceived political views and aims of herself and her clinic, and to in turn force Northwestern to disassociate from her because of those political views, or risk losing hundreds of millions of dollars in federal funding.

---

[49] As discussed above, Professor Bedi represents four protesters who *have been named as defendants* in a lawsuit by one plaintiff who alleges he missed his flight due to a protest against what the protesters viewed as Israel's unjustified assault on Gaza. The lawsuit is so patently baseless that several defendants filed motions for Rule 11 sanctions. *Manhart*, No. 24-CV-08209, Dkt. Nos. 63, 71. 76.

*Second*, the Committee's actions would deter a person of ordinary firmness from continuing to engage in the protected activity. Defendants seek confidential and sensitive information, including Professor Bedi's hiring materials and performance reviews. Ex. 12 (Demand Letter) at 3. Defendants also seek donor and budget information for Plaintiffs' clinics and all of the other centers and clinics at the Bluhm Legal Clinic. *Id.* Defendants seek information on the payments that CJCR has made for a 5-year period. *Id.* This would include, for example, payments to other professionals, who have agreed to provide services to the CJCR (such as court reporters and expert witnesses). Ex. 1 (Bedi Decl.) ¶¶34-39. These demands for records and the likelihood of disclosure of this information to the public would deter a person of ordinary firmness from continuing to engage in the protected activity—that is, engaging in the "political advocacy" and the type of client representations and cases that Plaintiffs have taken.[50]

*Third*, Plaintiffs are likely to succeed in showing that their protected activity was at least a motivating factor in the Committee's actions. Indeed, Professor Bedi's representation of certain clients, political advocacy, and clinical teaching in "movement lawyering" is the *expressly stated* reason why Defendants are seeking the information in their Letter. *See* Ex. 1 at 1. The Committee's letter states that Professor Bedi engages in "progressive-left political advocacy," and her clinic "describes itself as working 'in collaboration with social justice movements on legal and policy strategies aimed at redressing some of the most pressing, urgent issues of our time—namely over-policing and mass imprisonment.'" Ex. 12 at 2. The Letter also complains that the "Movement Lawyering" class Professor Bedi teaches gives students the opportunity to "work with 'collectives

---

[50]    Once information is disclosed to the Committee, there is a high likelihood that it will be made public. The Committee has previously made public documents that universities (including Northwestern) provided it in response to earlier document requests. *See* 10/31/24 Republican Staff Report at 307-25, "Antisemitism on College Campuses Exposed," Committee on Education and the Workforce, U.S. House of Representatives,  available online at https://edworkforce.house.gov/news/documentsingle.aspx?DocumentID=412025 (last visited April 9, 2025).

and community organizers' on 'creating a more just Chicago' on matters such as a 'court order aimed at transforming the Chicago Police Department.'" *Id.* The Letter claims that this work is "troubling," and that "it is only one of numerous Northwestern Law clinics and centers promoting left-wing causes." *Id.* at 3.

Likewise, Professor Cohn is likely to succeed in showing that her protected activity was at least a motivating factor in the Defendants' actions. As Professor Cohn explains, her classes explore topics such as "privilege, i.e., 'who gets to sit at the table,' power imbalances, and implicit bias in the context of mediations and negotiations. We examine historic exclusion in the legal system and promote diversity, equity and inclusion in alternative resolution methods. The Center honors identity as part of our processes and emphasizes the value of different perspectives typically excluded from traditional legal forums and systems." Ex. 2 (Cohn Decl.) ¶9. This is exactly the type of instruction that the Letter targets as "left-wing advocacy."

> **2. Violations of Plaintiffs' Free Speech and Freedom of Association Rights Under the First Amendment**
>
> **a. Plaintiffs have standing**

To demonstrate standing on the theories in this section, Plaintiffs must show that they have suffered or are likely to suffer an injury in fact, that Defendants' actions caused or will cause the injury, and the injury will likely be remedied by a favorable judgment. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Standing is "a personal stake in the case." *Brown v. Kemp*, 86 F.4th 745, 761 (7th Cir. 2023). Professors Bedi and Cohn plainly have a personal stake in this case and have suffered injuries in fact.[51] Some of the records that the Committee Defendants seek pertain directly to Plaintiff Bedi—they demand "[a]ll hiring materials and performance reviews

---

[51] While Plaintiffs both have standing independently, "[t]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).

for Sheila A. Bedi." Ex. 12 (March 27, 2025 Letter) at 3. Plaintiff Bedi's privacy interests and ability to negotiate fair compensation for herself would be injured by the release of those records—which contains, for instance, confidential information about her compensation and the terms of her employment contract with Northwestern—this injury is "imminent, not conjectural or hypothetical." *Lujan*, at 560; *see also Brown v. Kemp*, 86 F.4th 745, 761 (7th Cir. 2023). Ex. 1 (Bedi Decl.) ¶¶41-43. The Committee has demanded that Northwestern produce records responsive to the Letter by 11:00am CT on Thursday, and so the threatened injury is imminent. The release of documents pertaining to Plaintiff Bedi's hiring means that her employment contract will be public record. This will create a baseline for future employment negotiations. *Id.* In addition, any hiring materials such as reference letters could be publicly disclosed that would deter individuals from providing recommendations for any future employment opportunities. *Id.* As a result of the letter, some of Professor Bedi's references have expressed concern about their identity being disclosed and fear of what harm may come to them as well. *Id.*

Moreover, in the First Amendment context, "[c]hilled speech is, unquestionably, an injury supporting standing." *Bell v. Keating*, 697 F.3d 445, 453 (7th Cir. 2012). Plaintiffs must show "a chilling effect that is objectively reasonable, and that [they] self-censor[] as a result." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020). Plaintiffs "must substantiate a concrete and particularized chilling effect on [their] protected speech or expressive conduct to pursue prospective relief." *Bell*, 697 F.3d at 453. The Letter has a chilling effect on the topics and issues Professor Cohn can explore in her classes with students. Ex. 2 (Cohn Decl.) ¶11. Professor Bedi is not only in imminent danger of suffering concrete future injury, but she is currently suffering harm from the Committee's demand for records. For example, just yesterday, a client terminated Professor Bedi's representation because of the Letter in light of upcoming proceedings in the case.

