# **EXHIBIT 1**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHEILA BEDI and <br> LYNN COHN, <br>     *Plaintiffs*, <br><br> v. <br><br> THE UNITED STATES HOUSE OF <br> REPRESENTATIVES COMMITTEE ON <br> EDUCATION AND WORFORCE, et al., <br><br>     *Defendants*. | Case no.: 1:25-cv-03837 |

## DECLARATION OF SHEILA A. BEDI

I, Sheila Bedi, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct:

1. I am a Clinical Professor of Law and the Director of the Community Justice and Civil Rights Clinic ("CJCR"), that is part of the Bluhm Legal Clinic ("Bluhm Clinic") at Northwestern Pritzker School of Law ("Northwestern Law School"). I founded the CJCR in 2019. In the CJCR Clinic, law students work with racial/social justice movement organizations on policy and litigation aimed at redressing mass imprisonment and police abuse and protecting the right to protest. As Director of CJCR, I have worked to create rich opportunities to learn about lawyers' obligations to defend the U.S. Constitution and redress systemic injustice and oppression. My clinic works on both lawsuits and policy projects. Each is community-driven and requires my students to confront government overreach and systemic abuses of power. My clinic's policy work translates community-driven solutions—developed by those most impacted by injustice—into meaningful change.

2.      After receiving my law degree from American University Washington College of Law in 2001, I went on to obtain my LLM from Georgetown University Law Center in 2003. At Georgetown, I held the appointment of a Clinical Fellow, where I helped supervise law students enrolled in a Civil Rights clinic and developed a new practice area focused on the rights of people who are incarcerated. I am admitted to practice in Mississippi, Alabama, (inactive) Washington, DC, Illinois, and federal courts around the country.

3.      My life's work has been rooted in public service—fighting for racial justice and breaking down legal barriers for communities the system too often excludes. After completing my law degrees, I served as a deputy legal director at the Southern Poverty Law Center, where I worked initially as a legal fellow, and then as staff attorney and deputy legal director. I founded and managed the organization's first state-based office in Jackson, Mississippi. My work in Mississippi secured justice for incarcerated teenage girls, closed an abusive private prison and helped overhaul Mississippi's notoriously racist and abusive juvenile justice system.

4.      After spending ten years litigating federal civil rights cases and working on policy campaigns in the Deep South, in 2012, I joined Northwestern Law School as a Clinical Associate Professor of Law in its Roderick and Solange MacArthur Justice Center. In 2018, Northwestern Law School promoted me to Clinical Professor of Law. In 2019, I founded the CJCR Clinic where I presently supervise law students who appear in my cases as student attorneys and I teach a seminar focused on the practical skills related to my practice and the various theories of social change. My students and I have led or co-led cases that have improved access to justice for tens of thousands of people in Chicago and across Illinois. My cases have resulted in due process protections for over 30,000 people on parole throughout Illinois, protected thousands of people in

prison from the harm of the COVID-19 virus and sought justice for survivors of unlawful police violence and other forms of police misconduct—including violations of the rights of protesters.

5. Since 2017, I have served as co-lead attorney for Chicago-based community groups in civil rights litigation that resulted in a historic consent decree over the Chicago Police Department. The CPD consent decree is the only police-related consent decree in the country that provides the people most affected by police violence with the right to enforce a federal court order.

6. My students and I strive to fill a void in the Chicago legal community and often represent people who otherwise would go without representation. CJCR has represented the families of people who have been killed in police custody, people who have been sexually abused and attacked in the custody of the Illinois Department of Correction ("IDOC"). Many of my clients are indigent and the clinic provides legal representation *pro bono*. For example, I represent five people who are incarcerated in still pending clemency petitions. These clients are all people living with serious mental illness, who were convicted of offenses while incarcerated due to the IDOC's widespread practice of placing people with mental illness in solitary confinement—thus causing them to decompensate.

7. In another case, the Chicago Police Department wrongfully detained one of our clients 60 times because someone with the same name had a warrant out for his arrest and police were unwilling to correct this error—until my students and I filed a lawsuit seeking both damages and an emergency injunction.

