# EXHIBIT 9

MAJORITY MEMBERS:

VIRGINIA FOXX, NORTH CAROLINA,
*Chairwoman*

JOE WILSON, SOUTH CAROLINA
GLENN THOMPSON, PENNSYLVANIA
TIM WALBERG, MICHIGAN
GLENN GROTHMAN, WISCONSIN
ELISE M. STEFANIK, NEW YORK
RICK W. ALLEN, GEORGIA
JIM BANKS, INDIANA
JAMES COMER, KENTUCKY
LLOYD SMUCKER, PENNSYLVANIA
BURGESS OWENS, UTAH
BOB GOOD, VIRGINIA
LISA C. MCCLAIN, MICHIGAN
MARY E. MILLER, ILLINOIS
MICHELLE STEEL, CALIFORNIA
RON ESTES, KANSAS
JULIA LETLOW, LOUISIANA
KEVIN KILEY, CALIFORNIA
AARON BEAN, FLORIDA
ERIC BURLISON, MISSOURI
NATHANIEL MORAN, TEXAS
LORI CHAVEZ-DEREMER, OREGON
BRANDON WILLIAMS, NEW YORK
ERIN HOUCHIN, INDIANA
VACANCY



MINORITY MEMBERS:

ROBERT C. "BOBBY" SCOTT, VIRGINIA,
*Ranking Member*

RAÚL M. GRIJALVA, ARIZONA
JOE COURTNEY, CONNECTICUT
GREGORIO KILILI CAMACHO SABLAN,
NORTHERN MARIANA ISLANDS
FREDERICA S. WILSON, FLORIDA
SUZANNE BONAMICI, OREGON
MARK TAKANO, CALIFORNIA
ALMA S. ADAMS, NORTH CAROLINA
MARK DESAULNIER, CALIFORNIA
DONALD NORCROSS, NEW JERSEY
PRAMILA JAYAPAL, WASHINGTON
SUSAN WILD, PENNSYLVANIA
LUCY MCBATH, GEORGIA
JAHANA HAYES, CONNECTICUT
ILHAN OMAR, MINNESOTA
HALEY M. STEVENS, MICHIGAN
TERESA LEGER FERNÁNDEZ,
NEW MEXICO
KATHY E. MANNING, NORTH CAROLINA
FRANK J. MRVAN, INDIANA
JAMAAL BOWMAN, NEW YORK

## COMMITTEE ON
## EDUCATION AND THE WORKFORCE
### U.S. HOUSE OF REPRESENTATIVES
2176 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515-6100

June 7, 2024

Mr. Michael Schill, President                     Mr. Peter J. Barris, Chair, Board of Trustees
Northwestern University                           Northwestern University
633 Clark Street                                  633 Clark Street
Evanston, IL 60208                                Evanston, IL 60208

Dear Mr. Schill and Mr. Barris:

The Committee on Education and the Workforce (the Committee) is continuing to investigate the deficiency of Northwestern University's response to antisemitism on its campus. Unfortunately, rather than being cooperative and transparent, Northwestern has obstructed the Committee's investigation of this matter. Northwestern President Michael Schill impeded the Committee during his May 23, 2024, testimony by the fact that he pointedly refused to answer questions from Committee members, made statements at odds with the public record – including statements that contradicted the text of the Agreement on Deering Meadow (the Agreement) – and demonstrated an overall attitude of contempt for the Committee. President Schill's obstructive conduct comes on top of Northwestern's ongoing failure to comply with the Committee's May 10 document request.

The Committee will not tolerate Northwestern's obstruction of its oversight and is prepared to compel the production of documents and testimony, if necessary. The Committee holds not only President Schill and Board of Trustees Chair Peter Barris responsible for ensuring full compliance with the Committee's requests but also all members of Northwestern's Board of Trustees, in accordance with their fiduciary duties.

Northwestern's capitulation to its antisemitic encampment and its impeding of the Committee's oversight are unbecoming of a leading university. Northwestern's federal funding is predicated on adherence to its legal obligations under Title VI of the Civil Rights Act of 1964 (Title VI). It is inappropriate to expect taxpayers to continue providing federal funding while Northwestern appears to be in violation of its obligations to its Jewish students, faculty, and staff under Title VI and defies the Committee's oversight.