Ex. 1 (Bedi Decl.) ¶45. This not only impacted Professor Bedi and the students working on the case, which is a capstone in their clinical experience, but has also resulted in additional strain on the client's representation as now co-lead counsel has been forced to lead the case alone. *Id.* Since she received the Letter, other current clients have contacted Professor Bedi with concerns about the Congressional scrutiny and raised concerns about her continued ability to provide representation to them. *Id.* at ¶44. Professor Bedi has also been unable to take on new cases or clients. For example, she has three clients whose cases she has been investigating in anticipation of filing a case. However, she is unable to go forward with representing them in their cases and is working to refer these matters to other counsel, depriving her and her students of opportunities to work on these cases aligned with the Clinic's mission. *Id.* at ¶52. In another case, Professor Bedi requested oral argument time in a hearing, but if the court were to grant oral argument, she does not believe that she could do the argument on behalf of her clients due to the scrutiny from the Letter and the reputational harm that it has caused. *Id.* at ¶51. A co-counsel of Professor Bedi has informed her after the Letter that they are no longer inviting her to co-counsel on any future cases while this inquiry is pending due to how detrimental it could be the joint legal representation of their shared clients. *Id.* at ¶46. Allowing Northwestern's production of records to the Committee suggests that Congress can interfere with Plaintiff's practice of law by demanding information about the work Professor Bedi does simply because it does not like viewpoint of some of her clients.

Causation and redressability are easily met. The Committee's actions are causing the injury. Enjoining them from obtaining the records (and Northwestern from producing the records) would redress the injury.

### b. Viewpoint Discrimination

As discussed above, the Committee Defendants are clearly targeting Plaintiffs' (and their clients') viewpoints. The viewpoint discrimination here concerns "core political speech," which receives the First Amendment's highest protections. *FEC v. Cruz*, 596 U.S. 289, 313 (2022). The fact that Professor Bedi chooses to represent certain clients, her involvement in "movement lawyering," her advocacy of "left-wing causes," and using her legal skills to address "over-policing and mass imprisonment" are all protected under the First Amendment. *See, e.g.*, *Button*, 371 U.S. at 429-31. And the fact that Professor Cohn chooses to teach about privilege and diversity, equity and inclusion, issues in her clinic is also protected under the First Amendment. As the courts have repeatedly recognized, "[i]t is fundamental that the First Amendment was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 548 (2001) (cleaned up; citations omitted); *see also Matal v. Tam*, 582 U.S. 218, 244 (2017) ("We have said time and again that 'the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.'"); *Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."); *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 55-56 (1988); *Coates v. Cincinnati*, 402 U.S. 611, 615 (1971); *Tinker v. Des Moines Independent Community Sch. Dist.*, 393 U.S. 503, 509-14 (1969); *Cox v. Louisiana*, 379 U.S. 536, 551 (1965); *Edwards v. South Carolina*, 372 U.S. 229, 237-38 (1963); *Cantwell v. Connecticut*, 310 U.S. 296, 311 (1940).

Governmental actions that discriminate based on viewpoint are presumptively invalid. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). By its terms, the Letter "distinguish[es] favored speech from disfavored speech on the basis of the ideas or views expressed." *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 643 (1994). The Committee cannot possibly satisfy strict scrutiny by proving that the demand "furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015); *see Clingman v. Beaver*, 544 U.S. 581, 586 (2005). "[A] bare … desire to harm a politically unpopular group" is "not [a] legitimate state interest[]," much less a compelling one. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446-47 (1985) (alteration omitted). Here, Committee Defendants have plainly expressed disagreement with the viewpoint of Plaintiffs' advocacy and a desire to prevent them from expressing those views through their advocacy, litigation, and instruction.

Consistent with her work to address mass imprisonment, police abuse, and to protect First Amendment rights, and consistent with the aims of the CJCR, Plaintiff Bedi currently also represents, *pro bono*, protesters who participated in a protest for Palestinian human rights in 2024 who were named as defendants in a frivolous lawsuit, by a putative class representative, purporting to represent a class of people who were inconvenienced by the protesters blocking the roadway leading to O'Hare Airport. *Manhart v. National Students for Justice in Palestine*, Case No. 24-CV-08209 (Dkt. No. 3) (Civil Cover Sheet).

The *Manhart* plaintiff sued a variety of organizations and demanded $36 million dollars in damages. *Id*. at Dkt. 3. The organizations unfairly targeted in *Manhart* have filed motions to dismiss and motions for sanctions, which remain pending. *Id*. at Dkt. Nos. 71, 73, 75-78, 80, 82. There are no legal claims of antisemitism at issue in *Manhart* (the complaint alleges false

imprisonment); and the purported speech that the Committee quotes in its demand did not occur at the protest at issue in the case.

As a result, the Committee's references to one of Professor Bedi's client's statements is an outright pretext. As in the other current efforts by the federal government discussed above, the Committee here invokes the protection of Jewish people as a pretext to target institutions and individuals that the government disagrees with.

### c.     Freedom of Association

As discussed above, Professor Bedi has a protected First Amendment right to associate with her clients. Professor Cohn has a protected First Amendment right to associate with community members who participate in her Center's seminars and its restorative justice process. The Letter interferes with Professor Bedi's ability to represent clients and litigate causes that the Committee dislikes, and it interferes with Professor Cohn's ability to associate with those the Committee dislikes. The Letter pressures Northwestern to sever its association with Professor Bedi and her clinic, or else put hundreds of millions of dollars of federal funding at risk. Moreover, the Letter threatens funding to Northwestern over anything it deems to be "left-wing" advocacy or work on behalf of "left-wing" causes, which is how the Committee may view some of the programs in Professor Cohn's clinic, as well as some of the community members and organizations her clinic works with. The demands are unconstitutional because they overtly target Plaintiffs because of their protected associations.

### d.     Academic Freedom

Work in the university context itself comes with strong guarantees of academic freedom, a vaunted safeguard rooted in the First Amendment's protection of freedoms of speech and expression:

> Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools. The classroom is peculiarly the "marketplace of ideas." The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection.

*Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967); *Sweezy v. New Hampshire*, 354 U.S. 234, at 261-63 (1957) (opinion of Frankfurter, J.) ("For society's good—if understanding be an essential need of society—inquiries into these problems, speculations about them, stimulation in others of reflection upon them, must be left as unfettered as possible. Political power must abstain from intrusion into this activity of freedom, … except for reasons that are exigent and obviously compelling."); *see also Grutter v. Bollinger*, 539 U.S. 306, 329 (2003) (stressing the constitutional import of "the expansive freedoms of speech and thought associated with the university environment").