8. Some of CJCR's practice includes defense representation of people arrested, accused of crimes, or convicted when that representation is connected to the Clinic's mission and goals of addressing systemic injustice or a particular harm suffered by those in the criminal legal system. Many of my clients are indigent and the clinic provides legal representation *pro bono*.

9. The Community Justice and Civil Rights Clinic is not just a litigation project. It also provides important support and broader policy work helping advise and support community organizers working to implement policies in Chicago that will make its residents safer, including violence interrupters, restorative justice advocates, and community organizers.

10. My clinic is part of the broader Bluhm Legal Clinic at the Northwestern Law School. According to Bluhm's website, "the Bluhm Legal Clinic is widely recognized as one of the most comprehensive and effective clinical programs in the country. Through Northwestern Pritzker School of Law's clinical program, students gain direct experience representing clients and fine-tune their skills as advocates. Students also work with clinical faculty and staff to challenge the fairness of our legal institutions and to propose solutions for reform."

11. Outside of my work in the Clinic, I work to help make legal education and access to training related to civil rights advocacy more accessible to all. Under my leadership, Northwestern Law School, hosted the Prison Law and Advocacy Conference in 2022 (at which the then-Assistant Attorney General for Civil Rights Kristen Clarke spoke). I am a co-author of the only casebook instructing law students on the law related to incarceration. I have also worked in efforts to provide educational opportunities to incarcerated individuals.

12. I have received number of awards for my legal work. In 2024 the American Constitution Society awarded me with the Abner J. Mikva Award for extraordinary contributions to progressive legal causes. In 2022, I received the Outstanding Advocate for Clinicians Award from the Clinical Legal Education Association. In 2020, the Chicago Freedom School recognized me with its Champions of Justice Award. In 2017, United States District Court for the Northern District of Illinois awarded me the Excellence in Public Interest Award. In 2014, I was named a Fellow of the American Bar Association. In 2008, the American Bar Association awarded me the

Journal Newsmaker of the Year. The NAACP has honored me twice: awarding me with the Fannie Lou Hamer Award in 2007 and in 2005, the Vernon Dahmer Award.

13. I am frequently a requested panelist and speaker for continuing legal education. I have presented at numerous law schools across the country and at conferences sponsored by the American Association of Law Schools and the American Bar Association, including being invited to speak on panels organized by an array of student associations representing a broad spectrum of political view points, including the National Lawyers Guild, the Federalist Society and organizations such as the Chicago Community Trust.

14. I have published scholarship in various law journals and various publications have published my commentary on the criminal legal system including the Washington Post, the Chicago Tribune and U.S. News and World Reports.

15. I serve on various non-profit boards. Additionally, on April 28, 2023, Governor J.P. Pritzker appointed me to serve as a Member of the Illinois Torture Inquiry and Relief Commission, which gathers evidence about claims of torture occurring in Cook County, and then determines a sufficient basis exists to merit judicial review.

**The House Committee's March 27, 2025 Request for Information**

16. On March 27, 2025, Representative Tim Walberg, as Chairman of the United States House of Representatives' Committee on Education and Workforce and Representative Burgess Owens as Chairman of the Subcommittee on Higher Education and Workforce Development ("House Committee") sent a letter requesting information to Mr. Michael Schill, President of Northwestern University and Mr. Peter Barris, Chair of the Board of Trustees.

17. The House Committee's request for information seeks five categories of information:

5

1. All written policies, procedures, and guidance relating to the function of legal clinics at Northwestern Law, including any written guidance on what constitutes appropriate work, and direction on appropriate client representations;

2. A detailed budget for the Bluhm Legal Clinic, including detailed budgets for its more than 20 clinics and 12 centers.

3. A list of the sources of Bluhm Legal Clinic's funding, including the funding for each of its centers and clinics;

4. A list of all the Community Justice and Civil Rights Clinic's payments to people or groups not employed by Northwestern and any of its clinics and centers since 2020; and

5. All hiring materials and performance reviews for Sheila A. Bedi.

**Item 1: Disclosure of Northwestern Law School's Policies and Procedures for Legal Clinics**

18. The Letter's request for "any written guidance on what constitutes appropriate work and direction on appropriate client representations" is a clear indication that the House Committee seeks to interfere in the Bluhm Clinic's representation of certain clients who the Trump administration and its Congressional allies do not approve of for a variety of reasons. That interference from the federal government is a direct threat to my academic freedom , as well as, the CJCR's ability to represent our current clients and offer representation to new clients in furtherance of the clinic's two primary purposes: 1) seek justice for those harmed by the criminal legal system and to develop policy solutions that will prevent those harms through pro bono legal representation ; and 2) provide meaningful student learning opportunities..