Mr. Michael Schill and Mr. Peter J. Barris
June 7, 2024
Page 2 of 9

**President Schill's Obstructive and Misleading Testimony**

In his May 23 testimony, President Schill repeatedly refused to answer questions voluntarily and made multiple statements that were misleading at best and raised questions about the candor and veracity of his testimony. His conduct obstructed the Committee and its efforts to examine the explosion of antisemitism at Northwestern.

*Refusal to Answer Committee Questions*

On multiple occasions, President Schill inappropriately refused to answer questions by Committee members on a range of issues, including:

- His decision to appoint Jessica Winegar to his President's Advisory Committee on Preventing Antisemitism and Hate, despite her record of defending antisemitism and terrorism, referring to "Zionist media," and leading academic boycott efforts against Israel. Schill stated, "I will not be discussing individual faculty members."[1]

- His decision to appoint the leader of Northwestern's Middle Eastern and North African (MENA) Student Association to his President's Advisory Committee on Preventing Antisemitism and Hate, despite the MENA Student Association having released a statement explicitly supporting the October 7 attack against Israel just days after the attack. Schill stated, "I will not be commenting – certainly not commenting on any student that – in what students say."[2]

- Whether Assistant Professor of Journalism Stephen Thrasher and other Northwestern faculty who scuffled with and obstructed Northwestern University Police Department officers continued to teach students, saying, "I will not comment on individual faculty members."[3] Schill also refused to answer a follow-up question on whether or not the faculty members' conduct was acceptable.[4]

- Schill also refused to explain whether he had the same standards for addressing antisemitic conduct in a manner similar to conduct violations against other minority groups. When asked if he would have handled the encampment with the same strategy and patience "if these were KKK white supremacists…attacking and intimidating black people," responding, "I'm not going to engage in hypotheticals like that."[5]

---

[1] *Calling for Accountability: Stopping Antisemitic College Chaos: Hearing Before the H. Comm. on Educ. & the Workforce*, 118th Cong. (2024) (questioning by Rep. Tim Walberg, Member, H. Comm. on Educ. & the Workforce).
[2] *Id.*
[3] *Calling for Accountability: Stopping Antisemitic College Chaos: Hearing Before the H. Comm. on Educ. & the Workforce*, 118th Cong. (2024) (questioning by Rep. Jim Banks, Member, H. Comm. on Educ. & the Workforce).
[4] *Id.*
[5] *Calling for Accountability: Stopping Antisemitic College Chaos: Hearing Before the H. Comm. on Educ. & the Workforce*, 118th Cong. (2024) (questioning by Rep. Burgess Owens, Member, H. Comm. on Educ. & the Workforce).

Mr. Michael Schill and Mr. Peter J. Barris
June 7, 2024
Page 3 of 9

These questions all concerned President Schill's decision making as Northwestern's chief executive. His defiant refusal to answer them demonstrated flagrant disrespect not only toward the Committee, but also Northwestern's Jewish community. President Schill's refusal to answer questions is particularly striking in light of the fact that on multiple occasions Northwestern's outside counsel asserted Schill's purported willingness to answer questions before the Committee as an ostensible excuse for Northwestern's failure to produce requested documents or make administrators available to answer Committee questions on negotiations with the encampment prior to the hearing.[6]

*Misleading Testimony*

In addition to President Schill's refusal to answer the Committee's questions, he also made multiple statements that were misleading, at best, including some at odds with the text of the written Agreement.

Schill testified, "We did not give in to any of the protestors' demands."[7] This statement is difficult to reconcile with the text of the Agreement, which includes no less than nine specific different commitments made to the protestors who occupied the encampment.[8] It also is at odds with the April 30 statement by Northwestern University Students for Justice in Palestine, which called the agreement a "landmark victory made in our struggle for Palestinian liberation" and "an important step towards our ultimate goal: **divestment from Israel.**"[9]

In response to the hearing, the *Daily Northwestern* reported a student spokesperson for the Northwestern University Divestment Coalition believed that Schill's characterization of the agreement was false. The *Daily Northwestern* wrote:

> In the hearing, Schill emphasized that he gave up very little in negotiations with student protesters, but [the student spokesperson] said [the spokesperson] felt this is also false. The University committed to partial disclosure of its investments and the creation of a MENA space on campus, among other concessions.
>
> Both of those things are tools in the ongoing toolkit of organizers on this campus… that were practically inconceivable six months ago," [the student

---

[6] Letter from outside counsel to Northwestern Univ. to Virginia Foxx, Chairwoman, H. Comm. on Educ. & the Workforce (May 20, 2024) (on file with Comm.); Meeting between Virginia Foxx, Chairwoman, H. Comm. on Educ. & the Workforce, and Michael Schill, President, Northwestern Univ. (May 21, 2024).