Indeed, the Supreme Court has specifically warned that government scrutiny of the content of an individual scholar's work is "unquestionably … an invasion of her liberties in the areas of academic freedom and political expression—areas in which government should be extremely reticent to tread." *Sweezy*, 354 U.S. at 250. But that is exactly what the Committee is doing here, expressly targeting the work of a particular clinic, and scholar, because of disagreement with the subject matter of their work. Such intrusions on academic freedom necessarily require preventing the Committee from compelling the information sought here. *Dow Chemical v. Allen*, 672 F.2d 1262 (7th Cir. 1982) (upholding district court refusal to enforce subpoena in Environmental Protection Agency proceeding issued to university researchers for their underlying work, noting that the demands "threaten substantial intrusion into the enterprise of university research, and there

are several reasons to think they are capable of chilling the exercise of academic freedom"); *Cusumano v. Microsoft Corp.*, 162 F.3d 708 (1st Cir. 1998) (quashing subpoena to third party professors for research related to their writings based on the "chilling effect" if such information could be freely subpoenaed).

### 3. Violations of Plaintiffs' Clients' Rights to Free Speech, Freedom of Association, and Petition the Government

The Committee's actions also violate the First Amendment rights of Plaintiffs' clients, including their rights to free speech, freedom of association, and to petition the government for redress of grievances. Plaintiffs have standing to assert their clients' First Amendment rights in this suit because their interests are aligned. *See Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 955-58 (1984) (standing to assert rights of aligned third parties exists "when there is a danger of chilling free speech"); *see also U.S. Dep't of Lab. v. Triplett*, 494 U.S. 715, 720 (1990) (applying to lawyers).

The harms to Plaintiffs' clients imposed by the Committee's demands, both at present and imminently threatened, are manifold. *See infra*. With respect to the First Amendment, the risks to clients' rights if no injunction is entered are exemplified by the very case the Committee references in the demand letter. The letter cites Professor Bedi's representation of one client she is defending in the *Manhart* case, discussed above. The statements of protesters are protected speech under our Constitution, and this country has a long tradition of lawyers—lawyers of all political persuasions—representing clients who have said, written, sung, painted, or otherwise expressed objectionable-but-constitutionally protected sentiments. *See, e.g.*, *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 48 (1988); *Nationalist Socialist Party of Am. v. Village of Skokie*, 432 U.S. 43 (1977).

Lawyers are integral to enlisting the courts' protections of speech. Professor Bedi, however, already has had to advise some of her existing clients that her representation of them means they may be exposed to the ire of the Committee. Ex. 1 ¶¶47-48. Naturally, when a person learns their attorney is being targeted by the government purportedly because of the client's own speech, the chilling effect on that speech is immense. *Eng. v. Cooley*, 552 F.3d 1062, 1069 (9th Cir. 2009) ("State action designed to retaliate against and chill [an attorney's advocacy for his or her own client] strikes at the heart of the First Amendment") (quoting *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989))*. That effect will be exponentially increased if the Committee is permitted to obtain, scrutinize, and publicize the materials they seek.

This risk of congressional retribution for Professor Bedi also obviously inhibits clients' ability to pursue their cases, as is discussed in detail below in the context of the Sixth Amendment. This interference separately violates the First Amendment as well, which protects the "right of the people … to petition the Government for a redress of grievances." U.S. Const. amend. I. The "Petition Clause protects the right of individuals to appeal to courts and other forums established by the government[.]" *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011); s*ee Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) (noting the right to petition "extends to all departments of the Government"). And a petition may "take[] the form of a lawsuit." *Duryea*, 564 U.S. at 390. Professor Bedi's inability to effectively represent her clients at this time violates the First Amendment.

### 4.      Violations of Donors' Right to Freedom of Association

In the absence of an injunction, the First Amendment rights of the CJCRC's donors—as well as the donors to all of the Bluhm Legal Clinic's centers and clinics including Professor Cohn's—are also sure to be violated. Just as Plaintiffs may assert their clients' rights, they also have standing to assert the First Amendment rights of the CJCRC's and Center on Negotiation,

Mediation, and Restorative Justice's donors because the donors' interests are aligned with theirs, most obviously in that both support the existence of the clinics and the work they do. *Ams. for Prosperity Fund v. Bonta*, 594 U.S. 595, 618 (2021) (reiterating that compelled disclosure of donor information violates the First Amendment when donors face a "risk of reprisals" if their identifies are disclosed"); *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984) ("Even where a First Amendment challenge could be brought by one actually engaged in protected activity, there is a possibility that, rather than risk punishment for his conduct in challenging the statute, he will refrain from engaging further in the protected activity. Society as a whole then would be the loser."); *Penny Saver Publications, Inc. v. Vill. of Hazel Crest*, 905 F.3d 150, 154 (7th Cir. 1990) (newspaper had standing to assert First Amendment rights of advertisers whose speech would be chilled by ordinance).

The CJCRC's donors' right to freedom of association is implicated because the Committee Defendants seek a "list of the sources of Bluhm Legal Clinic's funding, including the funding for each of its centers and clinics." When individuals are compelled in this way to disclose "affiliation[s] with groups engaged in advocacy," the First Amendment is violated. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958). "[T]he protections of the First Amendment are triggered" by even the "*risk* of a chilling effect on association[.]" *Ams. for Prosperity*, 594 U.S. at 618-19 (emphasis added). By seeking the identities of donors who fund Plaintiffs' work, especially in the context of insinuations that their work is improper in some way, the demand produces a "chilling effect in its starkest form." *Id.* at 606.

Moreover, by extending the demand to identify donors to *all* programs at the Bluhm Legal Clinic, the demand also fails to meet the "narrow specificity" that the First Amendment demands. *Button*, 371 U.S. at 433. The government's interest "in amassing sensitive information for its own

convenience is" always weak. *Ams. for Prosperity*, 594 U.S. at 618. The demand does not even attempt to tie its broad demand for donor information to its investigation into antisemitism in any way. Even assuming the Committee had a non-pretextual interest in investigating wrongdoing, the government cannot impose "[indiscriminate] disclosure requirements" such as those it attempts to impose here. *Id.*

An injunction is needed to prevent irreparable harm to the Bluhm Legal Clinic's donors. If donor information is provided to the Committee as it demands, it will then be available to the public as exemplified by the Committee's prior past disclosure of confidential materials, described above. While Congress's motives for seeking the information cannot be questioned under the standards, examination of motives is unnecessary in this case because the Committee's demand on its face decries support for supposedly "left-wing" causes (unrelated to Plaintiff) at Northwestern. That donors to these disfavored causes will be exposed and harmed by disclosure to the Committee is certain.