**Item 2: Disclosure of CJCR's "Detailed Budget" Will Cause Irreparable Harm**

19. The House Committee's request for "a detailed budget for the Bluhm Legal Clinic, including the detailed budgets for more than 20 clinics and 12 centers," includes a request for the detailed budget for the CJCR budget.

20. Disclosure of CJCR's budget will include disclosure of how much funding the CJCR has overall to conduct its litigation.

21. Disclosure of the CJCR's "detailed budget" will include disclosure of the total financial resources CJCR has to expend on litigation tasks as its clients is provided *pro bono* and clients do not pay for case expenses such as filing fees, depositions, transcripts or expert fees.

22. Disclosure of CJCRs budget, even in the aggregate, will harm the ability to provide legal representation to its current and future clients because if that budget can be obtained by party opponents, many of whom the clinic repeatedly litigate against, will give them a litigation advantage because they will have otherwise unavailable information to inform them about the financial resources to conduct the clinic's litigation, such as the financial ability to retaining experts and other case-related expenses.

23. Providing CJCR's detailed budget would include providing information that is adverse to our clients' interests to the extent that parties adverse to my clients will have access to my litigation budget. It is my understanding that, when this information is disclosed to the House Committee it will become public record. Therefore, party opponents to CJCR would be able to obtain information that they would not otherwise have access to regarding the Clinic's financial and therefore legal resources.

**Item 3: Disclosure of "A list of the Sources" of Funding to CJCR Has Already Caused, and Will Continue to a Chill CJCR Donors From Providing Financial Support**

24. The House Committee's request for the identification of the sources of funding to CJCR will include identification of individual donors, whose financial gifts are designated to

7

provide financial support for CJCR. When Northwestern is compelled to comply with the House Committee's request to release private donor information, many donors will almost certainly cease supporting the CJCR in the future. The CJCR's funding is particularly endangered given that many of our clients are vocal critics of government abuse and frequently publicly critique elected officials—including but not limited to President Trump. Donors may be deterred if their support could be publicly disclosed or become the subject of a congressional investigation

25. This is not just a hypothetical concern. The financial support the CJCR receives from individual donors has already been negatively impacted just by the issuance of the House Committee's Letter targeting CJCR, its clients, and me.

26. Since the House Committee issued its request, I have spoken with three donors to the CJCR Clinic. Each fears their financial support for a clinic that is the subject of the House Committee's inquiry puts them at potential risk should their identities become publicly known. Two of the CJCR Clinic's largest donors have expressed to me that so long as the Clinic remains under Congressional investigation, they will not renew their donations to the Clinic due to the federal inquiry and how it may negatively impact them and their business associations.

27. Since March 27th, I have had a conversation with a third donor, who told me that they have the ability to donate more and would like to do so, but will not because of their concern about how the federal investigation may adversely impact their employer.

28. Based on these conversations, I have no doubt that providing a list of the CJCR donors to the House Committee will deter individuals from contributing to the clinic for fear of their being identified publicly.

**The Loss of Financial Support to CJCR Negatively Impacts Its Ability to Represent its Current Clients and Diminishes its Ability to Represent New Clients**

8

29. The loss of financial support through individual donors will result in a direct impact on the CJCR's ability to represent its current clients and take on new clients. As the Director, I fundraise sufficient funds to provide the funding for the CJCR staff attorney position. If I am unable to raise those funds because current and potential funders fear being identified and associated with the CJCR in light of the current attack on the clinic, CJCR will lose the ability to fund the staff attorney position.