[7] *Calling for Accountability: Stopping Antisemitic College Chaos: Hearing Before the H. Comm. on Educ. & the Workforce*, 118th Cong. (2024) (statement of Michael Schill, President, Northwestern Univ.).

[8] Northwestern Univ., Agreement on Deering Meadow (Apr. 29, 2024), https://www.northwestern.edu/leadership-notes/2024/agreement-on-deering-meadow.pdf.

[9] Northwestern SJP (@nu.sjp), INSTAGRAM (Apr. 30, 2024), https://www.instagram.com/p/C6ZsZ5uPuEt/. SJP's post also stated that the Agreement included "contractually committing to disclose both **direct and indirect** investments across **all 100** of their money managers." (Emphasis in original.) This level of detail is not specified in the public Agreement text, raising questions of whether this and other assurances may have been separately provided to encampment leaders.

Mr. Michael Schill and Mr. Peter J. Barris
June 7, 2024
Page 4 of 9

        spokesperson] said. "They have not been on the table for the University to
        consider, except under the duress that the encampment produced.[10]

President Schill also gave evasive and misleading testimony regarding provisions of the
Agreement that commit the University to reserving visiting faculty positions and undergraduate
enrollments for Palestinians in apparent violation of federal antidiscrimination laws, including
Title VI and Title VII of the *Civil Rights Act of 1964*.[11] When questioned about these
commitments, President Schill attempted to evade addressing them directly by characterizing
them as an "existing program" and "not a new program," and claimed it would include Israeli
faculty members, and disputed that Northwestern specifically committed to fundraising to sustain
these set-asides.[12]

In fact, the text of the Agreement explicitly commits to "support visiting Palestinian faculty and
students at risk (funding two visiting faculty per year for two years; and providing full cost of
attendance for five[13] Palestinian undergraduates to attend Northwestern for the duration of their
undergraduate careers)" as well as that the "University commits to fundraise to sustain this
program beyond this current commitment."[14] The Agreement makes clear that these allocations
are being designated for Palestinians and makes no mention of Israel, any other country, or
broader support for the Scholars at Risk Program. Finally, the Agreement indicates that
Northwestern committed to the encampment to reserve these faculty positions and undergraduate
enrollments for Palestinians, even if facilitated through a preexisting Scholars at Risk program.

**Northwestern's Obstruction of the Committee's Document Request**

In addition to President Schill refusing to provide responsive information in much of his hearing
testimony, Northwestern has obstructed the Committee's oversight by failing to comply with its
document requests. On May 10, the Committee sent a document request to President Schill and
Mr. Barris. To assist Northwestern in responding to the Committee's request, Committee staff

---

[10] Samantha Powers & Jacob Wendler, *University President Michael Schill tried to walk a thin line in his remarks before congress. He still faces dissatisfaction from dueling camps.*, THE DAILY NORTHWESTERN (May 24, 2024), https://dailynorthwestern.com/2024/05/24/lateststories/university-president-michael-schill-tried-to-walk-a-thin-line-in-his-remarks-before-congress-he-still-faces-dissatisfaction-from-dueling-camps/.

[11] *See* Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2.

[12] *Calling for Accountability: Stopping Antisemitic College Chaos: Hearing Before the H. Comm. on Educ. & the Workforce*, 118th Cong. (2024) (statement of Michael Schill, President, Northwestern Univ.).