### 5. Violations of the Right to Counsel under the Sixth Amendment and Due Process Clause of the Fifth Amendment

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right … to have the assistance of counsel[.]" U.S. Const. amend. VI. This right includes "the right to the effective assistance of counsel," *Strickland v. Washington*, 466 U.S. 668, 686 (1984), and the "right to choose one's own counsel." *Wheat v. United States*, 486 U.S. 153, 159 (1988). The same principles extend to civil cases. Civil litigation clients enjoy "the right to the aid of counsel when desired and provided by the party asserting the right." *Powell v. Alabama*, 287 U.S. 45, 68 (1932); *accord Guajardo-Palma v. Martinson*, 622 F.3d 801, 803 (7th Cir. 2010). "[A]rbitrarily" interfering with and chilling those attorney-client relationships "would be a denial … of due process in the constitutional sense." *Powell*, 287 U.S. at 69. Professor Bedi represents

clients in a wide-ranging variety of matters, both civil and criminal. Ex. 1 (Bedi Decl.) ¶¶5-9. Production of these records would arbitrarily interfere with those clients' Sixth Amendment and due process rights to counsel.[52]

*First*, production of the information sought by the Letter would unconstitutionally interfere with the Sixth Amendment rights of Professor Bedi's potential and existing clients by imposing additional arbitrary costs on clients choosing to be represented by Professor Bedi. *See Luis v. United States*, 578 U.S. 5, 12 (2016) (describing "the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire," as fundamental); *United States v. Laura*, 607 F.2d 52, 57 (3d Cir. 1979) ("[I]f a defendant chooses a particular counsel, the Sixth Amendment prevents [the government] from taking any 'arbitrary action prohibiting the effective use of (a particular) counsel'"); *United States v. Stein*, 541 F.3d 130, 154 (2d. Cir. 2008) ("[T]he right to counsel in an adversarial legal system would mean little if defense counsel could be controlled by the government or vetoed without good reason.").[53]

The costs here are numerous. As an initial matter, the Letter singles out Professor Bedi and disparages her, tying her to a witch hunt into supposed antisemitism and therefore imposing

_____

[52] Professor Bedi unquestionably has standing to challenge this infringement of her clients' right to counsel. An attorney may vindicate her clients' constitutional injuries if she possesses constitutional and third-party standing. *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 n.3 (1989). Professor Bedi has constitutional standing because, as described above, Defendants' actions have caused, and will continue to cause, a "concrete injury in fact" to her and restraining Defendants would redress those harms. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). Professor Bedi also has prudential, third-party standing to challenge violations of her clients' Sixth Amendment and due process rights to counsel. *See Caplin & Drysdale*, 491 U.S. at 623 n.3; *United States Dep't of Labor v. Triplett*, 494 U.S. 715, 720 (1990). An attorney's duty to provide effective counsel "may not be fettered by harassment of government officials" and a lawyer therefore has "standing to challenge any act which interferes with his professional obligation to his client and thereby, through the lawyer, invades the client's constitutional right to counsel." *Wounded Knee Legal Def./Offense Comm. v. Fed. Bureau of Investigation*, 507 F.2d 1281, 1284 (8th Cir. 1974).
[53] Many of Professor Bedi's clients are indigent and she represents them *pro bono*. They would not be able to find similar representation elsewhere and therefore, if deterred from working with Professor Bedi, may forgo private counsel altogether. Ex. 1 ¶8.

arbitrary costs on her existing and potential clients that they would not face if they retained another attorney. Ex. 12 (Letter) (describing Professor Bedi's work as "troubling"); *see United States v. Amlani*, 111 F.3d 705, 711 (9th Cir. 1997) (holding that the government cannot "veto defendant's choice of counsel by intentionally undermining his confidence in the attorney-client relationship through disparagement.").

Defendants' actions also make clear that the government (Professor Bedi's client's adversary in a federal criminal case or in certain civil litigation efforts) is ill-disposed towards Professor Bedi which, in turn, undermines the confidence of clients in Professor Bedi's ability to represent them. Professor Bedi's clients may choose to forego her counsel due to concerns that the Congressional inquiry will damage her reputation, and therefore their case, before the courts. Defendants' actions also subject Professor Bedi—and in turn, her clients—to additional scrutiny, scrutiny that clients would not be forced to endure if they retained another attorney. Ex. 1 (Bedi Decl.) 48. While the issuance of the Letter has already caused clients to express discomfort in continuing their attorney-client relationships with Professor Bedi, including one client already terminating her due to the Letter and a co-counsel deciding they can no longer engage in joint representation together, *id.* at ¶¶45-46, Professor Bedi's potential and existing clients are likely to be further deterred from their choice of counsel because of the additional exposure and uncertainty they will face if these documents are produced—affirming the idea that Professor Bedi and her clients are fair game for an illegitimate investigation. In addition, the production of the demanded documents would clearly deter Professor Bedi's clients from continuing to work with her because, as described below, the production of these documents would interfere with Professor Bedi's ability to effectively represent her clients.

These risks are not hypothetical. Indeed, the Letter and threat of the impending document production has already deterred Professor Bedi from accepting representation of new clients because of her concerns about the efficacy of her representation in the face of the imminent production of documents—directly depriving those potential clients of their choice of representation—and caused Professor Bedi's current clients to indicate they are concerned about their relationship and association with her, including ceasing her representation due to the Congressional inquiry. Ex. 1 (Bedi Decl.) ¶¶45-49.

*Second*, Defendants' actions also undermine the Sixth Amendment right to the effective assistance of counsel. *Strickland*, 466 U.S. at 686. The Letter and potential production of the demanded documents has already, and will continue, unless enjoined, to directly interfere with Professor Bedi's representation of her clients. Professor Bedi has had to divert significant resources each day since the Letter was released to dealing with the collateral consequences to the detriment of her pending cases, including having to reschedule a deposition and missing key media opportunities for a client. Ex. 1 ¶30. These demands also may include Professor Bedi's work product, the production of which would obviously compromise her ability to effectively advocate on behalf of her clients. The Letter and production of documents also creates a dangerous conflict of interest. *See Wood v. Georgia*, 450 U.S. 261, 271 (1981) ("Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest."). The fear of potential government reprisal as a result of continued zealous advocacy would lead any attorney to temper their advocacy. Professor Bedi has reason to fear that advocating for views that the government dislikes on her clients' behalf will bring further reprisals and will be forced to weigh her professional and ethical obligations to advance her clients' interests against the risks of personal and professional ruin. Ex. 1 ¶¶55-57;

*see United States v. Fulton*, 5 F.3d 605, 613 (2d Cir. 1993) (warning that a conflict arising from an attorney's "powerful self-interest in avoiding criminal charges or reputational damage" violates the Sixth Amendment). Professor Bedi can therefore only advocate for her clients at risk to her own well-being. The chilling of her zealous advocacy will be an immediate effect of the production of these materials and her clients' Sixth Amendment rights will be violated as a result.