30. Currently the staff attorney provides legal representation to all CJCR clients  The current staff attorney has a one-year contract for the position. The staff attorney acts as a force multiplier and ensures that the Clinic's clients are well served when I am otherwise occupied. For example, as a result of the March 27th Letter, the staff attorney took over a deposition for me last week that I was unable to cover because of obligations related to this Congressional investigation. Further, because the staff attorney can handle matters such as discovery disputes, depositions and document review, I have additional capacity to supervise students' Senior Research Projects, develop new clinic projects and explore expanded practice areas for the clinic. Without the staff attorney's contributions, these activities would be impossible

31. If I am unable to obtain funding through individual donors to raise the funds necessary to for the staff attorney position, the clinic will not be able to renew the current staff attorney's contract next year.

32. The loss of the staff attorney will detrimentally impact the CJCR's ability to provide legal representation to its current clients, it will greatly reduce the clinic's capacity to take on new clients. In addition, it will reduce my ability to teach and supervise law students and to pursue academic projects such as scholarship and developing new curricular offerings.

**Item 4: Disclosure of a list of all "payments to people or groups" not employed by Northwestern and any of its clinics and centers since 2020**

33. The House Committee has also requested a list of all payments CJCR has made to "people or groups" not employed by Northwestern, its clinic or centers since 2020.

34. The information requested will include, among many other items, payments CJCR has made to experts, court reporters, and graphic design firms who provide work for CJCR in support of our litigation and advocacy.

35. The CJCR clinic does not charge for its services and often works on cases where the plaintiffs' federal rights have been clearly violated, but their damages are relatively low. For these reasons, the CJCR often recruits experts who participate in our work at reduced rates. Similarly, the Clinic works with a court reporter who also provides the Clinic with reduced rates.

36. As a result of this Congressional Investigation, CJCR staff have notified its retained experts and regular court reporter that Congress is seeking information about payments that could implicate them. One of our retained experts expressed extreme discomfort at the possibility of their name being disclosed to Congress. This expert also conveyed to CJCR that had they known their involvement with the clinic would have risked such attention, they would have declined to participate in our cases.

37. Similarly, our long-time court reporter expressed distress at the possibility that Congress could get access to their identity in relation to this investigation. They are a sole proprietorship and fear that their association with legal work denounced by Congress could adversely affect their business. This concern is compounded by the fact that the court reporter does a significant amount of work at for the Clinic at discounted rates.

38. A graphic designer who does work for the Clinic and many of its clients also provides their services to the Clinic at a discounted rate. They are also very concerned about how exposing their name to Congress could affect their business and their other clients. They are

10

unwilling to work with the Clinic so long as there is a risk of Congress receiving information about their services.

39. Without litigation professionals willing to donate some services and offer others at a discounted rate my ability to serve my clients and teach my students and engage in will be seriously compromised.

**Item 5: Disclosure of Hiring and Performance Reviews will Cause Harm**

40. The Committee also requests "[a]ll hiring materials and performance reviews" for me. These documents contain private information about my family, my clients and my students. The fact that this private information will be in the public record is a violation that is clearly intended to chill my advocacy. To the extent that the Committee seeks information regarding whether I create a safe and equitable learning environment for all students, my student evaluations almost universally report that I excel at creating a learning environment that values all perspectives—even those that may differ from my own. I routinely receive positive student evaluations for my courses and take great pride in providing a positive learning space for all students and fostering a space for engaging in rigorous, respectful discussion and debate. My students learn to work cooperatively with people who hold views that are the polar opposite of their own, and to treat each other, their clients and their adversaries with professional empathy and respect.

41. However, the Committee does not seek information about the inclusive learning environment I have worked hard to create in my Clinic. Instead, it seeks my private information in an effort to chill my advocacy—and these materials have no bearing on the alleged purpose of this inquiry. For example, my hiring materials and evaluations will include my employment contracts, which include all the terms of my employment—including my salary, research account

allocations, and other terms related to my appointment as a Clinical Law Professor. Should I be forced to leave Northwestern, the publication of my employment contracts will prejudice my attempts to negotiate the terms of employment elsewhere.

42. Further, the hiring materials I submitted to Northwestern included reference letters from colleagues who do not want to be involved in any Congressional investigation. These are individuals who know my work well and who would likely be references for any future employers. According to one of my references, the threat of public disclosure has created for them significant concerns about their association with me and has made them concerned about their safety and the safety of their family members.