[13] To place Northwestern's commitment to fully fund five Palestinian undergraduates in context, Northwestern's most recently published International Student and & Scholar Statistics from the 2022-2023 academic year show that Northwestern enrolled only one undergraduate from Israel, fewer than five undergraduates each from France, Germany, Ireland, Argentina, and South Africa, and eight undergraduates from Mexico. Northwestern enrolled one undergraduate from the West Bank. *See*: *See*: NORTHWESTERN INT'L STUDENT AND SCHOLAR SERVICES, INTERNATIONAL STUDENT & SCHOLAR STATISTICS 2022-2023 (2023), https://oissportal.northwestern.edu/_customtags/ct_DocumentRetrieve.cfm?token=eyJ0eXAiOiJKV1QiLCJhbGciOiJIUzI1NiJ9.eyJwYXlsb2FkIjp7InRpbWVzdGFtcCI6IjIwMjMtMTEtMDJUMTc6NTk6MDYiLCJIeHBpcmVMaW5rIjpmYWxzZSwiZmlsZUlkIjoxNTgxOTF9fQ.CEbfBS0nMHw_XarhfxHsyT7eDRZPP-QBEOGxLVKzJNA

[14] *Deering Meadow Agreement, supra* note 14.

Mr. Michael Schill and Mr. Peter J. Barris
June 7, 2024
Page 5 of 9

identified items 1(b),[15] 2(a),[16] 2(b),[17] and 3[18] from the letter to be made a priority and produced
by the request's May 17, 2024, deadline. These priority requests focused on key issues of
negotiations with the encampment, data on student and faculty disciplinary cases, and Board of
Trustees records since the formation of the encampment.

Northwestern produced a mere 13 pages of documents responsive to the Committee's priority
requests that were not already public – all of which were formal records of Board of Trustees
meetings that lack substantive details of the Board's discussions.[19] Despite the Committee's
specific request for records such as notes, summaries, and recordings that would offer real
insight into the Board's deliberations, Northwestern failed to produce any such responsive
documents or certify that they do not exist.

While Northwestern's attorneys asserted that "Northwestern provided the Committee hundreds
of pages of documents," this is misleading.[20] Altogether, Northwestern produced only 233 pages
of documents to the Committee. Northwestern's own accounting of these documents
acknowledges that 182 of the 233 pages produced (78%) are not actually responsive to *any* of the
Committee's requests. Of the 233 total pages produced by Northwestern, at least 108 pages
(46%) were already publicly available.[21]

In response to the Committee's request for communications between Northwestern officials and
the encampment, Northwestern not only failed to produce a single page of nonpublic
communications but it also rejected a proposed interim accommodation by the Committee for
relevant Northwestern officials to provide an hour-long briefing in advance of the hearing
regarding the negotiations with the encampment and Northwestern's decision to reach the
Agreement. Instead of sharing the University's communications with the encampment as
requested by the Committee, Northwestern produced 20 pages of public mass communications,
such as campuswide email messages from President Schill concerning the encampment and
Agreement.[22]

In response to the Committee's request for data on student and faculty discipline, Northwestern
failed to provide data requested by the Committee regarding the number of suspensions,

---

[15] "All communications between Northwestern officials and/or their representatives and individuals associated with
the Northwestern Liberated Zone and/or their representatives."
[16] "A list of all student disciplinary/conduct cases relating to alleged antisemitic incidents at Northwestern since
October 7, 2023, showing the date, incident, case status, entity responsible for reviewing the case, status of the
alleged perpetrator (normal status, suspended, expelled, etc.), and case outcome."
[17] "A list of all faculty and staff disciplinary/conduct cases relating to alleged antisemitic incidents at Northwestern
since October 7, 2023, showing the date, incident, case status, entity responsible for reviewing the case, status of the
alleged perpetrator (normal status, suspended, terminated, etc.), and case outcome."
[18] "All Board of Trustees meeting minutes, notes, summaries, and recordings since April 24,
2024, whether formal or informal."
[19] Northwestern produced agendas for a May 13 Board of Trustees Executive Committee Meeting, and a May 16
Student Life and Academic Affairs Committee meeting.
[20] Letter from Debevoise & Plimpton, *supra* note 11.
[21] Letter from outside counsel to Northwestern Univ. to Virginia Foxx, Chairwoman, Comm. on Educ. & the
Workforce (May 17, 2024) (on file with Comm.).
[22] *Id.* .