In addition, Professor Bedi funds all of her litigation expenses through the clinic's budget and disclosure of this budget would allow opposing parties to evaluate the funds available to Professor Bedi's clients and make litigation choices accordingly. Ex. 1 ¶29-32. Experts, court reporters, co-teachers, and co-counsel may all refuse to work with Professor Bedi and her clients in the future, for fear of being tied to a Congressional investigation into "antisemitism," if these documents are disclosed. Ex. 1 ¶¶33-39. This would innately decrease the efficacy of Professor Bedi's representation. Similarly, donors have already indicated to Professor Bedi that they are less likely to provide additional funding to the clinic if these records are disclosed, leading to cascading effects that would result in Professor Bedi's inability to represent her clients effectively including the loss of the clinic's staff attorney. Ex. 1 ¶¶29-32. *See also* Ex. 15, (Hartung Dec) *Id.* at ¶¶18-19 (concerns that the inquiry will impact CWC's criminal defense work by chilling donors and co-counsel).

*Third*, production of the records also violates Plaintiffs' civil clients' due process right to counsel. Arbitrarily interfering with, and chilling, civil attorney-client relationships is a denial of due process. *Powell*, 287 U.S. 69. For the reasons discussed above, the Letter and the production of the demanded documents would unconstitutionally interfere with, and chill, Plaintiffs' potential and current attorney-client relationships. As a direct result of the Letter and potential production of documents, clients will be deterred from continuing or beginning attorney-client relationships

with Plaintiffs for fear of increased exposure, scrutiny, and negative impacts to their cases. This reality has already been borne out, and, if these documents are produced, will only become more severe as clients are directly implicated.

*Fourth*, production of this information represents a fundamental threat to the legal profession and the rule of law. Producing this information would send a signal to all lawyers that accepting politically controversial cases (or those that the current administration perceives as controversial) will carry risks to their reputations and livelihoods. These risks will inevitably discourage lawyers from taking on those cases. This inherently diminishes the pool of attorneys otherwise available to those in need of zealous representation. The Sixth Amendment serves to "insure fundamental human rights of life and liberty," and is a bulwark against arbitrary action by a powerful government. *Gideon v. Wainwright*, 372 U.S. 335, 343 (1963). The Letter and the production of these documents will inevitably intimidate lawyers into silence and submission, undercutting a fundamental pillar of an orderly society.

### A. Violations of Equal Protection

The Committee's demand for documents violates Plaintiffs' equal protection rights as well. Government action "must be rationally related to a legitimate governmental purpose." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 436 (1985). The government "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *Id.* When the government disfavors individuals without a constitutionally legitimate basis, they may bring "class-of-one" claims when (1) they have "been intentionally treated differently from others similarly situated" and (2) "there is no rational basis for the difference." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *see D.B. ex. rel. Kurtis B. v. Kopp*, 725 F.3d 681, 685 (7th Cir. 2013). When the differential treatment burdens a plaintiff's First Amendment activity, a test "appreciably more stringent than 'minimum rationality'" applies. *News*

*Am. Publ'g, Inc. v. FCC*, 844 F.2d 800, 802 (D.C. Cir. 1988). "The classic class-of-one claim is illustrated when a public official, with no conceivable basis for his action other than spite or some other improper motive . . . comes down hard" on a citizen. *Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013).

Here, the Letter intentionally targets Plaintiffs for differential treatment based on an obvious desire to harm them for their associations and client representations. Because "improper motive is usually covert," class-of-one-claims ordinarily require showing that "similarly situated individuals[] . . . received more favorable treatment[.]" *Swanson*, 719 F.3d at 784. In this case, the Committee has singled out and intentionally targeted the Law School's clinics and clinicians, and in particular, Professor Bedi, explicitly for their representation of specific clients and on behalf of specific causes that the Committee disagrees with. The Letter makes no attempt to hide this fact; to the contrary, "the improper motive" is evident in the plain text of the Letter which makes clear that the Committee is attacking Plaintiffs because of their "progressive-left political advocacy." Ex. 12 at 3.

Nor can the Committee justify its conduct under rational basis review. The government must have a "plausible reason," for its differential treatment. *FCC v. Beach Communications, Inc*., 508 U.S. 307, 313-14 (1993). A "bare . . . desire to harm a politically unpopular group'" is "not [a] legitimate state interest[]." *Cleburne*, 473 U.S. at 447 (quoting *United States Dept. of Ag. v. Moreno*, 413 U.S. 528, 534 (1973)); *see also Romer v. Evans*, 517 U.S. 620, 632 (1996) (concluding that a governmental action "lacks a rational relationship to legitimate state interests" where it "seems inexplicable by anything but animus"). The Letter is about retaliation and viewpoint discrimination; it is not rationally related to any legitimate interest, and indeed proceeds from false premises about Plaintiffs, their clients, their cases, and Northwestern's law clinics.

## B. The Result of Compliance with This Letter Would Be Impermissible Jawboning

Separately, production of the information sought by the Letter would serve only to coerce Plaintiffs, their clinical colleagues, their donors, and Northwestern into avoiding speech and associations that the government disfavors—the purpose of this sanction is to harass, embarrass, and punish Plaintiff Bedi and Cohn for representing clients and teaching "left-wing" methods and material that the Committee Defendants dislike. "[T]he First Amendment prohibits government officials from wielding their power selectively to punish or suppress speech, directly or (as alleged here) through private intermediaries." *Vullo*, 602 U.S. at 198. In *Vullo*, the Supreme Court "reaffirm[ed] what it said" in *Bantam Books* "six decades ago." *Id.* at 180 (citing *Bantam Books v. Sullivan*, 372 U.S. 58, 67, 83 (1963)). In *Bantam Books*, a local government commission employed "informal sanctions" to pressure a book seller to remove disfavored publications from circulation. *Bantam Books*, 372 U.S. at 67. This created a "scheme of state censorship effectuated by extralegal sanctions." *Id.* at 72. Such conduct violates the First Amendment. *See Vullo*, 602 U.S. at 190 ("Ultimately, *Bantam Books* stands for the principle that a government official cannot do indirectly what she is barred from doing directly . . . ."). This holds true even if the Committee is genuinely motivated by rooting out antisemitism, as the Letter claims here. *See id.* at 196 (explaining that in *Bantam Books*, the local commission sought to suppress the circulation of material it believed violated the law). The Committee cannot be permitted to coerce Northwestern to violate Plaintiffs' rights.