43. Disclosure of my employment contract terms and the identities of my references will almost certainly adversely affect my future employment prospects. By way of just one example, public disclosure of private salary information would impair my future employment negotiations.

**The Committee's Request also Impacts My Ability to Advocate for Clients**

44. Clients have also raised concerns about my continued ability to provide representation to them. A client has already expressed concern about my participation in future events that would provide training to their organization because they have expressed concern that my presence may result in their become the unwarranted focus of federal scrutiny.

45. As a result of this inquiry, yesterday a client who has upcoming court dates reluctantly terminated my representation. My client's case is now compromised because—while I worked with them to secure new counsel—their new representation must work to get up to speed on a very tight deadline. This transition has also imposed considerable strain on my co-counsel,

who relied on me to lead the case. My students are also adversely affected—several of them were going to work on this case as a capstone to their clinical experience. That will no longer be possible.

46. Similarly, I was contacted by one of my current co-counsel who often covers the costs of my clinics' cases and, with whom I frequently work, and learned that they will not be inviting me to co-counsel on any future cases while this inquiry is pending. My co-counsel expressed fear regarding how the reputational harm and increased scrutiny caused by this investigation could adversely affect our ability to jointly represent new clients.

### The Request Harms My Present Ability to Practice Law Due to the Diversion of Resources from Having to Respond to the Letter

47. Since I learned of the Committee's investigation, I have communicated with nearly fifty clients regarding potential implications of the investigation on their projects and cases.

48. Most of my clients have experienced some form of state violence and or abuse at the hands of government officials and have a deep distrust of the legal system. My organizational clients either represent or are comprised of people who have experienced these same harms. I have represented some of my organizational clients for ten years. These attorney-client relationships are grounded in a long history of collaboration, a deep understanding of my clients' goals and work styles. Should my clients need to seek to terminate or supplement their representation, they will lose the value of a collaborative legal representation developed during over a decade of representation. In addition, they will face multiple barriers to obtain *pro bono* legal representation as an organization because few places provide pro bono counsel to organizations not involved in active litigation and those that do are often already at capacity with limited ability to take on new clients. The same is true for many of my individual clients who have cases that for various reasons would not have been filed by the private bar. And, even if my clients could secure new counsel,

13

they would have to devote considerable resources to educating new counsel and their cases and projects will inevitably suffer.

49. For example, one of my clients is a youth collective that has a long-term policy goal and a shorter-term summer violence interruption project. My clinic provides strategic, administrative and legal support for the organization's short-term project and collects data and anecdotes that will help the organization advocate for its longer-term goal. This work requires collaboration with various stakeholders in City government and with neighborhood-based organizations—and has required my clinic to develop strong relationships in these disparate spheres. As a result of this investigation, my client faces an untenable decision—to remain with me, the counsel who knows them and their programming inside and out and risk being stigmatized as a result of their association with me or to recruit new *pro bono* counsel and lose the institutional knowledge and relationships that are vital to their operations.

50. On March 27, 2025, the day Congress issued its investigatory letter, I had an amicus brief due in *U.S. v. Illinois*, No. 25-cv-01285, a case in which the United States is seeking a court order to invalidate city, county and state Sanctuary Laws, in which I represent a coalition of organizations that support Sanctuary laws. Due to this inquiry, I had to unexpectedly divert time dedicated for the brief to meetings about the investigation. As a result, I filed the brief much later than was planned and thus compromised my clients' ability to get media attention.

51. The brief we filed requests that, if the Court order oral arguments on the Defendants' Motions to Dismiss, amici be permitted some argument time. However, due to the unjustified scrutiny and reputational harm caused by the Investigation, I no longer believe my clients will be served by having me present oral argument. This will impose a burden on my co-counsel who will have to divert resources from their law practices to prepare for argument.

14

### The Request Harms My Ability to Take on New Clients and
### Vigorously Represent Current Clients

52. Since the Committee's Letter, I currently believe that I am unable to take a new case or new clients due the present focus on me that exposes clients to unwarranted attention.

53. The Committee has hobbled my ability to practice law and provide my clients the best representation possible. I believe I am now under an ethical duty to inform all current clients of the potential risk that because of their connection to me they could be subject to reputational or other harms.