Mr. Michael Schill and Mr. Peter J. Barris
June 7, 2024
Page 6 of 9

expulsions, and other disciplinary actions in response to antisemitic incidents in advance of the hearing.[23] In the hearing, President Schill acknowledged that the University had failed to impose a single suspension or expulsion for student antisemitic conduct since October 7. Notably, the meeting minutes for a December 8, 2023, full Board meeting reference "a summary of reports and incidents" provided to Trustees in the section relating to the "response to the crisis in the Middle East."[24] This makes clear that data sets held by President Schill in advance of the hearing and presented to Trustees in December were withheld from the Committee in advance of the May 23 hearing.

Northwestern's failure to comply with the Committee's priority requests came after discussions between Committee staff and Northwestern's attorneys, in which Committee staff explained that they understood there were logistical challenges to providing complete responses within the timeframe and were willing to reach a reasonable accommodation, but that it was essential for Northwestern to produce documents and information that provided meaningful insight into the subjects of the priority requests in advance of the hearing. Chairwoman Foxx personally emphasized the importance of this directly to President Schill in a May 21 pre-hearing meeting, but Northwestern failed to act to satisfy the Committee's requests.

Northwestern's record suggests that it does not take complying with the Committee's oversight efforts or upholding its Title VI obligations to protect Jewish students seriously. Both are unacceptable.

Please produce the following items no later than 12:00 PM ET on June 17, 2024:

1. All documents and communications[25] since April 24, 2024, referring and relating to the Northwestern Liberated Zone and/or the Agreement on Deering Meadow, including:

   a. All documents and communications involving the following individuals: Michael Schill, Peter Barris, Virginia Rometty, Deborah L. DeHaas, Timothy P. Sullivan, Kathleen Hagerty, Susan Davis, Julie Allen, Mona Dugo, John Yates, Eliza Larson, Emily Babb, Bruce Lewis, Eric Chin, Latori Bartelle, Steven Thrasher, Jessica Winegar, Nour Kteily, Steven Cahillane, Howard Chrisman, D. Cameron Findlay, Jane Hoffman, Adam Karr, Jennifer Leischner Litowitz, Milton M.

---

[23] After the Committee requested aggregate data on discipline, Northwestern provided some aggregate information on overall case numbers in a May 22 letter from its attorneys, but conspicuously failed to provide any detail on actual disciplinary outcomes as requested. Northwestern informed the Committee that, "Between October 7, 2023 and May 13, 2024, there were 106 cases involving allegations broadly related to antisemitism, anti-Israeli bias, or conduct relating to Israeli-Palestinian conflict (excluding allegations of Islamophobia or anti-Arab sentiment). Of those, more than half—63 cases—were reported in the last month. Of those 106 total cases, 71 cases involved complaints against identified respondents, and of those, 66 cases involved respondents who were affiliated with the University. Of those 66 cases, 23 have resulted in discipline or are in the disciplinary process and an additional 17 cases remain open and may result in disciplinary action after further investigation and assessment. Disciplinary action has not been lifted or downgraded in any of the above-mentioned cases."
[24] Northwestern Univ. Board of Trustees Meeting (Dec. 8, 2023) (on file with Comm.) at 3.

Mr. Michael Schill and Mr. Peter J. Barris
June 7, 2024
Page 7 of 9

       Morris, William A. Osborn, Kimberly Querrey, Patrick G. Ryan, Patrick G. Ryan, Jr., David A. Sachs, Michael S. Shannon, Amanda J. Distel, Luke Figora, Stephanie Graham, David Lively, Gregory Stripp, and/or Nathan J. Taylor;

    b.  All communications between Northwestern officials and/or their representatives and individuals associated with the Northwestern Liberated Zone and/or their representatives;

    c.  All communications between Northwestern officials and Northwestern Hillel; and

    d.  All communications between Northwestern officials and law enforcement organizations, including, but not limited to, the Evanston Police Department, Cook County Sheriff's Office, and Illinois State Police.

2.  All documents and communications referring or relating to alleged antisemitic incidents at Northwestern since October 7, 2023, including:

    a.  A list of all student disciplinary/conduct cases relating to alleged antisemitic incidents at Northwestern since October 7, 2023, showing the date, incident, case status, entity responsible for reviewing the case, status of the alleged perpetrator (normal status, suspended, expelled, etc.), and case outcome;

    b.  A list of all faculty and staff disciplinary/conduct cases relating to alleged antisemitic incidents at Northwestern since October 7, 2023, showing the date, incident, case status, entity responsible for reviewing the case, status of the alleged perpetrator (normal status, suspended, terminated, etc.), and case outcome;

    c.  All documents referring and relating to student disciplinary/conduct cases relating to alleged antisemitic incidents since October 7, 2023, including the complete case files; and

    d.  All documents referring and relating to faculty and staff disciplinary/conduct cases relating to alleged antisemitic incidents since October 7, 2023, including the complete case files.