## II. ABSENT A PRELLIMINARY INJUNCTION, PLAINTIFF WILL SUFFER IRREPARABLE HARM

Plaintiffs will suffer irreparable harm if the Court does not enter a preliminary injunction. *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992).

## A.      Violations of Plaintiffs' First Amendment Rights Constitute Irreparable Harm

For starters, the irreparable harm caused by the violation of Plaintiffs' First Amendment rights alone constitute a basis for granting the TRO here. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). The Seventh Circuit has explained that "[t]he loss of First Amendment freedoms is presumed to constitute an irreparable injury for which money damages are not adequate, and injunctions protecting First Amendment freedoms are always in the public interest." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006); *Fighters, Loc. 365 v. City of E. Chicago*, 56 F.4th 437, 451 (7th Cir. 2022) (plaintiffs do not have to demonstrate a total loss of First Amendment rights to satisfy the irreparable harm of infringement of their First Amendment rights to meet irreparable harm standard).

For the reasons set forth above, Plaintiffs have more than met this standard here where Plaintiffs' First Amendment rights are violated in their ability to provide legal representation to clients who have disfavored views, the identification of their donors, and the chilling of the clinics' work. Ex. 1 (Bedi Decl.); Ex. 2 (Cohn Decl.). *See, e.g.*, *Nat'l People's Action v. Vill. of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990) (affirming entry of preliminary injunction regarding municipal ordinance that would chill protected First Amendment activity). Moreover, as stated above, the demanded information violates the right to counsel enshrined in the Sixth Amendment, which constitutes an additional basis supporting temporary relief. *First Def. Legal Aid*, 319 F.3d at 971 ("Attorneys often engage in political speech—either directly or through solicitation or representation of clients—and enjoy in that endeavor the highest degree of protection.") (Easterbrook, J.).

## B.      Reputational Harms Constitute Irreparable Harm to Plaintiffs

The reputational harms to Plaintiffs also constitute irreparable harm. "It is well established that the loss of goodwill and reputation, if proven, can constitute irreparable harm." *Life Spine, Inc. v. Aegis Spine, Inc*., 8 F.4th 531, 546 (7th Cir. 2021) (citing *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 680 (7th Cir. 2012); 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2948.1 (3d ed. 2002 & Apr. 2021 Supp.) ("Injury to reputation or goodwill is not easily measurable in monetary terms, and so often is viewed as irreparable.")).

Plaintiff Bedi will suffer irreparable harm in her ability to provide legal representation to her current clients as well as her ability to represent future clients. Ex. 1 (Bedi Decl.). As described above, Professor Bedi has attested to the fact that one client has terminated her representation, a co-counsel has indicated that they will no longer be able to work jointly on future representations due to the inquiry, three cases under investigation will be referred to other counsel, and experts, who provide their services at reduced fees to the Clinic, have expressed their concern of further work with the Clinic. *Id.* at ¶¶29-32. It is clear that the demand seeks to vilify Professor Bedi for her legal representation of certain clients associated with disfavored views and for engaging in what the Committee viewed as "left-wing advocacy." Ex. 12 (Letter) at 1, 3. Providing the information demanded will cause harm to Professor Bedi, CJCR, and its donors.

Professor Cohn will also suffer irreparable harm. Just as with CJCR, Professor Cohn's Center will be negatively impacted by the inquiry into Bluhm Clinic. For example, Professor's Cohn's Center worked with individual and organization partners whose information is private and disclosure of which would violate the Center's confidentiality agreements with them and cause substantial harm. Ex. 2 (Cohn Decl.) at ¶10. That is because the center "maintains the confidentiality of all aspects of the mediations" and restorative justice circles it participate in---the

non-disclosure of which is "crucial" to all of the participants, (participants, attorneys, the judiciary and court personnel, and mediators) and is also central to the "integrity of the mediation process." *Id*. at ¶10.

### C. Economic Harm Supports Preliminary Relief Because Loss of Funding

Temporary relief is further warranted because Plaintiffs and the clinic will suffer financial harm. Ex. 1 (Bedi Decl.) at ¶19-39; Ex. 2 (Cohn Decl.) at ¶15. Economic harm can support preliminary relief when "legal remedies after the fact [are] inadequate." *Mann v. Wash. Metro. Area Transit Auth*., 185 F. Supp. 3d 189, 195 (D.D.C. 2016). Professor Bedi has no legal remedy to seek damages against Congress if these documents are disclosed. And there is certain financial harm were the Committee Defendants allowed to successfully chill the Clinic's donors. "[M]onetary loss may constitute irreparable harm … where the loss threatens the very existence of the movant's business." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *Pro. Towing & Recovery Operators of Ill. v. Box*, 2008 WL 521192 at *9 (N.D. Ill. Dec. 11, 2008).

### III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR AN INJUNCTION

Finally, the Court must balance the "competing claims of injury and … consider the effect on each party [and the public] of the granting or withholding of the requested relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008) (internal citation omitted). The public interest is served by preventing a violation of Plaintiff's constitutional rights. *See, e.g.*, *Joelner v. Vill. of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004) ("Surely upholding constitutional rights serves the public interest.") (cite cleaned up). The balance of equities overwhelmingly weigh in favor of Plaintiffs because the harms they will suffer are significant—

indeed some of the most deeply valued constitutional rights—those of free speech, freedom of association, and legal representation.

While the damages to Plaintiffs are severe and irreparable if Northwestern responds to this demand, the Committee will suffer no injury from a temporary restraining order. The Committee Defendants have no need for the information they seek, and there is no public interest in allowing the Committee Defendants to violate Plaintiffs' rights through an unlawful action—in fact, there is "substantial public interest" in ensuring that that government "abide[s]" by the law. *See League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

There is also a fundamental public interest in relief because the Committee's demands, as part of a broader government effort to chill disfavored speech, punish universities, prevent attorneys from representing their clients, stop donors from associating with legal work, attorneys, and clinics that they believe are worth helping.