54. I have three potential new cases and litigation projects that my clinic has been investigating for months. Because of the uncertainty regarding how this investigation will affect my Clinic's ability to operate, I will now have to refer these matters to other counsel, thereby depriving myself and my students of opportunities to work on important matters aligned with our Clinic's mission.

### A Substantial Likelihood Exists That I Will Suffer
### Public Exposure, Harassment and Doxxing

55. I fear that Congress' Letter identifying me and vilifying my clients as antisemitic and terrorist supporters will expose me to harassment and doxxing. I fear the loss of my privacy that will result when Northwestern provides the requested information to the Committee.

56. I further fear that I may be the subject of threats to harm me and/or my family. I fear that this public exposure may also impact my ability to obtain new employment were that to become necessary as I will have been marked indelibly as someone who could bring unwanted attention to an educational institution, non-profit or law firm.

57. This fear is, in part, based on the fact that the Committee on Education and Workforce and its Subcommittee on Higher Education and Workforce Development has previously made public confidential information provided by Northwestern University. In 2024, the

Committee issued to Northwestern a request for information related to the Committee's investigation into the 2024 Gaza Solidarity Encampments. In response to this Inquiry, Northwestern and the other Universities involved in this investigation provided the Committee with confidential documents. The Committee disregarded the confidential designations and publicly disclosed documents Northwestern and other universities designated as confidential in the House Committee's Report. *See* 10/31/24 Republican Staff Report at 307-25, "Antisemitism on College Campuses Exposed," Committee on Education and the Workforce, U.S. House of Representatives, available at https://edworkforce.house.gov/news/documentsingle.aspx?DocumentID=412025.

### The Letter Harms My Ability to Associate with Clients of My Choice and Advocate for Views and Causes I Believe In

58. My work at the CJCR Clinic not only provides financial support for my family—it is also an expression of my values and political beliefs. My work is animated by my belief that over-policing and mass imprisonment is an urgent civil rights crisis. I have spent thousands of hours in prisons and jails across the country, witnessing firsthand the brutality, violence and de-humanization endemic to these institutions. Mass imprisonment has adversely affected the lives of my students and clients, but also my loved ones and community members. Similarly, in my work on over-policing, I have witnessed how police violence can devastate families and entire communities. I have contributed to scholarship that describes modern policing in poor, Black and brown communities as system used to instill fear and assert control—rather than support the conditions necessary for healthy, thriving and vibrant neighborhoods.

59. For these reasons, I have devoted my life and career to redressing the harms attendant to mass imprisonment and policing.

16

60. I have also witnessed the promise and possibility for a different approach to public safety. I believe building safe communities requires increased governmental funding for public health, recreational opportunities, housing and other positive, non-punitive, non-carceral investments. I also believe in the power of communities to keep themselves safe using strategies that do not replicate harm and violence. For these reasons, my work also focuses on providing legal support for community-led approaches to creating peaceful neighborhoods like peer-to peer-mediation, violence interruption and positive loitering.

61. My work is done in support of various racial and social justice movements, which are collective efforts to transform society undertaken by those who have traditionally lacked power or access to do so. I believe that transformative change occurs when lawyers work in service of movements and that legal strategies are most effective when they are only one part of a broader strategy for change that centers the leadership of those most directly affected by injustice. As a result of my commitment to movement work, my clinic frequently represents people and organizations involved in direct actions and protests, such as those involved in the North Dakota pipeline protests, protests to end to police violence, anti-war protesters, youth involved in peacekeeping and supporters of Palestinian human rights.

62. I founded the CJCR clinic because I believe that the rule of law in the United States falls far short of its potential to protect and further the common good. I hope that my work will help transform the United Sates legal system so that the vulnerable and despised among us are protected from the whims of the popular and powerful.

63. Finally, as a lawyer it is a deeply ingrained principle in my profession that everyone—even the unpopular—is entitled to a zealous advocate. That is one of the foundations of our adversarial system that stems back to before the founding of our nation. When lawyers agree

to represent a client, they agree to help solve a specific legal problem—not endorse the client's every life decision.

/s/ Sheila A. Bedi

Sheila A. Bedi