3.  All Board of Trustees meeting minutes, notes, summaries, and recordings since April 24, 2024, whether formal or informal, including but not limited to those pertaining to:

    a.  The April 30, 2024, Board of Trustees Informational Session;

    b.  The May 13, 2024, Executive Committee meeting;

    c.  The May 16, 2024, Student Life and Academic Affairs Committee meeting;

Mr. Michael Schill and Mr. Peter J. Barris
June 7, 2024
Page 8 of 9

    d.   The May 16, 2024, Alumni Relations and Development Committee meeting;

    e.   The May 17, 2024, Investments Committee meeting; and

    f.   The May 17, 2024, full Board meeting.

4.  All Board of Trustees meeting minutes, notes, summaries, and recordings since October 7, 2023, referring or relating to antisemitism, whether formal or informal, including but not limited to those pertaining to:

    a.   The December 8, 2023, full Board meeting;

    b.   The December 8, 2023, Student Life Committee meeting;

    c.   The January 25, 2024, Executive Committee meeting; and

    d.   The February 29, 2024, Academic Affairs Committee meeting.

5.  All documents referring and relating to the President's Advisory Committee on Preventing Antisemitism and Hate, including:

    a.   All meeting minutes, notes, summaries, and recordings, whether formal or informal; and

    b.   All documents and communications referring or relating to the selection of Committee members.

6.  All documents and communications referring or relating to Northwestern University-Qatar and/or Qatari donations/funding, including:

    a.   Documents sufficient to show the total annual amount of donations/funding Northwestern has received from Qatari sources since 2018;

    b.   All documents and communications since January 1, 2022, referring or relating to Northwestern University's review of its contract with the Qatar Foundation and/or its operations at NU-Q and partnership with Al-Jazeera;

    c.   All MOUs and/or documents governing the relationship between Northwestern/NU-Q and the Government of Qatar, Qatar Foundation, and/or Al-Jazeera;

    d.   All communications between Northwestern officials and the Government of Qatar since January 1, 2022;

Mr. Michael Schill and Mr. Peter J. Barris
June 7, 2024
Page 9 of 9

      e.   All communications between Northwestern officials and the Qatar Foundation since January 1, 2022; and

      f.   All communications between NU-Q officials and Al-Jazeera since January 1, 2022.

Northwestern has failed to voluntarily comply with the Committee's oversight. Most of the above requests were first made on May 10, nearly a month ago. The Committee is now providing Northwestern with an additional week to fulfill them. If these requests are not satisfied by the above deadline, the Committee is prepared to issue a subpoena. The Committee is ready to use the full array of oversight powers available to it to obtain the documents and information it requires and to address continued noncompliance.

Congress' oversight powers are derived from the U.S. Constitution and have been repeatedly affirmed by the United States Supreme Court.[26] Under House Rule X, the Committee has legislative and oversight jurisdiction over "education or labor generally."[27]

Sincerely,

*Virginia Foxx*

Virginia Foxx
Chairwoman
Committee on Education and the Workforce

---

[26] *See generally* U.S. CONST. art. I, § 8, cl. 8; McGrain v. Daugherty, 273 U.S. 135, 174 (1927) (holding that "the power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function"); Eastland v. U.S. Servicemen's Fund, 421 U.S. 491, 504 (1975) (holding that "the power to investigate is inherent in the power to make laws"); Barenblatt v. United States, 360 U.S. 109, 111 (1959) (holding that "the scope of power of inquiry … is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution.").

[27] *Rules of the House of Representatives: One Hundred Eighteenth Congress*, U.S. HOUSE OF REP. 7 (Jan. 10, 2023), https://rules.house.gov/sites/republicans.rules118.house.gov/files/documents/Rules%20and%20Resources/118-House-Rules-Clerk.pdf.