## IV. Defendants' Anticipated Defenses Are Unlikely to Succeed

Finally, Defendants' anticipated defenses are unlikely to succeed. Plaintiffs preview some of the arguments here for completeness.

### A. The Committee Exceeds Its Lawful Authority

Courts have the power to alter or quash congressional demands for information that exceed congressional limits. *E.g.*, *United States v. AT&T Co.*, 419 F. Supp. 454, 461 (D.C.C. 1976) (enjoining AT&T from complying with a Congressional subpoena without the prior authorization of the Executive Branch), *aff'd in part*, *United States v. AT&T Co.*, 551 F.2d 384 (D.C. Cir. 1976); *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 733 (D.C. Cir. 1974) (finding the congressional subpoena by the House Judiciary Committee "too attenuated and too tangential to its functions" to require compliance); *United States Servicemen's Fund v.*

*Eastland*, 488 F.2d 1252, 1270 (D.C. Cir. 1973) (staying the enforcement of a congressional subpoena be-cause "forced surrender [] of the subpoenaed records . . . would invade the constitutional rights of the plaintiffs"), rev'd on other grounds, *United States Servicemen's Fund v. Eastland*, 421 U.S. 491 (1975); *see also National Abortion Fed'n v. Center for Med. Progress*, 2015 WL 5818863, at *1 (N.D. Cal. Oct. 6, 2015) (recognizing that "case law allows courts to modify or quash Congressional subpoenas in order to protect constitutional rights from infringement by Congress") (citing *Exxon Corp. v. Fed. Trade Comm'n*, 589 F.2d 582, 589 (D.C. Cir. 1978)).

Many of the Committee's demands exceed congressional limits. "Congress has no enumerated constitutional power to conduct investigations or issue subpoenas, but . . . each House has power 'to secure needed information' in order to legislate." *Trump v. Mazars USA, LLP*, 591 U.S. 848, 862 (2020) (quoting *McGrain v. Daugherty*, 273 U.S. 135, 161 (1927)). "Because this power is 'justified solely as an adjunct to the legislative process,' it is subject to several limitations." *Id.* (quoting *Watkins v. United States*, 354 U.S. 178, 197 (1957)). Three of those limitations are implicated here: (1) congressional demands for information are valid only if they concern an issue on which legislation could be had and serve that purpose, *id*. at 862-63;[54] (2) Congress may not act as a law enforcement body—it has no "general power to inquire into private affairs and compel disclosures" or "to expose for the sake of exposure"—and so investigations conducted "for the personal aggrandizement of the investigators or to 'punish' those investigated are indefensible," *id.* (quoting *Watkins*, 354 U.S. at 200); and (3) individuals subject to congressional information gathering "retain their constitutional rights throughout the course of an

---

[54]     Here, neither "left-wing advocacy" nor conduct tangential to the demands that might loosely be labeled "antisemitic" (as opposed to conduct that is in fact based on someone's perceived national origin) is covered by Title VI.

investigation," as well as "common law and constitutional privileges with respect to certain materials," including over "attorney-client communication[s]," *id.* The Committee's different demands exceed some or all three of these limits.

## B. The Committee Cannot Justify Its Intrusion On First Amendment Rights

In addition, the Committee cannot justify its intrusion on First Amendment rights. "[I]t is an essential prerequisite to the validity of an investigation which intrudes into the area of constitutionally protected rights of speech, press, association and petition that the State convincingly show a substantial relation between the information sought and a subject of overriding and compelling state interest." *Gibson v. Florida Legislative Investigation Comm.*, 372 U.S. 539, 546 (1963). "[T]o impose a lesser standard than we here do would be inconsistent with the maintenance of those essential conditions basic to the preservation of our democracy." *Id.* at 558. Thus, in any and every form of Congressional investigation, "the First Amendment freedoms of speech, press, religion, or political belief and association" cannot be unlawfully "abridged." *Id.*[55] To meet *Gibson*'s strict test, Congress must first lay an adequate factual foundation for inquiry by producing a "reasonable, demonstrated factual basis to believe" that the recipient of a request is either engaged in unlawful activity or meaningfully associated with such activity. *Id.* at 551, 555. Indirect or unsubstantiated evidence of illegal activity is insufficient. *Id.* at 555. Where Congress cannot establish these things but nonetheless intrudes on First Amendment rights, it exceeds its lawful authority. See *NAACP v. Alabama*, 357 U.S. 449, 462 (1958) (holding that requiring the NAACP to produce membership lists would infringe the right to freedom of association).

---

[55] It does not matter whether Congress acts via subpoena or some other mechanism, like a request for information. "The Bill of Rights is applicable to investigations as to all forms of governmental action." *Watkins*, 354 U.S. at 188; see generally *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024) ("[A] government official cannot do indirectly what she is barred from doing directly . . . .").

Even where Congress meets this threshold requirement, any demand for information entrenching on First Amendment rights must be narrowly tailored. *See Watkins v. United States*, 354 U.S. 178, 204 (1957) (explaining that courts must determine "whether any legislative purpose justifies the disclosures sought and, if so, the importance of that information to the Congress in furtherance of its legislative function"); see generally *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (holding that Courts must apply "exacting scrutiny" to disclosures compelled by the government which infringe First Amendment rights, "given the "deterrent effect on the exercise of First Amendment rights that arises as an inevitable result of the government's conduct in requiring disclosure") (internal quotation marks omitted).

In this case, the Committee's demands implicate numerous First Amendment concerns, as discussed already.

The demands do so without furthering any valid legislative purpose. The Committee suggests that it is investigating whether the University has used taxpayer funds to "fund left-wing advocacy with its institutional resources"—a purpose the Committee calls "troubling." Ex. 12 (March 27, 2025 Letter). Set aside the pejorative and unfounded basis of these accusations. Congress could never pass a law authorizing funding for only those universities that do not support "left-wing" legal advocacy. To do so would violate myriad First Amendment precedent. *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 549 (2001) (Congress cannot condition the funding of legal services to "exclude certain vital theories and ideas" and "insulate the Government's interpretation of the Constitution from judicial challenge"); *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 216 (2013) (Congress may not leverage federal funding of a program to control a recipients' speech outside that program); *Keyishian v. Bd. of Regents of Univ. of State of N. Y.*, 385 U.S. 589, 603 (1967) (the First Amendment "does not tolerate laws that cast

a pall of orthodoxy over the classroom"); *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995) (viewpoint-based discrimination is presumptively unconstitutional).

Tamping down left-wing advocacy is the true purpose of the Committee, for the Committee has cited to no evidence that Plaintiffs or Northwestern have associated with any unlawful activity. Instead, the Committee invokes "antisemitism" as a pretext for viewpoint discrimination, which the Committee effects through investigations of what it deems "left-wing political activism at Northwestern Law." *Cf. Hentoff v. Ichord*, 318 F. Supp. 1175, 1182 (D.D.C 1970).

But assume the Committee in fact aims to gather information necessary to support legislation designed to root out illegal, antisemitic conduct. The Committee's demands are not narrowly tailored to serve that purpose. Most obviously, there is no world in which the demand for Ms. Bedi's *full* performance and management reviews are narrowly tailored to serve that purpose, *cf. Shelton v. Tucker*, 364 U.S. 479, 488 (1960) (striking down a requirement that teachers disclose associations that "could have no possible bearing upon the teacher's occupational competence or fitness"); perhaps a request for anonymized complaints of antisemitic or discriminatory conduct by professors at Northwestern would be.[56] Nor are the Committee's demands for *all* donations and expenditures by Northwestern law school's clinics necessary to support legislation aimed at tamping down on illegal antisemitic conduct; perhaps a request for any funds contributed by or expended to organizations designated "terrorists organizations" under federal law would be narrowly tailored, *see generally Holder v. Humanitarian L. Project*, 561 U.S. 1, 21 (2010). On

---

[56]     Nor could Congress limit funds to Northwestern on the condition that it not employ Ms. Bedi, based on her views, litigation activities, or other First Amendment rights. *See Keyishian v. Bd. of Regents of Univ. of State of N. Y.*, 385 U.S. 589, 603 (1967); *Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 460 (1958); *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *see also* U.S. Const. art. 1, § 9, cl. 3 ("No Bill of Attainder or ex post facto Law shall be passed.").

their face, the Committee's demands are not "narrowly tailored" to serve any legitimate legislative purpose. *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 610 (2021).

Moreover, on this point, before the Committee may issue demands that directly intrude upon First Amendment rights, as these demands do, Congress must "demonstrate[] its full awareness of what is at stake" by "unequivocally" authorizing an inquiry that "raises doubts of constitutionality in view of the prohibition of the First Amendment." *United States v. Rumely*, 345 U.S. 41, 46 (1953). As the Supreme Court has explained, that means the delegation of that power to the committee must be clearly revealed in its charter. *Watkins*, 354 U.S. at 198. Congress has not delegated to the Committee the authority to issue subpoenas that infringe upon First Amendment rights.

### C.    The Committee Lacks Immunity

In the same vein, the Speech or Debate Clause, Art. I, sec. 6, does not offer safe harbor to the Committee's conduct here. Although this clause provides legislators immunity when engaging in legislative activity, the provisions of the First Amendment "reach and limit congressional investigations." *Barenblatt v. United States*, 360 U.S. 109, 126 (1959) (citing *Watkins*, 354 U.S. at 197). And although Congress has immunity when engaging in "a valid legislative purpose," even under the Speech or Debate Clause Congress's interest must be "'compelling' in order to overcome the individual constitutional rights at stake." *Id.* at 127 (citing *Sweezy v. State of New Hampshire*, 354 U.S. 234, 255 (1957) (Frankfurter, J., concurring)). As discussed already, the Committee's conduct infringes Plaintiffs' First Amendment rights, the Committee has no valid legislative purpose, and there is no compelling purpose. Moreover, even where a congressional committee is conducting an investigation into a broader area over which it has authority, this

balancing test does not come out in the Committee's favor where the investigation serves to "pillory" witnesses, see *id.* at 134, as is the case here.

### D. Nominal Defendant Northwestern Lacks Immunity

Finally, the Speech or Debate Clause has no impact on the Court's ability to enjoin nominal Defendant Northwestern University. While the Speech or Debate Clause might operate to provide immunity to members of Congress in appropriate circumstances, the Supreme Court and lower courts recognize that there is no bar to suits that seek to enjoin third parties. See *AT&T Co.*, 419 F. Supp. at 459 ("The Speech or Debate Clause cannot be used to avoid meaningful review of constitutional objections to a subpoena simply because the subpoena is served on a third party."); see also *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 517 (1975) (Marshall, J., concurring) ("The Speech or Debate Clause cannot be used to avoid meaningful review of constitutional objections to a subpoena simply because the subpoena is served on a third party. Our prior cases arising under the Speech or Debate Clause indicate only that a Member of Congress or his aide may not be called upon to defend a subpoena against constitutional objection, and not that the objection will not be heard at all."). This Court can alter or enjoin a request for documents issued to a third party, as well as direct a third-party not to comply with such a request, it should do so in this case.

### REQUEST FOR ORAL ARGUMENT

If oral argument would assist the Court in resolving this motion, Plaintiffs stand ready for argument at the Court's convenience.

### CONCLUSION

WHEREFORE, before 11:00 a.m. Central Time on April 10, 2025, this Court should enter an order that the Committee's demands are stayed and that Northwestern University cannot comply with those demands until further ruling of this Court. A proposed order is attached as Ex. 17.

Dated:  April 9, 2025

RESPECTFULLY SUBMITTED,
By: /s/ Jon Loevy
*Counsel for Plaintiffs*

*Counsel for Cohn*
Amanda S. Yarusso
1180 N. Milwaukee Ave.
Chicago IL, 60642
(773) 510-6198
amanda.yarusso@gmail.com

*Counsel for Cohn*
Nora Snyder
People's Law Office
1180 N. Milwaukee Ave.
Chicago IL, 60642
773-235-0070
norasnyder@peopleslawoffice.com

*Counsel for Bedi*
Baher Azmy
Maria LaHood
*Pro Hac Vice* Applications Forthcoming
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
BAzmy@ccrjustice.org
mlahood@ccrjustice.org

*Counsel for Bedi*
Jon Loevy
Tara Thompson
Elizabeth Wang
Heather Lewis Donnell
Steve Art
Theresa Kleinhaus
Julia Rickert
Jordan Poole
Stuart Chanen
*Cooperating Counsel*
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012